# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

**Robert Updegrove**, and **Loudoun Multi-Images LLC** d/b/a **Bob Updegrove Photography**,

                    Plaintiffs,

   v.

**Mark R. Herring**, in his official capacity as Virginia Attorney General; and **R. Thomas Payne, II**, in his official capacity as Director of the Virginia Division of Human Rights and Fair Housing,

                    Defendants.

Case No. _____

**Verified Complaint**

## Introduction

Plaintiff Robert (Bob) Updegrove is a photographer, living out his passion for creating beautiful works of art by offering customized photography to the public. Bob is also a Christian who has used his photography to promote ideas he believes in. At first, Bob photographed school events and made slide shows while volunteering with a Christian youth ministry. Bob now creates event photography (often for conservative groups) and wedding photography (often for the same kids he photographed back in middle school). Throughout his career, Bob has worked with people from all walks of life and never declined to serve anyone because of who they are. Bob just cannot create certain content for anyone, no matter who they are. But Virginia recently passed a law that forces Bob to do precisely this—threatening to fine Bob into bankruptcy for not creating photography promoting the state's preferred view on marriage.

This law is the Virginia Values Act, which makes it illegal for businesses to discriminate on the basis of sexual orientation. Va. Code § 2.2-3904(B). But Virginia doesn't use this law simply to regulate discriminatory *conduct*. Bob already serves clients in the LGBT community.

Rather, Virginia seeks to regulate Bob's *views*—that marriage should be between a man and a woman—out of existence.

Specifically, Virginia requires Bob to create photography promoting same-sex marriage if he creates photography promoting opposite-sex weddings. The law even makes it illegal for Bob to post a statement on his business website explaining that he can only photograph weddings between a man and a woman or from adopting and distributing an editorial policy explaining his religious beliefs for only creating this wedding content. Va. Code §§ 2.2-3904(B), -3906(A) (forbidding "attempt[s] to refuse" services, "publish[ing] … communication[s]" declining service, and engaging in "pattern and practice" of declining services considered discriminatory).

If Bob does any of this, state officials will deploy investigations, lawsuits, onerous administrative and judicial proceedings, fines of up to $100,000 per violation, plus unlimited damages, attorney-fee awards, and court orders forcing Bob to create photographs against his conscience. Va. Code §§ 2.2-3906, -3907, -3908. Put together, these penalties could eclipse a million dollars and wipe out Bob's livelihood.

So Bob faces a choice no American should: violate the law and risk bankruptcy, compromise his faith, or close up shop. And this was exactly what officials wanted for those with Bob's religious beliefs. Legislators who passed Virginia's law called views like Bob's "bigotry" and acted to expunge them from the public square by threatening "unlimited punitive damages."

But Virginia does not get to decree that citizens can only profess views the state deems politically correct. Virginia cannot force Bob to convey messages against his faith without violating his First Amendment right to free speech and free exercise. These rights ensure each of us can choose what we say and what we celebrate, even when the government disagrees. Bob filed this lawsuit to restore his First Amendment right to do exactly this and to protect the ability

to speak and think freely for everyone—because a government that can censor Bob's view on marriage today can just as easily censor different views tomorrow.

## Jurisdiction and Venue

1.      This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.      This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; and the requested costs and attorney fees under 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occur within the Eastern District of Virginia's Alexandria Division, the effects of the challenged statute are felt in this Division, and Defendants can and do perform official duties in this Division.

## Plaintiffs

5.      Bob is a United States Citizen and resides in Leesburg, Virginia.

6.      Bob is the sole member-owner of Loudoun Multi-Images LLC.

7.      Loudoun Multi-Images LLC (doing business as Bob Updegrove Photography) is a for-profit limited liability company organized under Virginia law.

8.      Bob Updegrove Photography's principal place of business is in Leesburg, Virginia, where Bob operates his business out of his home.

**Defendants**

9.     Virginia Attorney General Mark Herring is the chief executive officer of the Virginia Department of Law, which includes the Division of Human Rights ("Division"). *See*, *e.g.*, Va. Code §§ 2.2-500, -520.

10.     Attorney General Herring administers and enforces Virginia law, works with law enforcement officials, assists with local prosecutions when requested by local Commonwealth attorneys, and defends Virginia's government throughout the state.

*See* https://www.oag.state.va.us/our-office/about-the-office.

11.     10.     The Attorney General has a regional office located in Fairfax, Virginia, which is within the Eastern District of Virginia's Alexandria Division.

*See* https://www.oag.state.va.us/contact-us/contact-info?id=268.

12.     Attorney General Herring oversees the Division, designates the Division Director, and administers and enforces the Virginia Human Rights Act ("Virginia's law" or "the law"), the law challenged in this lawsuit. *See, e.g.*, Va. Code §§ 2.2-500, -520(B), -3906, -3907(A), -3908(C); 1 Va. Admin. Code § 45-20-20 (defining "Director").

13.     Attorney General Herring is named as a defendant in his official capacity.

14.     Director R. Thomas Payne, II is the Division Director and administers and enforces the law. *See, e.g.*, Va. Code §§ 2.2-520(B), -3907(A); 1 Va. Admin. Code §§ 45-20-90, -100, -120.

15.     Director Payne is named as a defendant in his official capacity.

16.     Attorney General Herring and Director Payne have the duty and jurisdiction to administer and enforce Virginia's law throughout the state of Virginia, including Leesburg. Va. Code §§ 2.2-520, -3900; 1 Va. Admin. Code § 45-20-10, -20 (defining "Director").

17.     Attorney General Herring may also file suit under Virginia's law in any "appropriate circuit court" and may intervene in any private lawsuit seeking to enforce the law in any general district or circuit court in Virginia. Va. Code §§ 2.2-3906(A), -3908(A), (C).

**Factual Background**

Bob operates a photography business.

18.     Bob Updegrove Photography is a for-profit photography business that offers and provides photography services to the general public on a commission basis.

19.     Bob is the only employee and sole photographer for Bob Updegrove Photography.

20.     Bob solicits and receives inquiries for his photography from the general public through his business website, referrals from clients, and referrals from his personal and professional network.[1]

21.     Bob offers several kinds of photography services to the public, including services for religious organizations, corporations, non-profits, and other organizational events.

22.     For example, Bob creates event photography for non-profit organizations like the American Foreign Policy Council, Americans for Limited Government, the Young America's Foundation, the Claremont Institute, and the Clare Booth Luce Center for Conservative Women.

23.     At these events, organizations usually invite distinguished speakers to address members and guests of the organization on current political and social issues.

24.     Bob's event photography involves creating photographs of the speakers, capturing candid moments of the guests socializing, and documenting the details of the event like the food, banners, centerpieces, and other decorations.

---

[1] Unless context indicates otherwise, the remainder of the complaint refers to all plaintiffs collectively as "Bob."

25.     Bob offers other event photography for organizations like churches, small businesses, or schools.

26.     Bob also offers engagement and wedding photography.

27.     Bob's wedding photography involves documenting the wedding ceremony's most important moments, including the "first look" (the first time the bride and groom see each other on their wedding day), the bride walking down the aisle, the officiant delivering the homily, the couple exchanging vows, the couple kissing before the attendees, and the officiant announcing the couple as husband and wife.

28.     Bob always captures candid and posed photographs of the bride and groom, the wedding party, the bridal couple's family, and the wedding guests, before, during, and after the ceremony.

29.     Bob also always attends all or most of the wedding reception to photograph the wedding party's entrance, the bouquet toss, the best man's speech, the maid of honor's speech, the couple's first dance, the couple's send-off, and other special moments.

30.     Bob always attends and photographs the entire wedding ceremony and would not provide wedding photography if requested to photograph only a part of the wedding ceremony or everything but the wedding ceremony.

Bob's Christian faith motivates his photography and photography business.

31.     Bob is a Christian.

32.     Bob's faith shapes every aspect of his life, including why and how he operates his business.

33.     Bob believes that God created humans to work and to glorify Him through their vocation.

34.     Bob believes that God gives people certain gifts and passions and commands them to steward these in a way that honors and glorifies Him, including by sharing the Gospel.

6

35.    Bob believes that God equips some people with creative gifts to create aesthetically beautiful art that reflects God's beauty, artistry, and truth.

36.    Bob believes that God has called him to steward his creative talents to honor and glorify God through photography.

37.    Bob believes that God has called him to use his creative talents to promote messages that are at times counter-cultural in order to convey the truth about God and God's design for the creation.

38.    Hence, Bob's mission is to "create unique art, in a photojournalistic fashion, to promote messages consistent with [Bob's] Christian values." *See infra ¶ 151*, Ex. 1.

39.    Photojournalism is a photography style where photographers use candid and genuine photographs to tell a story.

40.    Bob aspires to create art in a photojournalistic style to tell stories about his subjects that communicate the truth about God, God's beauty, the beauty of God's creation, and the good news that God offers to the world.

41.    Bob also believes he must honor God in how he interacts with others, including current and potential clients and people he meets while creating photography.

42.    Bob seeks to fulfill the biblical command to love others by being honest with current and prospective clients and the public and by treating them with love, honesty, fairness, and excellence.

Bob celebrates God's design for marriage through his photography and posting.

43.    Bob believes that God designed marriage as a gift for people of all faiths, races, and backgrounds and that God ordained marriage to be a lifelong union between one man and one

woman that symbolizes and points people to Jesus' sacrificial death and everlasting covenant with His bride, the Church.

44.     Bob desires to only celebrate marriages that are consistent with his beliefs in order to promote God's design for marriage as a beautiful and sacrificial relationship that proclaims the significance of the Gospel to his clients, the wedding audience, and the public.

45.     Bob wishes to do this by providing custom photography for engagement sessions and wedding ceremonies celebrating the union of one man and one woman.

46.     To carry this out, Bob evaluates every wedding photography request he receives to determine whether he can fulfill that request consistent with his artistic judgment and religious beliefs.

47.     When Bob receives a request to create photography, he tries to meet with the prospective client in person so he can get to know them and discuss their needs.

48.     If Bob cannot meet with the prospective client in person, he speaks to them over the phone.

49.     Bob also asks prospective clients to agree in writing or in substance to Bob's terms of service.

50.     The form service agreement states that Bob has "full artistic license" and "retains complete editorial control over all content created and reserves the right to reject any request that conflicts with Bob Updegrove Photography's artistic judgment."

51.     If Bob agrees to fulfill a request, he photographs the engagement or wedding ceremony according to his artistic license.

52.     When Bob photographs an engagement session, he always portrays the couple in positive and romantic ways and he constantly makes artistic and editorial decisions in order to create

aesthetically beautiful photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

53.    For example, Bob sometimes gives the engaged couple suggestions about the location, the time of day, and what clothes to wear.

54.    Bob directs the engaged couple on how to pose, when to hold hands, when to embrace, and when to kiss in order to elicit and then capture a romantic connection.

55.    When Bob photographs a wedding, Bob also always portrays the couple in positive and romantic ways and he constantly makes artistic and editorial decisions to create aesthetically beautiful photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

56.    For example, Bob often advises couples to conduct the "first look" before the ceremony, because Bob believes that doing this makes it is easier to capture the couple's genuine and raw emotions.

57.    Bob strategically times his movement and placement during the ceremony to capture special moments like the couple exchanging vows, the couple kissing, and the officiant announcing the couple as husband and wife. *See supra ¶ 27*.

58.    Bob choreographs and directs the bridal couple, members of the wedding party, and the bride and groom's family on how to pose for choreographed photographs.

59.    Bob uses his technical proficiency and knowledge of cameras to utilize the camera's flash, aperture, shutter speed, and ISO setting to portray his subjects in diverse settings and lighting conditions.

60.    After the wedding or engagement session, Bob edits the photos using his artistic license.

61.     When Bob edits the engagement or wedding photography, he constantly makes artistic and editorial decisions to create aesthetically beautiful photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

62.     Bob first does a "quick edit" where he reviews the photographs and discards those that are blurry, unflattering, or otherwise do not meet his artistic and religious standards.

63.     Bob color corrects, levels, and checks exposure for each photograph.

64.     Bob also tags photographs that capture a variety of scenes from the wedding (or engagement) and that he believes have potential for further editing.

65.     After the quick edit, Bob then edits the photographs he previously tagged to create an "enhanced" collection of photographs.

66.     For example, Bob will adjust the color balance, saturation, and vibrance of a photograph to create a warmer or cooler appearance or a certain type of mood.

67.     Bob will use tools to reduce a photograph's noise so that it has a less granular appearance.

68.     Bob will often create a black and white version of a photograph or impose a vignette to create a more solemn or nostalgic feel.

69.     These are just some of the tools and techniques that Bob uses when he creates the enhanced collection of photographs.

70.     Bob's ultimate goal is to tell a compelling story, using photographs and photographic techniques to celebrate and positively portray the couple, their wedding (or engagement), and God's design for marriage.

71.     After Bob finishes editing, he delivers the photographs to his clients on a thumb drive.

72.     Bob also posts all of the edited photographs on his website on certain pages: the "Sample Galleries" page, the "Portfolio" page, the "Private Galleries" page, and the "Engagement Photos" page.

73.     The Sample Galleries page contains publicly accessible galleries of enhanced wedding photographs.

74.     The Portfolio page contains a collection of publicly accessible photographs from different weddings meant to illustrate Bob's photographic style and approach to photography.

75.     The Private Galleries page contains private galleries of wedding photographs.

76.     The Engagement Photos page contains private galleries of engagement photographs.

77.     For engagement sessions, Bob creates a gallery of all the edited (including enhanced) photographs in the Engagement Photos page.

78.     Galleries on the Engagement Photos page are password protected and accessible to the bridal couple and whoever they give their password to.

79.     For weddings, Bob posts a sample gallery of the enhanced photographs in the Sample Galleries page.

80.     Bob has created sample galleries for every wedding he has photographed since approximately 2009, with the exception of two couples who had privacy concerns.

81.     In the future, Bob will always offer to post and will in fact post some of his enhanced wedding photographs on the Sample Galleries page for every wedding he photographs.

82.     For weddings, Bob also creates a gallery of all the edited wedding photographs in the Private Galleries page.

83.     Galleries on the Private Galleries page are password protected and accessible to the bridal couple and whoever they give their password to.

84.     For weddings, Bob also sometimes posts edited photographs in the Portfolio page to showcase a diverse range of his work to the public and prospective clients.

85.     "Bob Updegrove Photography" is always displayed at the top of each page and every gallery on his website.

86.     For Bob's wedding photography (engagements included), Bob's clients rely on his aesthetic vision and ability to celebrate their engagement and wedding in a meaningful way.

87.     Bob makes most of his editorial decisions without any input from clients.

88.     When clients do offer suggestions, Bob tries to blend his clients' suggestions into his own aesthetic vision so that the final product effectively celebrates the couple's wedding and God's design for marriage.

89.     But usually clients defer to Bob's suggestions and rely heavily on his artistic and editorial judgments.

90.     For all of his engagement and wedding photography, Bob reserves the right to reject any objectionable requests, and retains full editorial control over what to photograph, how to photograph, how to edit the photographs, what to post in the galleries on his website.

91.     Bob does not offer and would not accept any request for wedding or engagement photography that portrayed the couple, their marriage, or their wedding in a negative way.

92.     In all of the ways described above, Bob makes numerous artistic and editorial decisions to positively portray the love, intimacy, and sacrifice of marriage between one man and one woman.

93.     In this way, Bob exercises editorial judgment and control of the engagement or wedding photography to create visual images that tell stories that celebrate the couple and promote God's design for marriage.

94.     Each component of Bob's wedding photography services—his photography and his editing—separately and in combination, is expressive in nature, as it involves images, symbols, or other modes of expression.

95.     Many commissioned photographers post engagement and wedding photographs on their website, blogs, or social media sites to celebrate the couples, to associate their business with their photographs and photographic style, and to allow the couple to associate with their business.

96.     Similar to these other photographers, Bob's website allows him to provide a preview of photographs to his clients; to publicly celebrate each couple; to publicly associate himself with his wedding photography; to promote his business, artistic style, and approach to photography; to allow the couple to identify with Bob Updegrove Photography; and to allow each couple to publicize their engagement and wedding to a greater audience than they otherwise could.

97.     In these ways and more, Bob associates himself with his wedding photography.

98.     Bob's website also allows him to proclaim his religious beliefs about marriage by publicly conveying the beauty and sacrificial nature of marriage between a man and a woman.

Bob cannot create photographs or participate in ceremonies contrary to his religious beliefs.

99.     Not only do Bob's religious and artistic beliefs inspire what he photographs and participates in, these beliefs also dictate what he cannot create, say, or do.

100.    Bob believes that he cannot rejoice in, condone, participate in, celebrate, or promote anything dishonorable to God or contrary to biblical teachings.

101.    Bob therefore does not provide photography that requires him to use his photography skills to celebrate anything dishonorable to God, to celebrate anything contrary to biblical teachings, or to participate in anything contrary to biblical teachings.

102.    So Bob only creates photography, or participates in events and ceremonies, consistent with his editorial, artistic, and religious judgment.

103.    For example, Bob would not provide photography promoting organizations that advocate for socialist policies like the Democratic Socialists of America, because he believes that a free market is the best way to promote freedom.

104.    Bob would not provide photography promoting the restriction of religious expression for organizations like the Freedom From Religion Foundation, or Americans United for the Separation of Church and State because he believes that the freedom of expression and religious liberty are God-given human rights.

105.    Bob would not provide wedding photography that celebrates sacrilegious ideas, such as satanic or voodoo-themed weddings, because Bob believes that all wedding ceremonies are inherently religious events that solemnize and initiate a sacred institution created by God.

106.    Bob would not provide wedding photography that celebrates any marriage not between one man and one woman, such as same-sex, polygamous, or open engagements or marriages, because Bob believes that God created marriage to be an exclusive union between one man and one woman.

107.    Bob cannot create the wedding photography described above because he always creates photography that positively portrays marriage, and creating wedding photography positively portraying same-sex, polygamous, or open-relationship weddings, or weddings with sacrilegious themes, would promote activities contrary to his beliefs, express messages contradicting his beliefs, and express messages contradicting messages that Bob wants to and does promote elsewhere.

108.    Bob also cannot create the wedding photography described above because he always actively participates in the weddings he photographs.

109.    For example, when Bob photographs a wedding, he always attends and photographs the entire ceremony.

110.    When Bob photographs a wedding, he always interacts with the bride and groom, the officiant, the wedding party, the bridal couple's family, and the wedding guests to capture photographs.

111.    When Bob photographs a wedding, he always expresses his approval of the marriage by joyfully interacting and congratulating the bride and groom and the bridal couple's family on the new union and verbally encouraging them to enjoy and celebrate the wedding.

112.    Bob could not effectively provide his wedding services if he did not personally and joyfully interact with the couple, the wedding party, and the wedding guests in these ways.

113.    Bob also believes that every wedding is inherently religious because the wedding solemnizes and initiates a sacred institution (marriage) created by God.

114.    Many of the weddings Bob has photographed have taken place at a church or involved other overtly religious elements like religious music, religious readings, communion, prayer, and a blessing by the pastor.

115.    Every wedding Bob has photographed has included expressive and symbolic elements meant to solemnize the marriage, like a procession, a homily or speech by an officiant, an exchange of vows, and a pronouncement of the couple as husband and wife.

116.    If Bob were compelled to photograph the ceremonies described above, he would feel coerced to remain silent and respectful during the ceremony and to express his approval of the wedding by rejoicing with and congratulating the couple and their family on the new union.

117.    Bob therefore also cannot provide photography services for same-sex, polygamous, or open-marriage engagements or weddings because photographing about these events would force Bob to participate in ceremonies that violate his religious beliefs.

118.    It is standard industry practice for commissioned photographers to decline to create content that violates or compromises their beliefs or editorial discretion in this way.

119.    For these reasons, it is Bob's formal policy, pattern and practice, and standard operating procedure to only offer wedding photography services celebrating weddings between one man and woman and to decline any photography requests celebrating any other weddings—including those for same-sex engagements or weddings—no matter who asks him to do so.

120.    Bob also desires to be transparent about his desire to only photograph weddings between one man and one woman by posting a statement on his website explaining the types of weddings he can and cannot celebrate. *See infra ¶¶ 162–65*; Ex. 2.

121.    Bob also desires to be transparent and honest about his reasons for only celebrating weddings between one man and one woman by adopting an editorial policy that he can hand out to prospective clients or the public upon request. *See infra ¶¶ 150–52*; Ex. 1

122.    Whenever Bob receives a request he cannot fulfill because of a conflict with his beliefs, he tries to refer that request to another photographer who can do so.

123.    Bob's pattern and practice of only offering wedding photography services celebrating weddings between a man and a woman and for declining requests for photography services celebrating same-sex, polygamous, or open-marriage engagements or weddings are never about the person requesting these services.

124.    Instead, Bob's pattern and practice of not offering to photograph these ceremonies is an objection to promoting and participating in a sacred event that violates his religious beliefs.

125.    For example, Bob will create photographs for individuals who identify as LGBT or create event photography for a business owned and operated by LGBT individuals.

126.    Bob will create wedding photographs depicting a wedding between a man and a woman when requested and paid to do so by an LGBT parent of those getting married.

127.    Bob will create wedding photographs for the union of one man and one woman where one or both of the individuals identify as gay, lesbian, or bisexual, so long as the couple intends the marriage to be a lifelong union between one man and one woman.

128.    Research institutes estimate that approximately thirteen percent of adults who identify as LGBT are married to members of the opposite sex. *E.g.*, Jeffrey M. Jones, *In U.S., 10.2% of LGBT Adults Now Married to Same-Sex Spouse*, GALLUP (June 22, 2017), https://news.gallup.com/poll/212702/lgbt-adults-married-sex-spouse.aspx.

129.    Bob will create photographs described above so long as the photographs themselves do not require Bob to participate in a ceremony or express a message that violates his religious beliefs.

130.    On the other hand, because it is Bob's pattern and practice to decline requests to create photographs that violate his religious beliefs, Bob does not accept every request to photograph an engagement or wedding between a heterosexual man and a heterosexual woman. *See supra ¶¶ 105–06*.

131.    For example, Bob would not photograph a stylized wedding shoot for a bridal magazine or other business depicting and promoting a wedding between two men or women, whether those persons identify as LGBT or not.

132.    When evaluating whether any request for photography is consistent with Bob's religious beliefs, Bob considers, and it is his pattern and practice to consider, the message conveyed by the

requested services and whether these services require him to create a message he opposes or participate in a ceremony he objects to, not the identity of who requests these services.

Virginia's law threatens Bob's wedding photography and business.

133.    Bob desires to operate his business consistent with his religious beliefs and to express some of his religiously motivated beliefs.

134.    The Virginia Values Act threatens Bob's ability to do this.

135.    The Virginia Values Act amended the Virginia Human Rights Act, Va. Code § 2.2-3904 *et seq.*, effective July 1, 2020.

136.    Among other things, Virginia's new law prohibits "unlawful discrimination because of" sexual orientation in "places of public accommodation." Va. Code § 2.2-3900(B)(1).

137.    The law defines a "place of public accommodation" as "all places or businesses offering or holding out to the general public goods, services, privileges, [or] advantages ...." Va. Code § 2.2-3904(A).

138.    Bob Updegrove Photography is a for-profit business offering goods, services, privileges, and advantages to the general public through photography.

139.    Bob Updegrove Photography also promotes its goods, services, privileges, and advantages to the general public on its website and through word-of-mouth.

140.    Bob Updegrove Photography is therefore a place of public accommodation under and subject to Virginia's law.

141.    The law prohibits "unlawful discrimination" in public accommodations (§ 2.2-3904(B)) through two clauses: First, an "Accommodations Clause," and second, a "Publication Clause."

142.    The Accommodations Clause (§ 2.2-3904(B)) makes it unlawful "for any person … to refuse, withhold from, or deny any individual, or to attempt to refuse, withhold from, or deny

any individual, directly or indirectly, … or to segregate or discriminate against any [] person in the use [of]" any "advantages, … services, or privileges made available in any place of public accommodation … on the basis of … sexual orientation."

143.    The Accommodations Clause prohibits Bob from:

- asking prospective clients whether they want him to photograph a same-sex wedding;

- exclusively offering wedding photography services that promote and celebrate engagements and weddings between one man and one woman;

- declining requests for wedding photography services that promote and celebrate same-sex engagements and weddings if he offers these services when they promote and celebrate opposite-sex engagements and weddings;

- maintaining a written editorial policy or de facto editorial practice of offering or providing wedding photography services only for engagements and weddings celebrating marriage between one man and one woman;

- maintaining a written editorial policy or unwritten editorial practice of uniformly declining requests to create photography services celebrating same-sex engagements and weddings while accepting requests for photography services celebrating opposite-sex engagements and weddings; and

- providing any unequal treatment when providing wedding photography services celebrating same-sex engagements and weddings compared to requests celebrating opposite-sex engagements and weddings.

144.    As to the last point, the Accommodations Clause also makes it unlawful for Bob to treat wedding-photography requests for same-sex weddings different from wedding-photography requests for opposite-sex weddings—whether by responding to requests to photograph same-sex weddings more slowly or by offering any part of his services for opposite-sex ceremonies but not

same-sex ceremonies, such as posting wedding photographs for opposite-sex weddings on his website but not posting wedding photographs for same-sex weddings.

145.    In short, the Accommodations Clause forces Bob to provide photography services for same-sex engagements or weddings and would require Bob to promote messages that violate his religious beliefs or require him to participate in religious ceremonies that violate his religious beliefs, something he cannot do. *See supra ¶¶ 99–117*.

146.    By forcing Bob to provide these services, the Accommodations Clause:

- undercuts Bob's message (expressed elsewhere in his photographs and website) celebrating marriage between one man and one woman;

- harms Bob's reputation among his past and prospective clients; and

- adversely affects Bob's ability to share biblical truths about marriage with others.

147.    The Publication Clause (§ 2.2-3904(B)) makes it unlawful for any person "to publish, circulate, issue, display, post, or mail, either directly or indirectly, any communication, notice, or advertisement to the effect that any of the accommodations, advantages, … privileges, or services of any such place [of public accommodation] shall be refused, withheld from, or denied to any individual on the basis of … sexual orientation."

148.    The Publication Clause, and the Accommodations Clause's prohibition on "attempt[ing] to refuse, withhold from, or deny" a service on the basis of sexual orientation, prohibit Bob from:

- explaining on his website and directly to prospective clients, his religious beliefs about marriage and what types of wedding photography he provides;

- distributing a written editorial policy offering wedding photography services only for engagements and weddings celebrating marriage between one man and one woman;

- distributing a written editorial policy uniformly declining requests to create photography services celebrating same-sex engagements and weddings while accepting requests for photography services celebrating opposite-sex engagements and weddings.

Virginia's law imposes insurmountable burdens on Bob's wedding photography.

149.    The Accommodations and Publication Clauses impose significant pressures and burdens on Bob and on how he operates Bob Updegrove Photography.

150.    For example, Bob wants to adopt an editorial policy as an addendum to his company's operating agreement that explains his artistic and religious beliefs for choosing to promote certain ideas but not others.

151.    A true and correct copy of the editorial policy Bob desires to adopt is attached to this complaint as Exhibit 1.

152.    Bob wants to adopt this policy to bind his company to only create materials consistent with his beliefs and to distribute to potential clients or the public when they have questions about the types of services his business provides so that he can thoroughly and consistently explain his method for deciding whether or not to provide a service.

153.    But the Accommodations Clause prohibits Bob from adopting Bob Updegrove Photography's desired editorial policy because the policy binds Bob Updegrove Photography to not photograph same-sex weddings, which Virginia equates to refusing, attempting to refuse, segregating, or discriminating against someone according to their sexual orientation.

154.    The Accommodations and Publication Clauses also prohibit Bob from distributing his desired editorial policy because Virginia would consider distributing the policy to be an attempt to refuse or withhold services or publishing, circulating, issuing, or posting a communication indicating that a business would deny services because of a person's sexual orientation.

155.    Because of the Accommodations and Publications Clauses, Bob Updegrove Photography has not and will not formally adopt or distribute the editorial policy (Exhibit 1).

156.    By forbidding Bob from adopting and distributing his desired written editorial policy, the Accommodations Clause undercuts Bob's ability to exercise editorial judgment over his wedding photography and photography business, hinders his ability to bind future owners and employees to promote messages Bob agrees with, hinders his ability to plan his business, and effectively requires Bob to accept projects promoting messages contrary to his beliefs.

157.    By forbidding Bob from adopting and distributing his desired written editorial policy, the Accommodations and Publication Clauses hinder Bob's ability to operate his business as efficiently as possible because Bob will not have a prepared explanation of his religious and artistic beliefs that he can distribute upon request to prospective clients or members of the public.

158.    The Accommodations and Publication Clauses hinder Bob's ability to operate his business as efficiently as possible in other ways as well.

159.    For example, Bob wants to ask prospective clients whether they are seeking photography services celebrating same-sex engagements or weddings so that he can be transparent with them and let them know he does not create these photographs.

160.    But the Accommodations Clause forbids Bob from asking this question and therefore Bob will have to research every wedding photography request he receives to determine if the request seeks services that violate his beliefs.

161.    Doing this research will take time and effort and reduce the amount of time and effort Bob can spend on operating his business.

162.     The Accommodations and Publication Clauses also prohibit Bob from posting on his business website a statement explaining his religious motivations for why he only promotes marriages between one man and one woman.

163.     A true and correct copy of this statement is attached to the complaint as Exhibit 2.

164.     Bob wants to post this statement to briefly explain his services and beliefs to the public and to prospective clients because Bob is religiously motivated to be transparent and honest with clients, potential clients, and the public, *see supra* ¶ 120, and he desires to avoid giving any false impression about the services Bob Updegrove Photography will provide.

165.     Bob also wants to make statements materially similar to Exhibit 2 on his website and directly to prospective clients when called upon to explain his services.

166.     If Bob posted his desired statement (Exhibit 2) or materially similar statements on his website or made materially similar statements directly to prospective clients, he would violate the Accommodations Clause and the Publication Clause.

167.     Because of the Accommodations and Publication Clauses, Bob has not and will not post his desired statement (Exhibit 2) or materially similar statements on his website or make materially similar statements directly to prospective clients.

168.     By preventing Bob from effectively communicating the photography services he can and cannot provide, Bob must spend additional time and effort researching the requests he receives and reduce the amount of time and effort Bob could spend on operating his business.

169.     By preventing Bob from effectively communicating the photography services he can and cannot provide, the Accommodations and Publication Clauses also cause reputational harm by preventing Bob from clearly and honestly communicating his religious and artistic beliefs to prospective clients and the public.

170.    If not for the Accommodations and Publication Clauses, Bob would immediately initiate or restart activities motivated by his religious beliefs.

171.    For example, if not for the Accommodations Clause, Bob would immediately sign and formally adopt his desired editorial policy (Exhibit 1) and pass out that policy upon request.

172.    If not for the Accommodations Clause, Bob would immediately begin asking prospective clients whether they are seeking photography services for a same-sex engagement or wedding.

173.    If not for the Accommodation and Publication Clauses, Bob would immediately post the statement in Exhibit 2 or materially similar statements on his business website and make materially similar statements directly to prospective clients.

174.    Bob is refraining from the activities described above because he faces a credible threat and substantial risk that he will be investigated or prosecuted under Virginia's law for doing these activities.

175.    Bob is also refraining from these activities because he faces a credible threat and substantial risk that he will receive requests to provide photography services for same-sex engagements or weddings, thereby increasing the chances of his being investigated or prosecuted under Virginia's law because Bob will always decline these requests.

176.    For example, four percent of all weddings in Virginia are same-sex weddings. *See* https://www.nbc12.com/2019/09/27/marriages-virginia-have-been-same-sex-unions/.

177.    And between 2015 and 2018, almost 9,000 same-sex couples have gotten married in Virginia. *See*

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/Marriage%20Data%202015.pdf;

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/Marriage%20Data%202016.pdf;

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/2017_by_issuance_and_same_sex.pdf;
and

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/2018_by_issuance_and_same_sex.pdf.

Virginia's law uses aggressive enforcement mechanisms and devastating penalties.

178.   Virginia's law allows Attorney General Herring and Director Payne to enforce the law

against Bob in numerous ways.

179.   For example, Virginia's law allows the Attorney General to file a civil action in the

appropriate circuit court if he "has reasonable cause to believe that any person or group of

persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights

granted" by Virginia's law. Va. Code § 2.2-3906(A).

180.   The Attorney General considers a public accommodation's policy and practice of

offering expressive services (like photography) celebrating opposite-sex weddings but not same-

sex weddings or declining these services for same-sex weddings while offering them for

opposite-sex weddings to be "a pattern or practice of resistance to the full enjoyment of"

Virginia's law.

181.   In fact, the Attorney General has taken the formal position that public accommodations

discriminate on the basis of sexual orientation if they (A) have a policy and practice of offering

expressive services celebrating opposite-sex weddings but not same-sex weddings; (B) have a

policy and practice of or actually decline to provide expressive services celebrating same-sex

weddings while offering them for opposite-sex weddings; or (C) publish communications with

the effect of declining expressive services celebrating same-sex weddings but not opposite-sex

weddings. *See* Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd.*

*v. Colo. Civil Rights Comm'n* at 29–37, 138 S. Ct. 1719 (No. 16-111), 2017 WL 5127307 (joined

by Attorney General Herring); Br. for Mass. et al. as Amici Curiae in Support of Defs.,
*Telescope Media Grp. v. Lindsey* at 25–28, 936 F.3d 740 (No. 17-3352), 2018 WL 1414316,
at *14 (same); Br. for Mass. et al. as Amici Curiae in Support of Defs. at 13–14, 26–27, *303
Creative LLC v. Elenis* (10th Cir. 2020) No. 19-1413 (Apr. 29, 2020) (same).

182.    After another wedding photographer recently challenged Virginia's law, Attorney
General Herring confirmed that he would enforce the law against artists who cannot in good
conscience photograph same-sex weddings, stating: "Attorney General Herring believes that
every Virginian has the right to be safe and free from discrimination no matter what they look
like, where they come from, or who they love," and "LGBT Virginians are finally protected from
housing and employment discrimination under Virginia law and Attorney General Herring looks
forward to defending the Virginia Values Act in court against these attacks." Katherine Hafner,
*Norfolk wedding photographer sues Virginia, says new law forces him to promote LGBT
couples*, The Virginian-Pilot (July 1, 2020),

https://www.pilotonline.com/government/virginia/vp-nw-wedding-photographer-lawsuit-
20200701-kobahftzy5bcnlvrypsoxfbafa-story.html.

183.    Virginia's law also empowers the Attorney General to file a civil action in the appropriate
circuit court if he "has reasonable cause to believe … that any person or group of persons has
been denied any of the rights granted by this chapter and such denial raises an issue of general
public importance." Va. Code § 2.2-3906(A).

184.    The Attorney General considers it an issue of general public importance if a public
accommodation offers expressive services (like photography) celebrating opposite-sex weddings
but not same-sex weddings or if a public accommodation declines to provide expressive services
celebrating same-sex weddings while offering these services for opposite-sex weddings or if a

public accommodation publishes communications with the effect of denying these services celebrating same-weddings but not opposite-sex weddings.

185.    In fact, the Attorney General has publicly stated this official position elsewhere. Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (No. 16-111), 2017 WL 5127307, at *18–23 (joined by Attorney General Herring); Br. for Mass. et al. as Amici Curiae in Support of Defs., *Telescope Media Grp. v. Lindsey*, 936 F.3d 740 (No. 17-3352), 2018 WL 1414316, at *16–20 (same); Br. for Mass. et al. as Amici Curiae in Support of Defs. at 16–22, *303 Creative LLC v. Elenis*, No. 19-1413 (Apr. 29, 2020).

186.    If Bob publishes his belief statement (Exhibit 2) on his business website, or passes out his editorial policy (Exhibit 1) to prospective clients, he faces a substantial risk that the Attorney General (or someone else) would learn about this statement and seek to enforce the Act against him.

187.    The Virginia legislature appropriated additional funds to the Attorney General for fiscal year 2020–2021 and 2021–2022 so that additional attorneys "be directed to the Division of Human Rights for enforcement related to" Virginia's law. HB 30, Item # 61, 2020 Reg. Sess. (Va. 2020), https://budget.lis.virginia.gov/get/amendmentpdf/4100/.

188.    In addition, Virginia's law empowers any "person claiming to be aggrieved by an unlawful discriminatory practice" or the Attorney General or Director on behalf of such person to file a complaint with the Division. Va. Code § 2.2-3907(A).

189.    The Division may also "[i]nquire into incidents that may constitute unlawful acts of discrimination" and "[s]eek through appropriate enforcement authorities, prevention of or relief from an alleged unlawful discriminatory practice." Va. Code § 2.2-520(B)(3)-(4).

190.     After receiving a complaint, the Division must serve the complaint on the person alleged to have engaged in an unlawful discriminatory practice (the "Respondent"). Va. Code § 2.2-3907(B); 1 Va. Admin. Code 45-20-20 (defining "Respondent").

191.     Also, after receiving a complaint, the Division must conduct an investigation "to determine whether there is reasonable cause to believe the alleged discrimination occurred." Va. Code § 2.2-3907(D).

192.     During this investigation, the Director has authority to request position statements and additional information from the Respondent, and the Attorney General can compel production of that information. Va. Code § 2.2-521; 1 Va. Admin. Code 45-20-80(A)-(B).

193.     The Director may also hold fact-finding hearings and formal hearings with the complaining party and the Respondent. *See* Va. Code §§ 2.2-520(B)(1), -4020(C)-(D); 1 Va. Admin. Code 45-20-80(C).

194.     Among other things, these hearings require the Respondent's or its counsel's attendance, allow an administrative officer to take evidence, and authorize this officer to make a written determination of whether unlawful discrimination has occurred. *See* Va. Code §§ 2.2-520(B)(1) (authorizing the Division to "hold hearings pursuant to the Virginia Administrative Process Act § 2.2-4000 *et seq*.)"), -4019(A), -4020(C)-(D).

195.     The Division may also use other means during its investigation. 1 Va. Admin. Code 45-20-80(D).

196.     The investigatory process imposes a significant burden on Bob in that the Division is required to investigate every complaint "sufficient to determine whether there is reasonable cause to believe the alleged discrimination occurred." Va. Code § 2.2-3907(D).

197.    This investigation occurs in an adversarial process where the Division investigates the Respondent on the complaining party's behalf.

198.    The Division can also compel Respondent to respond to the complaint and supply additional information and participate in informal and formal hearings during its investigation.

199.    The Division's investigation may last up to six months. Va. Code § 2.2-3907(H).

200.    Once the Division completes its investigation, it issues a reasonable-cause report. Va. Code § 2.2-3907(D).

201.    If the Division concludes there is reasonable cause to believe the Respondent committed the alleged unlawful discriminatory practice, the Division "shall immediately endeavor to eliminate any alleged unlawful discriminatory practice by informal methods such as conference, conciliation, and persuasion." Va. Code § 2.2-3907(F).

202.    Because of the severely intrusive nature of the Division's investigative and administrative process, the fear of going through this process has forced Bob to refrain from adopting and distributing Bob Updegrove Photography's editorial policy (Exhibit 1) for fear of attracting a complaint to the Division.

203.    Likewise, the fear of going through this process has caused Bob to refrain from posting his desired statement (Exhibit 2) or materially similar statements on his website or directly to prospective clients. *See supra ¶¶ 162–67*.

204.    If the Division cannot settle the complaint or determines that settlement "is unworkable and should be bypassed," the Division closes the case and gives notice to the complaining party of his or her right to file a civil action. Va. Code § 2.2-3907(F).

205.    At any time after issuing a right-to-sue notice, the Division or the complaining party may petition a court to enjoin the Respondent from doing anything "that would render ineffectual an order that a court may enter with respect to the complainant." Va. Code § 2.2-3907(G).

206.    Once a complaining party receives a right-to-sue notice, he or she may file suit in a general district or circuit court with jurisdiction over the Respondent. Va. Code § 2.2-3908(A).

207.    If a court determines that a public accommodation has violated Virginia's law by committing unlawful discrimination, that court has substantial remedial powers.

208.    In civil actions filed by the Attorney General, the court may find unlawful discrimination and then award remedies including:

- "preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation … as is necessary to assure the full enjoyment of the rights granted by this chapter,"

- a civil penalty "not exceeding $50,000 for a first violation" and "not exceeding $100,000 for any subsequent violation,"

- "compensatory damages and punitive damages," and

- "reasonable attorney fees and costs." Va. Code § 2.2-3906(B)(1)–(3), -3906(C).

209.    Any "aggrieved person" may intervene in an action filed by the Attorney General. Va. Code § 2.2-3906(D).

210.    If an aggrieved party intervenes and the court finds unlawful discrimination has occurred, the court may award the aggrieved person the remedies described above in addition to remedies awarded to the Attorney General. *See also* Va. Code §§ 2.2-3906(D), -3908(B).

211.    In civil actions filed by an aggrieved person who obtains a right-to-sue notice, the court may find unlawful discrimination and then award remedies to the aggrieved person including:

- "any permanent or temporary injunction, temporary restraining order, or other order, including an order enjoining the defendant from engaging in such practice,"

- "compensatory and punitive damages," and

- "reasonable attorney fees and costs." Va. Code § 2.2-3908(B).

212.    The Attorney General may also intervene in a civil action filed by an aggrieved person if the case is of "general public importance." Va. Code § 2.2-3908(C).

213.    If the Attorney General intervenes in such an action and the court finds that unlawful discrimination has occurred, the court may award the Attorney General the remedies described above in addition to the remedies awarded to the aggrieved person. *See also* Va. Code § 2.2-3908(B)–(C).

214.    The Virginia legislature designed the punitive damages to be especially severe.

215.    For example, Delegate Marcus Simon (D-53) made the following comment during a House General Laws Committee meeting:

> I've actually looked at the [uncapped punitive damages in Virginia's law] language … and I think it's actually doing exactly what we intended for it to do. If you don't want to be subject to unlimited punitive damages, don't discriminate on the basis of sexual orientation ….
>
> I mean, this wasn't meant to be a non-punitive bill. We created a private right of action for a reason. And so I think the bill accomplishes exactly what it's intended to do in the form that it's intended to do it.

*Hearing on SB 868 before the Comm. on Gen. Laws*, H.D. 2020, Reg. Sess. (Feb. 13, 2020), available at: https://virginiageneralassembly.gov/house/chamber/chamberstream.php.

216.    As Delegate Simon indicated, the Act is intended to force Bob and people with beliefs like him to choose between either being punished for his religious convictions and risking bankruptcy or abandoning their business altogether.

Virginia's law only bans views the government disfavors.

217.    The Attorney General interprets Virginia's law to allow some public accommodations to decline to create custom expressive work that is contrary to their creator's artistic or editorial judgment, while requiring other public accommodations to create custom expressive work that is contrary to their creator's artistic or editorial judgment.

218.    For example, according to the Attorney General, public accommodation laws (like Virginia's law) gives a cakeshop the discretion to decline requests for custom cakes with "offensive messages about LGBTQ people" based on the cakeshop's non-religious objections, even though a cakeshop cannot decline requests for custom wedding cakes celebrating a same-sex marriage based on the cakeshop's religious objections. Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n* at 27–28, 138 S. Ct. 1719 (No. 16-111), 2017 WL 5127307 (joined by Attorney General Herring).

219.    This distinction treats religious objections to creating expressive works worse than non-religious objections to creating expressive works.

220.    As applied to Bob, Virginia's law prohibits him from promoting and celebrating his religious views about marriage by providing wedding photography services exclusively for engagements and weddings celebrating one man and one woman, but this law allows other wedding photographers to promote and celebrate their views supporting same-sex marriage.

221.    This distinction in treatment is based on the particular view that a photographer holds about marriage and the content that photographer expresses, both through the photographer's services and on the photographer's website.

222.    Many photographers in Virginia offer to photograph opposite-sex and same-sex engagements and weddings.

223.    For example, Wedding Wire is an online service that allows individuals to search for wedding vendors (including wedding photographers), and it lists over 800 wedding photographers in Virginia: https://www.weddingwire.com/c/va-virginia/wedding-photographers/10-sca.html.

224.    The Wedding Wire's Terms of Use prohibits its vendors—including wedding photographers—from "refusing to provide or accept services" based on sexual orientation. https://www.weddingwire.com/corp/legal/terms-of-use.

225.    Upon information and belief, there are at least 800 photographers in Virginia who will photograph same-sex and opposite-sex weddings.

226.    Many Virginia-based photographers also promote and celebrate same-sex marriage on their social media sites, blogs, and websites.

227.    For example, many Virginia-based photographers write statements on their websites or social media sites expressing their support for same-sex marriage, their willingness to photograph same-sex weddings, and their celebration of same-sex marriage, and they display photographs of same-sex weddings on their websites, blogs, and social media sites that positively depict and celebrate same-sex weddings. *See*, *e.g.*, *Matt & Greg's Fall Jewish Wedding | King Family Vineyards*, AARON WATSON PHOTOGRAPHY, https://www.aaronwatsonphoto.com/charlottesville-same-sex-wedding-photographers/.

228.    Bob is in direct competition with the photographers identified above in terms of competing for clients seeking a photographer for opposite-sex engagement sessions or weddings.

229.    But Virginia's law imposes increased regulatory burdens on Bob that it does not impose on these other Virginia businesses.

230.     For example, to avoid being harmed by Virginia's law, Bob must refrain from publishing his desired statement, adopting and distributing certain editorial policies, and tailoring his services and operating his business in certain ways, while these other Virginia businesses do not face these burdens because they willingly promote opposite-sex and same-sex weddings.

231.     These differences make it harder for Bob to compete and intensify the competition in the wedding photography market, make it easier for his competition to compete against him, lower the costs and effort other businesses exert when offering wedding photography, illegally structure a competitive environment, make it harder for Bob to promote his business in comparison to these other businesses, and impose a reputational harm on his business that these other businesses do not suffer.

232.     Additionally, although Virginia's law restricts Bob's desired activities, it makes several exemptions from its discrimination provisions for public accommodations, employers, and landlords. *See, e.g.*, Va. Code §§ 2.2-3904(D)(i) (exempting public accommodations from serving individuals under eighteen for any reason), -3905(A)-(B)(1)(a)-(b) (exempting employers with less than fifteen employees from antidiscrimination provisions for some employment decisions), -3905(B)(8) (allowing employers to state preferences in postings for bona fide occupational qualifications); § 36-96.2 (exempting landlords who own less than three single-family houses from certain discrimination provisions).

233.     These exemptions undermine any basis for compelling Bob to create wedding photography celebrating same-sex weddings.

234.     Bob supports the rights of other photographers to communicate their beliefs, to conduct their business in a way that promotes their beliefs, and to decline requests for expressive work that is inconsistent with the owners' beliefs.

235.    Bob simply wants to enjoy this same freedom.

Virginia passed its law to target and punish those with Bob's religious beliefs.

236.    Many Virginia legislators have explicitly stated their hostility towards religious beliefs

defining marriage as between one man and one woman.

237.    This animosity was evident before Virginia's law passed.

238.    For example, SB 41 2016 was a bill that would have allowed religious persons to object

to solemnizing a marriage "in accordance with a sincerely held religious belief … that marriage

is or should be recognized as the union of one man and one woman." SB 41, 2016, Reg. Sess.

(Va. 2020) https://lis.virginia.gov/cgi-bin/legp604.exe?161+ful+SB41ER+pdf.

239.    Senator Adam Ebbin (D-30) opposed this bill stating, "[T]his bill carves out a space for

bigotry cloaked under the guise of religious freedom." *Debate on SB 41*, S. 2016, Reg. Sess. (Va.

Feb. 12, 2016), available at:

https://www.youtube.com/watch?time_continue=17&v=cBHftN0pEVA&feature=emb_logo.

240.    Senator Ebbin was the chief patron of Virginia's law.

241.    Likewise, HB 773, 2016 was a bill that would have prohibited a government entity from

making adverse tax, contracting, licensing, entitlement, and certain other decisions "against a

person … on the basis that such person believes, speaks, or acts in accordance with a sincerely

held religious belief or moral conviction that (i) marriage is or should be recognized as the union

of one man and one woman." HB 773, 2016, Reg. Sess. (Va. 2016), https://leg1.state.va.us/cgi-

bin/legp504.exe?161+ful+HB773H1+pdf.

242.    Delegate Mark Sickles (D-43) called the bill "a discrimination bill" and explained the bill

"authorizes blatant discrimination." *Debate on HB 773*, H.D. 2016, Reg. Sess. (Va. Feb. 16,

2016), available at: https://www.youtube.com/watch?v=zFPSrUvs1Q8&feature=youtu.be;

*Delegate Mark Sickles' Statement on Passage of HB 773 – "Government Nondiscrimination Act,"* (Feb. 16, 2016), http://www.marksickles.com/press-releases/delegate-mark-sickles-statement-passage-hb-773-government-nondiscrimination-act.

243.    Delegate Simon said the bill was "a license to discriminate." *Debate on HB 773*, H.D. 2016, Reg. Sess. (Va. Feb. 16, 2016), available at: https://www.youtube.com/watch?v=Q-0iBqkBWO0

244.    Delegate Charniele Herring (D-46) said the bill gave "a free pass to discriminate." Michael K. Lavers, *Va. House approves 'Kim Davis' religious freedom bill*, Washington Blade (Feb. 16, 2016), https://www.washingtonblade.com/2016/02/16/va-house-approves-kim-davis-religious-freedom-bill/.

245.    Delegate Sam Rasoul (D-11) said the bill "gives state approval to discriminate against others," "sends a terrible message," and "sets an unwelcoming and hostile tone to people." *House passes bill giving businesses license to discriminate against LGBTs*, Augusta Free Press (Feb. 16, 2016), https://augustafreepress.com/house-passes-bill-giving-businesses-license-to-discriminate-against-lgbts/.

246.    The animosity surfaced during debates on Virginia's law.

247.    For example, during a debate in the Virginia House of Delegates over an amendment to Virginia's law which would have excluded "a religious corporation, association, society, or unincorporated house of worship" from the definition of public accommodations, *see* HB 1663, 2020, Reg. Sess. (Va. 2020), https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+HB1663ASE, Delegate Joshua Cole (D-28) said:

> I understand we have theological disagreements and we have theological beliefs of what we're supposed to carry out, but if you are a public organization, your doors are supposed to be open to everyone in the public. Now I don't know what type of Christianity you

come from, but the type of Christianity I come from, the Apostle Paul said "Try with everything within you to live peaceably with all men."

…

The Bible also says "And they shall know us by our love." What are we doing with our witness when we allow organizations to say just because we have St. Peter's behind it, or Christian behind it, … that we don't like you so don't come over here…. Madame Speaker as an ending thought, I will let you know that in Jesus' day the sinner was not his enemy. It was the church.

*Debate on HB 1663*, H.D. 2020, Reg. Sess. (Va. March 6, 2020), available at:

https://virginiageneralassembly.gov/house/chamber/chamberstream.php.

248.    During that same debate, Delegate Mark Levine (D-45) stated that "religious bigotry is bad," which in context implied that religious organizations were bigoted if they objected to hiring someone who violated the organization's views on sexual ethics and sexual orientation.

*Debate on HB 1663*, H.D. 2020, Reg. Sess. (Va. March 6, 2020), available at:

https://virginiageneralassembly.gov/house/chamber/chamberstream.php

249.    Upon information and belief, many legislators applauded after both of these statements.

250.    Likewise, the Virginia legislature rejected amendments to SB 868 2020 which would have (1) allowed "a religious organization" to "require that all employees or applicants for employment conform to the religious tenets of such organization"; (2) exempted "a religious corporation, association, educational or charitable institution, or society from taking such action as it deems necessary to promote the religious principles by which it is established or maintained"; and (3) allowed "a religious organization, association, or society, or any nonprofit institution or organization operated, supervised, or controlled by or in conjunction with a religious organization, association, or society, from taking such action as it deems necessary to promote the religious principles by which it is established or maintained." SB 868, 2020, Reg.

Sess. (Va. 2020), https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+SB868AHR and

https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+SB868ASR.

251.    The Virginia legislature also failed to enact HB 1663 2020 due to a Senate amendment

which would have exempted (1) religious organizations from "provid[ing] employment that

would be inconsistent with its deeply held religious beliefs regarding sexual orientation" and (2)

"a religious corporation, association, society or unincorporated house of worship" from the

definition of a public accommodation. HB 1663, 2020, Reg. Sess. (Va. 2020),

https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+HB1663ASR.

252.    The animosity also manifested during debates on HB 1049, a bill that incorporated sexual

orientation and gender identity language into several Virginia statutes on discrimination.

253.    For example, after Delegate David LaRock warned that the bill could be "weaponized"

against Christians and other religious persons with sincerely held religious beliefs, Delegate

Danica Roem called legislatures who opposed HB 1049 for these reasons, "discriminatory

politicians." *Debate on HB 1049*, H.D. 2020, Reg. Sess. (Va. February 5, 2020), available at:

https://virginiageneralassembly.gov/house/chamber/chamberstream.php

254.    Upon information and belief, many legislators applauded after Delegate Roem's

statements.

255.    And in a Senate committee hearing on HB 1049, Jeffrey Caruso of the Virginia Catholic

Conference proposed an amendment to the bill because the "religious tenets of our organization

would be that, that marriage is the union of a man and a woman and we would expect that

employees of our organization would adhere to that standard of conduct." *Hearing on HB 1049*

*before the Comm. on Gen. Laws and Tech.*, S. 2020, Reg. Sess. (Va. Feb. 19, 2020), available at:

http://virginia-

senate.granicus.com/MediaPlayer.php?view_id=3&clip_id=3113&eType=EmailBlastContent&eId=a892ddee-6f76-4e77-b55f-cf72688553c6.

256.    Senator Ghazala Hashmi (D-10) responded, "I just have a real problem with that line of argument. As a Commonwealth, we are committed to nondiscrimination…. And so I have an issue with that argument." *Hearing on HB 1049 before the Comm. on Gen. Laws and Tech.*, S. 2020, Reg. Sess. (Va. Feb. 19, 2020), available at: http://virginia-senate.granicus.com/MediaPlayer.php?view_id=3&clip_id=3113&eType=EmailBlastContent&eId=a892ddee-6f76-4e77-b55f-cf72688553c6.

257.    All of the state representatives listed above voted in favor of passing Virginia's law. SB 868, 2020, Reg. Sess. (Va. 2020), https://lis.virginia.gov/cgi-bin/legp604.exe?201+mbr+SB868 (listing patrons), and https://lis.virginia.gov/cgi-bin/legp604.exe?201+vot+HV1245+SB0868 (house vote).

## Legal Allegations

258.    Plaintiffs are subject to and must comply with Virginia's Accommodations and Publication Clauses.

259.    These clauses violate Plaintiffs' constitutional rights, and chill and deter Plaintiffs from exercising their constitutional rights.

260.    As a direct and proximate result of the Defendants' violation of the Plaintiffs' constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm and economic injury (including lost business), entitling Plaintiffs to declaratory and injunctive relief.

261.    Plaintiffs do not have an adequate monetary or legal remedy for the loss of their constitutional rights.

262.     Unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm and economic injury.

First Cause of Action
First Amendment: Freedom of Speech, Association, and Press

263.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1–262 of this complaint.

264.     The First Amendment's Free Speech and Press Clauses protects Plaintiffs' ability to speak; to create, publish, sell, and distribute speech; to associate with others for expressive purposes; and to associate with messages of Plaintiffs' choosing.

265.     The First Amendment also protects Plaintiffs' ability not to speak; to exercise editorial control over their speech; to decline to create, publish, sell, or distribute speech; and to decline to associate with others and with other messages for expressive purposes.

266.     The First Amendment also protects Plaintiffs' right to be free from content, viewpoint, and speaker-based discrimination.

267.     The First Amendment also prohibits the government from conditioning a benefit on the relinquishment of any First Amendment right.

268.     Plaintiffs' wedding photography, and all activities associated with this service, are forms of protected speech and expressive association, and Plaintiffs publish their speech to the public.

269.     As applied to Plaintiffs, the Accommodations Clause compels speech Plaintiffs object to, interferes with their editorial judgment, compels them to sell, publish, and disseminate speech they object to, compels them to engage in expressive associations they deem objectionable, forbids them from tailoring their business and from adopting certain policies, and regulates speech, association, and publication based on content, viewpoint, and speaker identity.

270.    As applied to Plaintiffs, the Accommodations Clause conditions their ability to participate in the wedding industry and to create wedding photography promoting marriage between one man and one woman on the requirement that Plaintiffs also create wedding photography promoting marriages other than those between one man and one woman.

271.    As applied to Plaintiffs, the Accommodations and Publication Clauses are a content, viewpoint, and speaker-based regulation that bans, chills, and burdens Plaintiffs' desired speech (and publication of that speech) on Bob Updegrove Photography's website and directly to prospective clients, and that inhibits Plaintiffs from forming expressive associations they desire to form and from avoiding expressive associations they want to avoid.

272.    Plaintiffs have not and will not engage in certain protected speech because of the Accommodations and Publication Clauses.

273.    If not for the Accommodations and Publication Clauses, Plaintiffs would immediately begin to engage in this protected speech again.

274.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' free speech, free association, and free press rights.

275.    Accordingly, as applied to Plaintiffs, the Accommodations Clause and Publication Clause violate the First Amendment's protections for free speech, free association, and free press.

Second Cause of Action
First Amendment: Free Exercise of Religion

276.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1–262 of this complaint.

277.    The First Amendment's Free Exercise Clause protects Plaintiffs' right to operate their business, to create expression, to not create expression, to participate in religious exercises, to

not participate in religious exercises, to speak, to not speak, to associate, and to not associate in accordance with their religious beliefs.

278.    The First Amendment also protects Plaintiffs from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to laws that lack neutrality and general application, being targeted for their religious beliefs, and being punished for exercising their religious beliefs.

279.    Plaintiffs exercise their religion under the First Amendment when they operate their business, adopt patterns and practices consistent with their religious beliefs, exercise their editorial judgment consistent with their religious beliefs, honestly communicate with clients and prospective clients about the photography they can and cannot create, participate in wedding ceremonies, and celebrate marriages between one man and one woman.

280.    As applied to Plaintiffs, the Accommodations and Publication Clauses substantially burden Plaintiffs' sincerely held religious beliefs by requiring them either to operate their expressive business in ways that violate their religious beliefs or to close their business, by preventing them from maintaining patterns and practices consistent with their religious views on marriage, by stopping them from being honest with prospective clients by barring them from stating what messages they will not express due to their religious beliefs, by preventing their religiously motivated speech, by compelling speech that they are religiously obligated to avoid, and by forcing their participation in activities prohibited by their religious beliefs.

281.    The Accommodations and Publication Clauses do not force nonreligious persons and businesses, or persons and business with favored religious views, to choose between these same options when faced with requests to promote messages they disagree with or when they must decide how to explain why they decline to promote certain messages.

282.     The Accommodations and Publication Clauses impermissibly prefer secular views over religious views, and certain religious views over others, by allowing those who own and operate public accommodations to express beliefs (religious or otherwise) in favor of same-sex marriage but not allowing them to express religious beliefs against same-sex marriage.

283.     The Accommodations and Publication Clauses are not facially or operationally neutral or generally applicable, are hostile towards religion, target and show favoritism towards certain religious beliefs, and impose special disabilities on Plaintiffs due to their religious beliefs.

284.     The Accommodations and Publication Clauses are not neutral or generally applicable because they contain several categorical exemptions, yet Defendants refuse to grant a religious exemption to Plaintiffs.

285.     The Accommodations and Publication Clauses also violate Plaintiffs' free-exercise rights under the hybrid rights doctrine because they implicate free exercise rights in conjunction with other constitutional protections, like the rights to free speech, association, and press.

286.     The Accommodations and Publication Clauses impose severe coercive pressure on Plaintiffs to change or violate their religious beliefs and to stop operating their business according to their religious beliefs.

287.     Plaintiffs have not and will not engage in certain religiously motivated conduct because of the Accommodations and Publication Clauses.

288.     If not for the Accommodations and Publication Clauses, Plaintiffs would immediately begin to act in ways motivated by their religious beliefs.

289.     The Accommodations and Publication Clauses are also facially unconstitutional because they regulate and prohibit certain activities because they are undertaken for religious reasons, ban activities only because of the religious beliefs those activities display, disfavor a particular

religion, target a specific religious belief for punishment, have the object of singling out a disfavored religious belief for punishment, were promulgated to achieve these goals, and were promulgated based on hostility toward particular religious views.

290.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing the rights to freely exercise their religion.

291.    Accordingly, both facially and as applied to Plaintiffs, the Accommodations Clause and Publication Clause violate the First Amendment's protections to freely exercise religion.

Third Cause of Action<br>First Amendment: Establishment Clause

292.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1–262 of this complaint.

293.    The First Amendment's Establishment Clause protects Plaintiffs' right to participate and to not participate in religious exercises in ways consistent with their religious beliefs.

294.    The Accommodations Clause forces Plaintiffs to participate in religious exercises contrary to their sincere religious beliefs.

295.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by compelling Plaintiffs to participate in religious exercises contrary to their sincerely held religious beliefs.

296.    Accordingly, as applied to Plaintiffs, the Accommodations Clause violates the First Amendment's protections to be free from religious establishments.

**Prayer for Relief**

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

1.      A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from:

      a.   enforcing the Accommodations and Publication Clauses as applied to Plaintiffs' constitutionally protected speech, association, free press, religious exercise rights, and their right to be free from religious establishments; and

      b.   enforcing the Accommodations and Publication Clauses facially because they were adopted and are enforced based on religious hostility.

2.      A declaration that the Accommodations and Publication Clauses violate and are currently violating Plaintiffs' First Amendment rights under the United States Constitution to engage in speech, association, press, free exercise of religion, and to be free from the establishment of religion as applied to Plaintiffs' constitutionally protected activities;

3.      A declaration that the Accommodations and Publication Clauses facially violate the United States Constitution's First Amendment protections for free exercise of religion because they were adopted and are enforced based on religious hostility;

4.      That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

5.      That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

6.      That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

7.      That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

8.      That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 28th day of September, 2020.

By: _s/ C. Douglas Welty_

Jonathan A. Scruggs
Arizona Bar No. 030505*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org

David A. Cortman
Georgia Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
Minnesota Bar No. 396303*
**Alliance Defending Freedom**
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
(571) 707-4656 (facsimile)
jwidmalmdelphonse@ADFlegal.org

C. Douglas Welty
Virginia Bar No. 29480
**C. Douglas Welty PLC**
2111 Wilson Boulevard
Suite 800
Arlington, Virginia 22201
(703) 276-0114
(844) 456-7800 (facsimile)
cdwelty@weltyblair.com

## DECLARATION UNDER PENALTY OF PERJURY

I, BOB UPDEGROVE , a citizen of the United States and a resident of the State of

Virginia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

is true and correct to the best of my knowledge.

Executed this **26** day of **SEPTEMBER** , 2020, at **LEESBURG** , Virginia.

BOB UPDEGROVE