# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| **Robert Updegrove**; and **Loudoun Multi-Images LLC** d/b/a **Bob Updegrove Photography**,<br><br>          Plaintiffs,<br><br>    v.<br><br>**Mark R. Herring**, in his official capacity as Virginia Attorney General; and **R. Thomas Payne, II**, in his official capacity as Director of Virginia Division of Human Rights and Fair Housing,<br><br>          Defendants. | Case No. _____<br><br>**Brief in Support of Plaintiffs' Motion for Preliminary Injunction** |

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... ii

Introduction ........................................................................................................................ 1

Statement of Facts .............................................................................................................. 2

Argument ............................................................................................................................ 8

I.     The law violates the First Amendment because it compels Bob to speak and infringes his editorial discretion. ........................................................................................ 8

    A.     Bob engages in protected speech. ........................................................... 9

    B.     The Accommodations Clause compels Bob to speak. ........................... 11

    C.     The Accommodations Clause compels Bob to speak messages he objects to...... 15

    D.     Forcing Bob to speak creates a dangerous and limitless principle. ...................... 19

II.    The law violates the First Amendment because it regulates Bob's speech based on content and viewpoint. ......................................................................................... 20

    A.     The Accommodations Clause compels speech based on content and viewpoint. ........................................................................................ 20

    B.     The Accommodations and Publication Clauses restrict speech based on content and viewpoint. ........................................................................ 21

III.   The law violates the First Amendment because it compels Bob to participate in and celebrate religious ceremonies he disagrees with. ........................................... 23

IV.    The law violates the First Amendment because it restricts a hybrid of historically protected rights. ................................................................................................... 25

V.     The law fails strict scrutiny as applied to Bob's expression and participation. ................ 26

    A.     Virginia does not have a compelling interest to force Bob to celebrate same-sex weddings. ......................................................................... 26

    B.     The law lacks narrow tailoring. ........................................................... 28

VI.    The remaining preliminary injunction factors favor granting an injunction .................... 30

Conclusion ........................................................................................................................ 30

i

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anderson v. City of Hermosa Beach*,
   621 F.3d 1051 (9th Cir. 2010) ........................................................................10

*Anderson v. Laird*,
   466 F.2d 283 (D.C. Cir. 1972)........................................................................24

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004) ........................................................................................28

*Axson-Flynn v. Johnson*,
   356 F.3d 1277 (10th Cir. 2004) ......................................................................25

*Barr v. American Association of Political Consultants, Inc*,
   140 S. Ct. 2335 (2020) ....................................................................................22

*Bery v. City of New York*,
   97 F.3d 689 (2d Cir. 1996) ...............................................................................9

*Billups v. City of Charleston*,
   961 F.3d 673 (4th Cir. 2020) ..........................................................................10

*Boy Scouts of America v. Dale*,
   530 U.S. 640 (2000) ........................................................................................18

*Brown v. Entertainment Merchants Association*,
   564 U.S. 786 (2011) ..........................................................................9, 10, 27, 28

*Brush & Nib Studio, LC v. City of Phoenix*,
   448 P.3d 890 (Ariz. 2019) ........................................................................ *passim*

*Centro Tepeyac v. Montgomery County*,
   722 F.3d 184 (4th Cir. 2013)............................................................................8

*Chelsey Nelson Photography LLC v. Louisville/Jefferson County Metro Government*
   2020 WL 4745771, at *11 (W.D. Ky. Aug. 14, 2020).........................13, 14, 17, 22

*Claybrooks v. American Broadcasting Companies, Inc.*,
   898 F. Supp. 2d 986 (M.D. Tenn. 2012) .........................................................14

*Cornerstone Bobtian Schools v. University Interscholastic League*,
   563 F.3d 127 (5th Cir. 2009)...........................................................................25

*Cressman v. Thompson*,
   798 F.3d 938 (10th Cir. 2015)...........................................................................9

*Cut 'N Dried Salon v. Department of Human Rights*,
   713 N.E.2d 592 (Ill. App. Ct. 1999)...............................................................29

*Elrod v. Burns*,
   427 U.S. 347 (1976) ........................................................................................30

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990) ......................................................................................................25

*Fields v. City of Philadelphia*,
    862 F.3d 353 (3d Cir. 2017) ..........................................................................................10

*Freedom Watch, Inc. v. Google*,
    816 F. App'x. 497 (D.C. Cir. 2020) ..............................................................................29

*Fulton v. City of Philadelphia*,
    93 F. Supp. 2d 649 (E.D.N.C. 1999) .............................................................................26

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ................................................................................................26, 27

*Greater Baltimore Center. for Pregnancy Concerns, Inc. v. Mayor & City Council of
    Baltimore*,
    879 F.3d 101 (4th Cir. 2018), *cert. denied*, 138 S. Ct. 2710 (2018) ......................10, 19

*Hicks ex rel. Hicks v. Halifax County Board of Education*,
    93 F. Supp. 2d 649 (E.D.N.C. 1999) .............................................................................25

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995) ............................................................................................. *passim*

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*,
    138 S. Ct. 2448 (2018) ............................................................................................15, 17

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) .........................................................................................25

*Kania v. Fordham*,
    702 F.2d 475 (4th Cir. 1983) .........................................................................................14

*Kaplan v. California*,
    413 U.S. 115 (1973) ........................................................................................................9

*Lee v. Weisman*,
    505 U.S. 577 (1992) ................................................................................................23, 24

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) .........................................................................................30

*Marrero-Mendez v. Calixto-Rodriguez*,
    830 F.3d 38 (1st Cir. 2016) ...........................................................................................25

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
    138 S. Ct. 1719 (2018) ......................................................................................18, 24, 27

*McCullen v. Coakley*,
    573 U.S. 464 (2014) .......................................................................................................20

*Melvin v. U.S.A. Today*,
    No. 3:14-CV-00439, 2015 WL 251590 (E.D. Va. Jan. 20, 2015)............................11, 14

*Miami Herald Publishing Company v. Tornillo*,
    418 U.S. 241 (1974) .........................................................................................8, 13, 15, 21

iii

*Newsom ex rel. Newsom v. Albemarle County School Board*,
    354 F.3d 249 (4th Cir. 2003) ............................................................8, 30

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ..................................................16, 17, 24

*Ostergren v. Cuccinelli*,
    615 F.3d 263 (4th Cir. 2010) ............................................................10

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,
    475 U.S. 1 (1986) ..................................................................9, 21

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ....................................................................10

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..................................................................20, 26

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997) .......................................................................10

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ..............................................................11, 15, 20

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ..................................................................21, 23

*Stuart v. Camnitz*,
    774 F.3d 238 (4th Cir. 2014) ............................................................20

*Telescope Media Group v. Lucero (TMG)*,
    936 F.3d 740 (8th Cir. 2019) ..................................................... *passim*

*Tucker v. California Department of Education*,
    97 F.3d 1204 (9th Cir. 1996) ............................................................23

*Turner Broadcasting System, Inc. v. F.C.C.*,
    512 U.S. 622 (1994) .......................................................................21

*Turner v. Safley*,
    482 U.S. 78 (1987) ........................................................................24

*United States v. Stevens*,
    559 U.S. 460 (2010) .........................................................................9

*Vejo v. Portland Public Schools*,
    204 F. Supp. 3d 1149 (D. Or. 2016) ....................................................29

*Washington Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) ........................................................10, 11

*West Virginia Association of Club Owners & Fraternal Services., Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) ............................................................8, 30

*Western Watersheds Project v. Michael*,
    869 F.3d 1189 (10th Cir. 2017) ..........................................................10

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ............................................................................8, 9

*World Peace Movement of America v. Newspaper Agency Corporation,*
    879 P.2d 253 (Utah 1994) ......................................................................18

*Zhang v. Baidu.Com Inc.,*
    10 F. Supp. 3d  (S.D. N.Y. 2014) ...........................................................14

## **Statutes**

42 U.S.C. § 2000 a(b) ................................................................................29

42 U.S.C. § 2000 e–2(e)(1) ........................................................................28

29 C.F.R. § 1604.2 .....................................................................................28

29 C.F.R. § 1604.7 .....................................................................................23

Colo. Rev. Stat. § 24-34-601(3) .................................................................28

Fla. Stat. § 760.02(11) ...............................................................................29

Miss. Code § 11-62-5(5)(a) ........................................................................29

S.C. Code. Ann. § 45-9-10(B) ....................................................................29

Va. Code § 2.2-520(B) .................................................................................7

Va. Code § 2.2-3904 ....................................................................................5

Va. Code § 2.2-3904(B) ....................................................................... *passim*

Va. Code § 2.2-3904(D) ..............................................................................27

Va. Code § 2.2-3905(A) ..............................................................................27

Va. Code § 2.2-3905(B), (C) .......................................................................27

Va. Code § 2.2-3906(A) .....................................................................6, 7, 12

Va. Code § 2.2-3906(B) ................................................................................6

Va. Code § 2.2-3907(A) ................................................................................6

Va. Code § 2.2-3907(D) ................................................................................7

Va. Code § 2.2-3907(F) ................................................................................7

Va. Code § 2.2-3908(B) ................................................................................7

Va. Code § 2.2-4020(C)-(D) .........................................................................7

Va. Code § 36-96.2(A) ..........................................................................27, 28

1 Va. Admin. Code 45-20-80-C .....................................................................7

**Other Authorities**

Eugene Volokh, *Court Allows Lawsuit Against Ideological Group for Discriminatory Rejection of Noncommercial Ad in Its Publication*, The Volokh Conspiracy (March 19, 2018), https://bit.ly/2VVZeH7 .....................................19

Susan Selasky, *Lesbian baker in Detroit got homophobic cake order: Why she made it anyway*, DETROIT FREE PRESS (Aug. 13, 2020), http://bit.ly/freeparticle ......................19

**Introduction**

Plaintiff Robert (Bob) Updegrove has a passion for creating beautiful photography. He has used his camera to capture photographs celebrating schools, non-profits, businesses, and weddings for over 30 years. Bob is also a Christian. He prides himself on treating others with respect while serving clients of all different backgrounds, including those in the LGBT community. Bob just does not create certain content for anyone no matter who asks him to do so. Like writers who pitch liberal policies instead of conservative ones, or painters who produce portraits instead of landscapes, Bob uses his artistic discretion to promote values in which he believes. The question in this case is whether Virginia can treat Bob different from other artists and force him to create artwork he objects to just because Bob wants to promote a view Virginia dislikes—that marriage should be between a man and a woman.

This issue stems from the recent "Virginia Values Act," which requires Bob to photograph same-sex weddings and post those photographs on his website because he does the same for opposite-sex weddings. The law even makes it illegal for Bob to ask potential clients whether they want him to photograph a same-sex wedding, to post a statement on his website that he does not photograph same-sex weddings, and to adopt an editorial policy explaining the reasons for this editorial choice. If Bob follows his conscience and does any of these things, Virginia considers it illegal discrimination and officials can investigate, prosecute, and penalize him, levying injunctive orders, unlimited damages, unlimited attorney-fee awards, and fines up to $50,000 initially and then $100,000 for each subsequent violation. Add it all up and Bob's 30-year career goes away. So Virginia has given Bob an ultimatum: close your business, defy your conscience, or suffer your fate.

But the First Amendment reconfigures the calculus. Virginia cannot compel Bob's speech, censor his views, or force him to participate in weddings without violating the First

1

Amendment and undermining everyone's editorial freedom. Photography is speech. And the state does not get to tell artists what values they must voice or what content they must capture. The First Amendment gives that value choice to each of us, not the state. For these reasons, Bob asks this Court to stop the ongoing violation of his constitutional rights and temporarily enjoin Virginia's law as applied to his photography.

## **Statement of Facts**

Bob speaks through his photography. He got his first camera in college and shortly afterwards began creating multi-media productions as a volunteer with Campus Life, a Christian youth ministry focused on high school students. Decl. ¶¶ 29–35. Bob enjoyed creating slide shows overlaid with audio that featured photographs and audio interviews with students. *Id.* ¶ 36. Through his photography, Bob cultivated relationships with students and that allowed him to share his faith and minister to others. *Id.* ¶¶ 38–39. Bob believes that God gives every person a unique set of gifts and talents to use for His glory. *Id.* ¶ 55. And Bob believes that God has given him a passion for sharing the Gospel through his photography. *Id.* ¶ 57.

What started as a side gig eventually grew into a vocation. *Id.* ¶¶ 45–48. As Bob began to receive more requests for photography, he decided to form Loudoun Multi-Images, now Loudoun Multi-Images LLC (doing business as Bob Updegrove Photography). *Id.* ¶¶ 2, 48. His business offers photography services for many clients, including non-profits, businesses, and schools. *Id.* ¶ 49. Bob also offers wedding photography, which includes photographing engagements and weddings. *Id.* ¶¶ 59–68.

Bob's wedding photography involves three steps. First, Bob photographs the couple's engagement or wedding. *Id.* ¶ 90. Second, Bob curates and edits the photographs. *Id.* ¶ 96. Third, Bob posts all of the finished photographs on his website and delivers them to his clients.

*Id.* ¶¶ 103, 119–21. When Bob posts wedding photographs on his website, he always creates two galleries: 1) a private gallery that contains all of the edited photographs, and 2) a publicly accessible gallery that contains about 50–150 "enhanced" photographs. *Id.* ¶¶ 106–113. Per the last item, Bob first color corrects, levels, and checks exposure for all the wedding photographs before he creates a smaller collection of enhanced photographs. *Id.* ¶¶ 98–101. These enhanced photographs capture the wedding's most special moments, represent many scenes from the wedding, and are edited further to evoke a distinct mood or effect. *Id.* ¶ 102. Bob will also often post a few photographs in his business' portfolio page, a publicly accessible gallery on his website that contains representative photographs from many different weddings. *Id.* ¶¶ 114–15.

Bob also views his wedding photography as an opportunity for ministry. *Id.* ¶ 69. Bob believes that God designed marriage as a permanent institution that symbolically points people to Jesus' sacrificial death and covenantal relationship with His Church. *Id.* ¶ 72. To celebrate God's design for marriage, Bob wants to tell stories about the love, intimacy, and sacrificial nature of marriage between one man and one woman. *Id.* ¶ 126. In this way, Bob believes he can promote the Gospel. *Id.* ¶ 127.

Practically, Bob does this by always portraying the couple in positive and romantic ways. *Id.* ¶¶ 132–35, 204. For example, during the photo shoot, Bob strategically times his movement to capture the wedding ceremony's special moments, such as the exchange of vows, the first kiss, and the wedding recessional. *Id.* ¶ 144. After the ceremony, Bob directs the couple, the wedding party, and the couple's family on how to pose against the backdrop while considering the ambient light, color temperature, and the capacities of his camera. *Id.* ¶¶ 94, 148–167. Then, when Bob edits the photographs, he adjusts elements like noise, color,

exposure, saturation, and vibrance to evoke different moods or to bring out different elements of a photograph's subject. *Id.* ¶¶ 169–84.

Bob desires to honor God in everything his business creates. *Id.* ¶¶ 54–58, 82. For this reason, Bob does not offer to create photography that dishonors God, demeans others, or requires him to participate in events contrary to his religious or moral beliefs. *Id.* ¶¶ 193–94. For example, Bob has created event photography for several conservative organizations that promote religious liberty and free market policies. *Id.* ¶¶ 195–96. But Bob would not offer photography promoting organizations that advocate for the censorship of religious beliefs or socialist policies. *Id.* ¶ 197. Additionally, Bob will only offer wedding photography that celebrates marriages consistent with his faith. *Id.* ¶¶ 129, 198. Since Bob believes that marriage is a sacred union between one man and one woman, *id.* ¶ 72,  Bob will not offer wedding photography that celebrates sacrilegious themes, polygamous or open relationships, or same-sex marriage. *Id.* ¶¶ 200–01.

Bob also believes that all wedding ceremonies are inherently religious events. *Id.* ¶ 200, Compl. ¶ 113. Every wedding Bob has photographed has included a procession, an exchange of vows, a homily or speech by the officiant, and a pronouncement of the couple as husband and wife. Compl. ¶ 115. Of the weddings Bob has photographed, many have also included religious music, religious vows, communion, prayer, and a pastor presiding over the ceremony. *Id.* ¶ 114. And Bob participates in every wedding he photographs. He always attends and photographs the entire ceremony, and most or all of the reception. Decl. ¶ 95. Bob also expresses his approval of the marriage by joyfully interacting with the bride and groom, the bridal couple's family, and the wedding party when he congratulates them or instructs them on how to pose for photographs. *Id.* ¶¶ 204–05.

Although Bob believes marriage should be between a man and a woman, he is happy to provide photography services to those in the LGBT community. For example, Bob will gladly provide photography services to LGBT persons or businesses owned by LGBT individuals. *Id.* ¶ 298. And Bob would happily provide wedding photography if requested by someone who identifies as LGBT—whether a gay parent asking for a son's wedding to a woman or a bisexual woman asking for her own wedding to a man. *Id.* ¶¶ 299–301. Bob just cannot promote messages or participate in ceremonies that violate his beliefs for anyone, no matter their status. *Id.* ¶¶ 284–97.

To ensure his company expresses messages consistent with his beliefs, Bob wants to take certain steps. First, Bob wants to offer, create, and post wedding photographs celebrating only opposite-sex weddings. *Id.* ¶ 215. Next, Bob wants to be transparent about what artwork he offers and wants to publish a statement on his website explaining his inability to celebrate same-sex weddings. *Id.* ¶ 216; Compl. Ex. 2 (statement Bob wants to publish). Third, Bob wants to adopt an editorial policy that formalizes his editorial choices and that he can provide to members of the public who want to know why he only chooses to celebrate certain events. *Id.* ¶ 218; Compl. Ex. 1 (editorial policy Bob wants to adopt). Fourth, Bob wants to ask prospective clients if they want him to create content that would violate his religious beliefs. *Id.* ¶ 222.

According to Virginia, Bob cannot do any of this.

The Virginia Values Act, which became effective on July 1, 2020, revises the Virginia Human Rights Act ("Virginia's law" or "the law"), Va. Code § 2.2-3904 *et seq.*, and adds two provisions relevant here. First, the Accommodations Clause makes it unlawful for public accommodations like Bob Updegrove Photography "to refuse, withhold from, or deny any individual, or to attempt to refuse, withhold from, or deny any individual, directly or indirectly,

… or to segregate or discriminate against any [] person in the use [of]" any "advantages, … services, or privileges made available in any place of public accommodation … on the basis of … sexual orientation …." *Id.* § 2.2-3904(B). Second, the Publication Clause makes it unlawful "to publish, circulate, issue, display, post, or mail, either directly or indirectly, any communication, notice, or advertisement to the effect that any of the accommodations, advantages, … privileges, or services of any such place [of public accommodation] shall be refused, withheld from, or denied to any individual on the basis of … sexual orientation." *Id.*

The Virginia Attorney General has already interpreted similar laws in other states to require businesses like Bob's to offer the same expressive works for celebrating same-sex marriage as they offer for opposite-sex weddings. Compl. ¶ 181. The Virginia Attorney General has also interpreted these laws to require businesses to treat requests for artwork celebrating same-sex weddings the same as requests to celebrate opposite-sex weddings, as well as to refrain from posting statements which decline to create expressive works celebrating same-sex weddings. *Id.*

Meanwhile, Virginia's law allows the Attorney General to file a civil suit against anyone he reasonably believes is "engaged in a pattern or practice of resistance to the full enjoyment" of rights granted by the law. Va. Code § 2.2-3906(A). The law also allows the Attorney General to obtain a temporary or permanent injunction, attorney fees and costs, penalties of $50,000 for the first violation, and up to $100,000 for each additional violation, and damages. *Id.* § 2.2-3906(B).

Adding to that, the law allows the Attorney General, private individuals, or the Division of Human Rights to file a complaint with this Division. *Id.* § 2.2-3907(A). This complaint triggers an administrative process that may include fact-finding, hearings, investigation, and

conciliation attempts. *See* Va. Code §§ 2.2-520 (B); -3907(D), -4020(C)-(D); 1 Va. Admin. Code 45-20-80(C). If the Division cannot settle the dispute, it issues the complainant a notice allowing them to file a civil action. Va. Code § 2.2-3907(F). In this civil action, a private citizen may recover injunctions, compensatory and punitive damages, and costs and attorney fees. *Id.* § 2.2-3908(B).

Virginia's law affects Bob's business in several ways. First, the Accommodations Clause forces Bob to offer, create, and post photographs celebrating same-sex weddings since he offers, creates, and posts photographs celebrating opposite-sex weddings. *Id.* § 2.2-3904(B) (making it illegal to "withhold," "attempt to … withhold," or "segregate" services). Second, the Accommodations and Publication Clauses forbid Bob from posting a statement on his website explaining that he cannot create artwork celebrating same-sex weddings. *Id.* (making it illegal to "attempt to refuse, withhold from, or deny" services or "publish … any communication … to the effect that … services … shall be refused"). Third, the Accommodations and Publication Clauses forbid Bob from adopting and distributing his desired editorial policy. *Id*; *see also* Va. Code § 2.2-3906(A) (making persons liable for "pattern or practice of resistance to the full enjoyment" of rights protected by law). Fourth, the Accommodations Clause forbids Bob from asking clients whether they seek services celebrating same-sex weddings. *Id.* § 2.2-3904(B) (making it illegal to "attempt to … withhold," or "segregate" services).

Bob continues to photograph weddings between one man and one woman but operates his business in fear of violating the law, being investigated and prosecuted, and suffering the penalties mentioned above. Since July 1, Bob has refrained from adopting or distributing his desired editorial policy, publishing his desired internet statement, and asking clients his desired questions about same-sex weddings. Compl. ¶ 174.

## Argument

Bob seeks a preliminary injunction to stop the ongoing violation of his First Amendment rights. For this relief, plaintiffs must prove they will likely succeed on the merits, they will likely suffer irreparable harm without an injunction, the balance of equities tips in their favor, and the injunction serves the public interest. *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (cleaned-up). When the movant alleges a First Amendment violation though, likelihood of success becomes most important. *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (because irreparable harm for First Amendment claim is "inseparably linked" to likelihood of success, courts "focus our review on the merits of plaintiff's First Amendment claim"); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 254–55 (4th Cir. 2003) (same).

Focusing on this factor, Bob deserves his requested injunction for six reasons: (I) Virginia's law compels him to speak a message he disagrees with, (II) the law regulates his speech based on content and viewpoint, (III) the law forces him to celebrate and participate in religious ceremonies he objects to, (IV) the law regulates a hybrid of rights, (V) Virginia's actions trigger and fail strict scrutiny, and (VI) these First Amendment violations satisfy the remaining preliminary injunction factors.

## I.     The law violates the First Amendment because it compels Bob to speak and infringes his editorial discretion.

The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). This right means speakers have editorial discretion to choose the content of their speech. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (First Amendment protects "the function of editors" in their "exercise

of editorial control and judgment"). These protections originate in the individual's personal autonomy and "individual freedom of mind." *Wooley*, 430 U.S. at 714 (cleaned-up).

A compelled speech claim has three elements: 1) speech, 2) the government compels, 3) and the speaker objects to. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572–73 (1995) (applying elements); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (identifying elements). Virginia's law compels Bob to speak a message he disagrees with by requiring him to create and post photographs promoting same-sex weddings. This triggers strict scrutiny. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.* (*PG&E*), 475 U.S. 1, 19 (1986) (plurality) (applying strict scrutiny to law compelling speech).

## A. Bob engages in protected speech.

The First Amendment protects mediums like "books, plays, and movies [that] communicate ideas." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011). This standard covers Bob's photography.

*Photographs*: The Supreme Court has repeatedly "applied … First Amendment standards … to photographs." *Kaplan v. California*, 413 U.S. 115, 119–20 (1973). *Accord United States v. Stevens*, 559 U.S. 460, 468 (2010) (regulation on "'visual [and] auditory depiction[s],' such as photographs" regulated speech). Indeed, "paintings, photographs, prints and sculptures … always communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection." *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir. 1996). Bob's photographs do the same; they seek to celebrate the couple and tell a story about the beauty and romance of marriage as a sacrificial relationship between one man and one woman. Decl. ¶¶ 72, 126–27; *see also* App. at __ (examples of Bob's engagement and wedding photographs).

*Creating Photographs*: Because Bob's photographs deserve protection, the process of creating these photographs deserves protection too. "Whether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1. The reason is simple. "Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010). We simply don't "disaggregate Picasso from his brushes and canvas," or divide "Beethoven" from his "strings and woodwinds." *Id.* (protecting tattoo creation under First Amendment). The same logic applies to creating photographs. *Id.* ("the act of setting the type" protected as much as essays themselves); *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) (protecting photography creation); *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) (protecting photography and note-taking creation).

*Posting Photographs:* After Bob creates and edits his wedding photographs, he always posts some of them on his website. Decl. ¶ 103. This posting also constitutes protected speech. The communication of ideas through "traditional print" or "audio, video, and still images" posted to the internet receives the same level of First Amendment protection as any other medium of expression. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) ("In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'"); *Ostergren v. Cuccinelli*, 615 F.3d 263, 273–276, 287 (4th Cir. 2010) (posting public records containing social security numbers online was protected speech).

What's more, it doesn't matter that clients pay Bob for these photography services. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988); *Billups v. City of Charleston,* 961 F.3d 673, 683 (4th Cir. 2020) (protecting paid tour-guide services) (cleaned up). Bob's photographs convey a message whether Bob is paid or not. That is decisive for First Amendment purposes.

### B.    The Accommodations Clause compels Bob to speak.

Compelled speech occurs when the government infringes on a speaker's "autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 572–73. The "general rule" is that speakers have a "right to tailor [their] speech" to express messages they want. *Washington Post v. McManus*, 944 F.3d 506, 519 (4th Cir. 2019) (cleaned-up).

For example, officials cannot force pro-life centers to display signs about abortion-referrals because that would convey a message "antithetical to the very moral, religious, and ideological reasons the Center exists." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 110–11 (4th Cir. 2018), *cert. denied*, 138 S. Ct. 2710 (2018). Campaign-finance laws cannot force online newspapers to disclose certain information about political advertisements because that would force "publishers to speak in a way they would not otherwise." *McManus*, 944 F.3d at 518. Likewise, anti-discrimination laws cannot force newspapers to publish articles from protected groups because that would undermine freedom "at the heart of editorial discretion protected by the First Amendment"— "the power to decide whether to speak on any particular subject." *Melvin v. U.S.A. Today*, No. 3:14-CV-00439, 2015 WL 251590, at *4 (E.D. Va. Jan. 20, 2015).

Virginia's Accommodations Clause threatens Bob's editorial freedom in similar ways. This clause makes it illegal for public accommodations to (1) "withhold from, or deny… any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation … on the basis of … sexual orientation"; (2) to "attempt to" do this; or (3) to "segregate or discriminate" in the use of these services on the basis of sexual orientation. Va. Code § 2.2-3904(B). A mere "pattern or practice" of resisting "the rights granted by" these requirements subjects someone to liability. *Id.* § 2.2-3906(A).

But Virginia interprets these provisions to require more than equal treatment regardless of status. Virginia demands special treatment for certain content—that paid speakers must offer the same photography services to celebrate same-sex weddings as they do to celebrate opposite-sex weddings. *See* Br. for Mass. et al. as Amici Curiae Supporting Defs. at 10, *303 Creative LLC v. Elenis*, No. 19-1413 (10th Cir. April 29, 2020) (Virginia Attorney General joining amicus brief arguing that web-designer violated public accommodations law by creating websites celebrating opposite-sex weddings and not same-sex weddings); Br. for Mass. et al. as Amici Curiae Supporting Defs. at 11–12, *Telescope Media Group v. Lucero* (*TMG*), 936 F.3d 740 (8th Cir. 2019) (No. 17-3352), 2018 WL 1414316 (Virginia Attorney General joining amicus brief arguing that film studio violated public accommodations law by offering films celebrating opposite-sex weddings and not same-sex weddings ); *see also TMG*, 936 F.3d at 748 (Minnesota interpreting a similar law to mean that filmmakers' decision to make "*any* wedding videos requires the [filmmakers] to make them for everyone"); *Brush & Nib Studio, LC v. City of Phoenix* (*B&N*), 448 P.3d 890, 898–900 (Ariz. 2019) (Phoenix adopting similar interpretation of similar law).

Practically, this means Bob cannot legally offer to create and post photographs celebrating only opposite-sex weddings; he cannot adopt an editorial policy binding his company to create photographs only celebrating opposite-sex weddings; and he must offer, create, and then post photographs celebrating same-sex weddings. Doing otherwise would be to withhold, attempt to withhold, segregate, and adopt a pattern or practice of activities contrary to Virginia's law. This in turn strips Bob of his editorial discretion to control what content he offers and what content he creates and compels him to convey a message that violates his core convictions. That is compelled speech.

The Supreme Court already said so in *Hurley*. 515 U.S. at 572–73. There, an LGBT group tried to use a public accommodations law to gain access to a St. Patrick's Day parade. *Id.* at 561. But *Hurley* stopped this application because the parade was expressive. *Id*. at 578. So forcing the parade organizers to admit the LGBT group would alter the parade's content and infringe the organizers' right to speak the message they wanted. *Id.* at 572–73.

The same logic applies here. Virginia may not constitutionally use its public accommodations law to force Bob to offer photography celebrating same-sex weddings or otherwise limit his editorial freedom to avoid conveying this message. Doing so would alter the content of his photography and burden his editorial freedom to convey his desired message. *See Tornillo*, 418 U.S. at 258 (requiring newspapers to publish op-eds affected "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper," which "constitute the exercise of editorial control and judgment").

Indeed, federal courts have repeatedly stopped anti-discrimination laws from burdening editorial freedom and compelling speech like this. *See, e.g.*, *TMG*, 936 F.3d at 752 (cannot force film studio to produce same-sex wedding films); *Chelsey Nelson Photography LLC v.*

*Louisville/Jefferson Cty. Metro Gov't*, No. 3:19-CV-851-JRW, 2020 WL 4745771, at *11 (W.D. Ky. Aug. 14, 2020) (cannot force photographer to photograph same-sex weddings); *Claybrooks v. Am. Broad. Cos.*, Inc., 898 F. Supp. 2d 986, 999 (M.D. Tenn. 2012) (cannot force television studio to cast certain actors); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 437 (S.D.N.Y. 2014) (cannot force internet company to publish search-engine material from protected group); *Melvin*, 2015 WL 251590, at *4 (cannot force newspapers to publish material from protected group); *cf. Kania v. Fordham*, 702 F.2d 475, 477 n.5 (4th Cir. 1983) (stating that University could not compel student newspaper "to provide equal access to those disagreeing with its editorial positions"); *B&N*, 448 P.3d at 898–900 (cannot force art studio to create invitations celebrating same-sex weddings). This Court should too.

   To be sure, the laws in these cases, like the law in *Hurley,* do not facially target speech; their "focal point" is stopping "the act of discriminating." 515 U.S. at 572. But that doesn't matter. When "applied to expressive activity," the law in *Hurley* still "require[d] speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own." *Id*. at 578. In other words, courts must look beyond a law's text or purpose to evaluate its effects *as applied* to the particular speech at hand.

   What's more, Virginia cannot claim that Bob is merely a conduit for his client's speech. *See TMG*, 936 F.3d at 773–76 (Kelly, J., dissenting) (for this argument). Bob always retains editorial control over his art. Bob decides what content to capture, which photographs to discard, and what editing to make to tell a cohesive story about the "love, intimacy, and sacrifice" of marriage. Decl. ¶ 126.

   Like a commissioned biographer, Bob might tell stories about someone else to earn a living. But he is still the one telling the story. If Virginia could compel Bob to speak because he

speaks about and receives payment from others, then officials could compel every paid writer, lawyer, publisher, painter, printer, graphic designer, advertising firm, newspaper, and internet company to speak any message. That is not the law. *Hurley*, 515 U.S. at 573, 575 (rejecting conduit argument because parade organizers "choose the content" of their speech and are "more than a passive receptacle" for someone else's message); *Tornillo*, 418 U.S. at 258 ("A newspaper is more than a passive receptacle or conduit for news, comment, and advertising."); *TMG*, 936 F.3d at 753 (rejecting conduit argument for film studio); *B&N*, 448 P.3d at 911–12 (rejecting conduit argument for art studio); *see also Riley*, 487 U.S. at 794 n.8 (law could not compel professional fundraiser to speak on charity's behalf because fundraiser had "independent First Amendment interest in [its] speech").

### C.     The Accommodations Clause compels Bob to speak messages he objects to.

"Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).

The same principle applies here. Bob believes that God created marriage to be between one man and one woman. Decl. ¶ 72. Bob wants to create messages celebrating this view. *Id.* ¶ 126. But as applied to Bob's photography, Virginia's law forces Bob to create and publish photographs celebrating same-sex weddings. This not only alters the formal content in Bob's photographs; it reverses the message of these photographs—from celebrating opposite-sex marriage (Bob's photographs, left) to celebrating same-sex marriage (photographs by other Virginia photographers, right).



Similarly, Bob's photographs celebrate a union between one man and one woman and therefore convey a different message than those celebrating polygamous relationships.



Photographs positively portraying same-sex weddings necessarily communicate a different message than photographs of weddings between one man and one woman. After all, many photographers post same-sex wedding photographs on their websites to advertise their support for, and willingness to celebrate, same-sex weddings. *See* Decl. ¶¶ 306–28. "The First

Amendment" protects both "those who oppose same-sex marriage" and "those who believe allowing same-sex marriage is proper or indeed essential." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2607 (2015). Each side on this debate has a different message to say and different view to promote. Conflating the messages respects neither side.

That means compelling Bob to create photographs celebrating same-sex marriage is no small thing. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 138 S. Ct. at 2464. Both the Eighth Circuit and Arizona Supreme Court have held that forcing paid speakers to create speech celebrating same-sex weddings when they want to celebrate only opposite-sex weddings alters their message and compels their speech. *See TMG*, 936 F.3d at 753 (forcing filmmakers to create same-sex wedding films forced them to "convey the same 'positive' message in their videos about same-sex marriage as they do for opposite-sex marriage"); *B&N*, 448 P.3d at 909 (forcing art studio to write wedding invitations compelled speech because "writing the names of two men or two women … clearly does alter the overall expressive content of [studio's] wedding invitations"). And recently, a district court in the Sixth Circuit applied this same reasoning to protect a photographer who only wants to celebrate opposite-sex weddings. *Chelsey Nelson*, 2020 WL 4745771, at *10–11. Although "the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one." *Hurley*, 515 U.S. at 579.

Of course, this does not mean Bob objects to working with LGBT people or discriminates against anyone. Bob serves all people no matter their status. Indeed, Bob will gladly provide event photography services to LGBT persons and provide his wedding services to LGBT persons seeking to promote opposite-sex marriages. Decl. ¶¶ 297–300. Bob simply

cannot create speech celebrating same-sex marriages *for anyone*, whether they are gay, straight, or anything else. For Bob, it's all about the content requested, not the client requesting. Just as atheist website designers can decline to create websites promoting Christianity without discriminating against Christians, Bob can decline to create photographs promoting same-sex marriage without discriminating against anyone.

The Supreme Court drew the same message/status distinction in *Hurley*, where it allowed parade organizers to decline an LGBT group's request to march in a St. Patrick's Day parade. *Hurley* reasoned that the organizers did not "exclude homosexuals as such" but only sought to exclude the message communicated by an LGBT group marching under its own banner. 515 U.S. at 572, 574; *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1736 (2018) (Gorsuch, J., concurring) (when cake designer refused to create cake celebrating same-sex wedding "it was the kind of cake, not the kind of customer, that mattered"); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000) (affirming status/message distinction in *Hurley*); *B&N*, 448 P.3d at 910 (declining to create same-sex wedding invitations "based on message, not status"); *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 258 (Utah 1994) (newspaper could decline religious advertisement because "it was the message itself that [the newspaper] rejected, not its proponents"). Bob has done nothing more here: serve people regardless of status and decline to speak certain messages. Bob deserves to exercise this editorial freedom just as other speakers exercise their editorial freedom on different subjects.

### D.     Forcing Bob to speak creates a dangerous and limitless principle.

If Virginia can force Bob to celebrate messages about marriage he disagrees with, nothing stops Virginia from compelling other speech as well. In this sense, compelling Bob hurts speakers of all views and all beliefs.

For example, the same principles that protect Bob's freedom mean Virginia cannot force Muslim filmmakers to produce films for and promoting synagogues because they do so for mosques. Or force atheists to photograph Easter services and place those photographs in a church's out-reach emails because they do the same for secular groups. Or force LGBT-owned printers to publish signs saying, "Join the Westboro Baptist Church" for that church just because they would publish signs saying, "Join the Unitarian Church" for that church. But if we stop protecting speaker autonomy, Virginia could compel a progressive bar association to publish advertisements promoting Israel in that association's magazine.[1] Or force LGBT cake artists to create cakes saying, "Homosexual acts are gravely evil. (Catholic Catechism 2357)"[2] Or make "political belief" a protected class tomorrow and then force Democratic speech writers to write speeches supporting Republican politicians. *See TMG*, 936 F.3d at 756 (making this point).

Thankfully, Virginia lacks this power. In our pluralistic society, the First Amendment protects everyone's freedom of speech. No one should "be forced by the state … to renounce and forswear what they have come as a matter of deepest conviction to believe." *Greater Baltimore*, 879 F.3d at 113. That includes Bob.

---

[1] Eugene Volokh, *Court Allows Lawsuit Against Ideological Group for Discriminatory Rejection of Noncommercial Ad in Its Publication*, The Volokh Conspiracy (March 19, 2018), https://bit.ly/2VVZeH7.
[2] Susan Selasky, *Lesbian baker in Detroit got homophobic cake order: Why she made it anyway*, DETROIT FREE PRESS (Aug. 13, 2020), http://bit.ly/freearticle.

II.   **The law violates the First Amendment because it regulates Bob's speech based on content and viewpoint.**

Laws may not "target speech based on its communicative content," unless they are narrowly tailored to serve a compelling government interest. *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015). *Reed* sets out a two-step inquiry. First, courts consider whether the law is facially content-based: does it facially "draw[] distinctions based on the message a speaker conveys." *Id.* at 163–64. Second, a facially content-neutral law may still regulate content as applied if it "cannot be justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* (cleaned up). *See also McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (law's application content-based "if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred.") (cleaned-up). Virginia's law fails these requirements either facially, as-applied, or both.

A.   **The Accommodations Clause compels speech based on content and viewpoint.**

As applied to Bob, the Accommodations Clause compels Bob to speak based on content and viewpoint in three ways.

First, the law compels Bob to celebrate same-sex weddings, which causes him to speak a message he would not otherwise convey and to change the content of his speech. *See supra*, § I.C; *Riley*, 487 U.S. at 795 ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."); *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014) ("A regulation compelling speech is by its very nature content-based.").

Second, the law requires Bob to celebrate same-sex weddings because of his speech promoting opposite-sex weddings elsewhere. If Bob sticks to photographing corporate events, he is safe. Only if Bob creates photographs celebrating opposite-sex marriage must he create

photographs promoting same-sex marriage. In this way, the content of Bob's prior speech triggers the Accommodation Clause's application. That makes the application content-based. *See Tornillo*, 418 U.S. at 256 (statute "exacts a penalty on the basis of the content" because it required newspapers to print editorial only if they printed editorial with particular content earlier); *PG&E*, 475 U.S. at 13–14 (law regulates based on content if it "condition[s] [access] on any particular expression" conveyed); *TMG*, 936 F.3d at 753 (law regulated based on content by treating filmmakers "choice to talk about one topic—opposite-sex marriages—as a trigger for compelling them to talk about a topic they would rather avoid—same-sex marriages").

Third, the law confers access based on speaker viewpoint. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is … an egregious form of content discrimination."). If Bob photographs opposite-sex weddings, the law does not require him to photograph everything requested of him. Nor does the law require Bob to photograph most content requested. No, because Bob photographs opposite-sex weddings, the law requires him to create photographs for those seeking to promote only one view— celebrating same-sex engagements or weddings. That is a viewpoint-based access requirement. *See PG&E*, 475 U.S. at 13 (law discriminates based on viewpoint when it awards access "only to those who disagreed with the [speaker's] views"); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 654 (1994) (law in *PG&E* viewpoint-based because it "conferred benefits to speakers based on viewpoint, giving access only to a consumer group opposing the utility's practices").

### B.   The Accommodations and Publication Clauses restrict speech based on content and viewpoint.

Besides compelling speech based on content and viewpoint, Virginia's law also restricts speech based on content and viewpoint. In fact, the Publication Clause does so facially. This Clause makes it unlawful for public accommodations to "publish … any communication … to

the effect that any … services of any such place shall be refused, withheld from, or denied to any individual on the basis of … sexual orientation." Va. Code § 2.2-3904(B). Statements saying, "no photographs of animals" are allowed; those saying, "no photographs of same-sex weddings" are forbidden. "That is about as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2346 (2020) (robocall statute content-based because law's application turned on content in calls). Under the *Reed* test then, that makes the Publication Clause facially content-based.

Both the Publication Clause and the Accommodations Clause (banning "attempt[s] to refuse … or to segregate or discriminate" in providing services) also restrict Bob's desired speech based on content as applied. Bob wants to distribute his editorial policy, explaining his religious and artistic reasons for declining to celebrate same-sex weddings, to potential clients or members of the public upon request. Compl. ¶¶ 150–52; Ex. 1. Bob also wants to publish a statement on his website that declines to celebrate same-sex weddings. *Id.* ¶¶ 162–65; Ex. 2. But the law forbids Bob from distributing his editorial policy or posting his desired statement just because of their content: Bob's decision to, and artistic and religious view for, celebrating marriage only between a man and a woman. *See Chelsey Nelson*, 2020 WL 4745771, at *12 (public accommodations law's application to photographer was "a content-based restriction on Nelson's expression," declining to create photographs celebrating same-sex weddings); *see also TMG*, 936 F.3d at 757 n.5 (public accommodations law could not "force [videographers] to remain silent" about their desire to celebrate opposite-sex weddings); *B&N*, 448 P.3d at 899, 926 (public accommodations law could not prevent calligraphers from posting website statement "announcing their intention to refuse requests to create custom artwork for same-sex weddings").

Additionally, the Accommodations Clause prevents Bob from even asking prospective clients whether they seek his services to celebrate a same-sex wedding. Va. Code § 2.2-3904(B) (banning "attempt[s] to refuse … or to segregate or discriminate" in providing services); *cf.* 29 C.F.R. § 1604.7 (federal law prohibiting sex discrimination in employment precludes "pre-employment inquiry … which expresses directly or indirectly any limitation, specification, or discrimination as to sex"). So Bob can ask non-profits if they promote liberal or conservative policies to make sure he feels comfortable promoting their event, but he can't ask his wedding clients whether they want him to celebrate a same-sex wedding. Again, this turns solely on the content of his question.

These applications also make the Accommodations and Publication Clauses viewpoint based. The Clauses allow Bob to post a statement on his website supporting marriage generally, supporting same-sex and opposite-sex marriage, or showing a willingness to create speech celebrating same-sex and opposite-sex marriages. But he cannot express views supporting only opposite-sex marriage or stating that he will only celebrate opposite-sex marriages. These restrictions favor particular views over others. That is viewpoint discrimination. *Rosenberger*, 515 U.S. at 829; *see Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1216 (9th Cir. 1996) (viewpoint discrimination for government to ban sign saying, "gay marriage is a sin" but allowing sign advocating "person's right to choose whatever mate he or she wishes").

III. **The law violates the First Amendment because it compels Bob to participate in and celebrate religious ceremonies he disagrees with.**

The First Amendment "guarantees at a minimum that a government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 577 (1992). This principle comes from both the Establishment and Free Exercise Clauses. *Id.*

(grounding principle in former); *Masterpiece*, 138 S. Ct. at 1727 (forcing clergy to officiate wedding ceremonies violates latter).

Just as officials may not compel someone to attend or participate in chapel services, *Anderson v. Laird*, 466 F.2d 283, 284 (D.C. Cir. 1972) (per curiam), or in a "group exercise [that] signifie[s]" participation in prayer, *Lee*, 505 U.S. at 593–94, officials may not force someone to attend or participate in wedding ceremonies. Like many, Bob believes that weddings are religious ceremonies because they solemnize an institution (marriage) created by God. Compl. ¶ 113. Courts have recognized this unique quality of marriage and weddings. *See Obergefell*, 135 S. Ct. at 2594 (noting "the transcendent importance of marriage" that is "sacred" to many); *Turner v. Safley*, 482 U.S. 78, 96 (1987) ("[M]any religions recognize marriage as having spiritual significance ….").

But here, the Accommodations Clause requires Bob to treat same-sex weddings the same as opposite-sex weddings. *See supra*, § I.C (explaining that Bob cannot treat requests to celebrate same-sex marriages differently than requests for opposite-sex marriages). This means Bob must not only attend same-sex wedding ceremonies to take pictures, he must express his approval of the marriage by creating photography that positively portrays the wedding, participate in the ceremony by joyfully interacting with the couple and the couple's family, and act as a witness before God and before those attending by observing the exchange of vows and the pronouncement of the marriage—things he always does for opposite-sex weddings. Decl. ¶¶ 202–05.

But Bob cannot possibly do this at same-sex wedding ceremonies without violating his belief that only marriage between a man and woman should be celebrated. *See Lee*, 505 U.S. at 593 ("[T]he act of standing or remaining silent was an expression of participation in the rabbi's

prayer. That was the very point of the religious exercise."); *Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 44–45 (1st Cir. 2016) (forcing police officer to listen and stand still "in close proximity" to group praying violated First Amendment); *Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012) ("The core of the message in a wedding is a celebration of marriage and the uniting of two people in a committed long-term relationship."). So Virginia cannot force Bob to participate in these events.

## IV. The law violates the First Amendment because it restricts a hybrid of historically protected rights.

Laws that burden religious exercise along with other constitutional rights violate a hybrid of rights and trigger strict scrutiny under the Free Exercise Clause. *See Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881–82 (1990) (strict scrutiny for "hybrid situation[s]" where free-exercise claim is linked with "other constitutional protections, such as freedom of speech"). Although the Fourth Circuit has not decided whether to adopt the hybrid-rights doctrine, at least one district court in this circuit has. *Hicks ex rel. Hicks v. Halifax Cty. Bd. of Educ.*, 93 F. Supp. 2d 649, 663 (E.D.N.C. 1999) (strict scrutiny for hybrid free-exercise and parental-right claims). Several other circuits agree and apply the doctrine when there is a "colorable" claim that the government has violated a companion right. *See, e.g.*, *Cornerstone Bobtian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 136 n.8 (5th Cir. 2009); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295–97 (10th Cir. 2004) (hybrid-rights claim is colorable when there is a "fair probability or likelihood, but not a certitude, of success on the merits"); *see also TMG*, 936 F.3d at 759 (hybrid rights claim adequate where free-exercise claim alleged in connection with communicative activity).

This Court should adopt the same standard here. Indeed, compelling religious objectors to speak is the paradigmatic hybrid-rights violation discussed in *Smith*. 494 U.S. at 881–82

(citing historic examples of compelling religious objectors to speak messages they disagree

with). And Bob can show a colorable free speech claim since the Eighth Circuit, the United

States District Court for the Western District of Kentucky, and Arizona Supreme Court have

found free speech violations in similar situations and no one seriously doubts that photographs

deserve First Amendment protection. *See supra* §§ I.A–B.

This result fits the original understanding of the Free Exercise Clause as well. As even

*Smith* acknowledges, courts have historically applied strict scrutiny to regulations compelling

someone to speak religiously objectionable messages. This Court should follow this

understanding here as well.[3]

## V.       The law fails strict scrutiny as applied to Bob's expression and participation.

Because Virginia's law compels Bob to speak, regulates his speech based on content and

viewpoint, and compels him to participate in religious ceremonies, Virginia must prove that

these applications are narrowly tailored to serve a compelling state interest. *Reed*, 576 U.S.

at 163. Virginia cannot satisfy this difficult standard.

### A.       Virginia does not have a compelling interest to force Bob to celebrate same-sex weddings.

As for compelling interest, Virginia may try to invoke its need to stop discrimination to

justify regulating Bob. But Bob does not discriminate. He merely declines to provide wedding

services if doing so conveys a message he disagrees with. *See supra* § II.C (explaining

message/status distinction). Courts must "look[] beyond broadly formulated interests" and

---

[3] If this Court disagrees and applies the *Smith* standard—rational basis review for neutral and generally applicable laws burdening religion—then the *Smith* decision should be overturned. While this Court cannot do that, the Supreme Court recently granted certiorari in *Fulton v. City of Philadelphia,* 140 S. Ct. 1104 (Feb. 24, 2020) (no. 19-123) to consider doing so. So Bob wishes to preserve this issue for appeal. Bob has also alleged in the complaint that the law is not neural or generally applicable.

consider "the asserted harm of granting specific exemptions to particular … claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). So Virginia cannot cite discrimination to justify regulating Bob.

And courts have held that stopping discrimination does not justify compelling speech or forcing participation in wedding ceremonies. *Masterpiece*, 138 S. Ct. at 1727 (state could not force clergy to officiate wedding ceremonies); *Hurley*, 515 U.S. at 579 (using public accommodations law to compel speech was "fatal objective"); *TMG*, 936 F.3d at 755 ("regulating speech because it is discriminatory or offensive is not a compelling state interest"); *B&N*, 448 P.3d at 914–15 (same). Similarly, Virginia cannot commandeer Bob's photography or participation to "produce a society free of the corresponding biases." *Hurley*, 515 U.S. at 578.

Just as problematic, Virginia cannot identify an "actual problem" that justifies regulating Bob's photography. *Brown* 564 U.S. at 799. Many photographers and other creatives in Virginia gladly provide services celebrating same-sex weddings. Decl. ¶¶ 306–328. Forcing Bob to do so despite so many alternatives makes little sense.

What's more, Virginia's law has several exceptions that undermine any basis for regulating Bob. *See Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").

For one, Virginia allows public accommodations to discriminate against anyone "less than 18 years of age." Va. Code § 2.2-3904(D). Then for employers, Virginia allows businesses with fewer than fifteen employees to discriminate in some ways and businesses with fewer than five employees to discriminate against employees in any way. *Id.* § 2.2-3905(A) (defining employer these ways). And for housing, Virginia allows discrimination based on how many

properties someone owns and where the owner sleeps. *Id.* § 36-96.2(A)–(B) (exemption for private sale and rental of single-family homes where homeowner owns three or less units and for owner-occupied rentals intended for no more than four families). But if Virginia allows rank status discrimination in these situations, Virginia cannot justify compelling Bob to convey messages or participate in ceremonies he disagrees with, especially since he does not discriminate against anyone. *See Brown*, 564 U.S. at 802 (state's failure to regulate violence in books, cartoons, and movies undermined law restricting sale of violent video games to minors).

### B.     The law lacks narrow tailoring.

For narrow tailoring, Virginia must prove that regulating Bob is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). But Virginia has many better options.

First, Virginia could apply its law to regulate actual status discrimination, not message-based objections when speaking. *Supra* § I.C. Courts around the country already do this without problem. *See supra* §§ I.B–C (citing cases in Arizona, Utah, Eighth Circuit, Kentucky, and elsewhere). In other words, Virginia can stop status discrimination and still respect the First Amendment. Under Bob's proposal, Virginia can achieve all its (legitimate) interests.

Second, Virginia could create a "bona fide relationship" exception when classifications are integral to expressive services. Colo. Rev. Stat. § 24-34-601(3). Title VII already did this when it created a bona fide occupational qualification (BFOQ) exception for employment classifications necessary for decisions affecting expression. 42 U.S.C. § 2000e–2(e)(1); 29 C.F.R. § 1604.2 (interpreting Title VII to allow production studios to make classifications for BFOQs when "necessary for the purpose of authenticity or genuineness … e.g., [selecting] an actor or actress"). In fact, Virginia already allows several BFOQ exceptions for preferences in

advertising and hiring for employment positions where "religion, sex, age, or national origin is a [BFOQ] for employment." Va. Code. §§ 2-2.3905(B), (C).

Third, Virginia could exempt individuals and small businesses that celebrate weddings. Mississippi has already done this without problems. Miss. Code § 11-62-5(5)(a) (exempting photographers and other businesses that decline to provide wedding services based on sincere belief in marriage between a man and a woman). And the federal government has interpreted the First Amendment to *require* this freedom for those wanting to speak only in support of marriage between a man and a woman. Br. for the United States as Amicus Curiae Supporting Pet'rs at 22, *Masterpiece*, 138 S. Ct. 1719 (No. 16-111), 2017 WL 4004530 (public accommodation law could not force speakers to celebrate same-sex weddings).

Fourth, Virginia could interpret its law to not apply to highly selective entities. Courts have recognized such distinctions for selective university programs, *Vejo v. Portland Pub. Sch.*, 204 F. Supp. 3d 1149, 1168 (D. Or. 2016), *rev'd and remanded on other grounds*, 737 F. App'x 309 (9th Cir. 2018), and selective insurance companies, *Cut 'N Dried Salon v. Dep't of Human Rights*, 713 N.E.2d 592, 595–96 (Ill. App. Ct. 1999). The same logic applies to businesses when they create expression and exercise selectivity to convey the message they want.

Fifth, Virginia could define public accommodations narrowly to apply only to essential or non-expressive or non-internet businesses like restaurants, hotels, and stadiums. The federal government and several other states already do this. *See* 42 U.S.C. § 2000a(b) (defining public accommodations as hotels, restaurants, entertainment venues, and gas stations); Fla. Stat. § 760.02(11) (same); S.C. Code. Ann. § 45-9-10(B) (same); *Freedom Watch, Inc. v. Google Inc.*, 816 F. App'x 497, 501 (D.C. Cir. 2020) (interpreting DC public accommodation law only to apply to physical places, not online businesses).

## VI.    The remaining preliminary injunction factors favor granting an injunction.

When a plaintiff alleges a First Amendment violation, the remaining preliminary injunction factors fall into place. The loss of First Amendment freedoms always constitutes an irreparable injury. *WV Ass'n of Club Owners*, 553 F.3d at 298 ("[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim."); *Newsom*, 354 F.3d at 261 ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Nor is Virginia harmed by a preliminary injunction that prevents it from enforcing a statute that is likely unconstitutional as applied to Bob. *Legend Night Club v. Miller*, 637 F.3d 291, 303–04 (4th Cir. 2011); *Newsom*, 354 F.3d at 261. Finally, "upholding constitutional rights is in the public interest." *Legend Night Club*, 637 F.3d at 303; *Newsom*, 354 F.3d at 261. All these standard principles apply here too and justify Bob's requested injunction.

## <u>Conclusion</u>

Forcing Bob to celebrate weddings he disagrees with violates the First Amendment and ultimately threatens everyone's free speech and religious liberty. To stop this violation, Bob asks this Court to grant his preliminary injunction motion.

Respectfully submitted this 28th day of September, 2020.

By:  *s/C. Douglas Welty*

Jonathan A. Scruggs                    C. Douglas Welty
Arizona Bar No. 030505*              Virginia Bar No. 29480
**Alliance Defending Freedom**     **C. Douglas Welty PLC**
15100 N. 90th Street                     2111 Wilson Boulevard
Scottsdale, AZ 85260                    Suite 800

(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org

David A. Cortman
Georgia Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
Minnesota Bar No. 396303*
**Alliance Defending Freedom**
20116 Ashbrook Place, Suite 258
Ashburn, VA 20147
(571) 707-4655
(571) 707-4656 (facsimile)
jwidmalmdelphonse@ADFlegal.org

Arlington, Virginia 22201
(703) 276-0114
(844) 456-7800 (facsimile)
cdwelty@weltyblair.com

ATTORNEYS FOR PLAINTIFFS

* Motions for *Pro Hac Vice* admission filed concurrently

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of September, 2020, I electronically filed the foregoing paper with the Clerk of Court using the ECF system, and I hereby certify that the foregoing paper will be served via private process server with the Summons and Complaint to the following participants:

Mark R. Herring, Attorney General
Commonwealth of Virginia
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

R. Thomas Payne, II, Director
Civil Rights Unit/SAAG Fair Housing
Division of Human Rights and Fair Housing
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

s/ *C. Douglas Welty*
C. Douglas Welty
*Attorney for Plaintiffs*