**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| ROBERT UPDEGROVE *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-01141-CMH-JFA |
| | ) | |
| MARK R. HERRING *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' COMBINED OPPOSITION TO PRELIMINARY INJUNCTION**
**AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Mark R. Herring
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
  *Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
  *Solicitor General*

Martine E. Cicconi (VSB No. 94542)
Michelle S. Kallen (VSB No. 93286)
  *Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 89537)
  *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

      A.  The Virginia Values Act .................................................................................2

      B.  This Litigation.................................................................................................6

LEGAL STANDARDS ............................................................................................... 7

ARGUMENT .............................................................................................................. 8

I.    This Court lacks jurisdiction over plaintiff's pre-enforcement challenge to the
Virginia Values Act ...................................................................................................8

II.   Plaintiff's free speech claim fails because the Virginia Values Act regulates
what plaintiff does as a participant in commerce, not what he believes or says .............12

      A.  The Virginia Values Act regulates conduct, not speech ...........................................12

      B.  The Act is constitutional because there is no reasonable likelihood that the
public will associate any disputed "message" with plaintiff .....................................14

      C.  The Act does not target speech based on content or viewpoint...............................17

III.  Prohibiting discrimination in public accommodations does not violate plaintiff's
right to religious freedom .........................................................................................21

      A.  The Virginia Values Act is a neutral law of general applicability...........................21

      B.  The "hybrid rights" doctrine has not been recognized in this Circuit ....................22

IV.  The Virginia Values Act satisfies strict scrutiny............................................................23

V.   Plaintiff is not entitled to a preliminary injunction ........................................................25

CONCLUSION............................................................................................................. 26

CERTIFICATE OF SERVICE ....................................................................................... 28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*303 Creative LLC v. Elenis,*
   385 F. Supp. 3d 1147 (D. Colo. 2019) ................................................................. 19

*Abbott v. Pastides,*
   900 F.3d 160 (4th Cir. 2018) ............................................................................... 10

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
   458 U.S. 592 (1982) ............................................................................................. 24

*Allen v. College of William & Mary,*
   245 F. Supp. 2d 777 (E.D. Va. 2003) ................................................................... 7

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................... 8

*Axson-Flynn v. Johnson,*
   356 F.3d 1277 (10th Cir. 2004) .......................................................................... 23

*Baskin v. Bogan,*
   766 F.3d 648 (7th Cir. 2014) ................................................................................. 4

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................... 8

*Board of Directors of Rotary Int'l v. Rotary Club of Duarte,*
   481 U.S. 537 (1987) ............................................................................................. 23

*Burson v. Freeman,*
   504 U.S. 191 (1992) ............................................................................................. 23

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,*
   447 U.S. 557 (1980) ............................................................................................. 18

*Christ Coll., Inc. v. Board of Sup'rs, Fairfax Cty.,*
   944 F.2d 901, 1991 WL 179102 (4th Cir. 1991) ................................................. 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ............................................................................................. 21

*Combs v. Homer-Ctr. Sch. Dist.,*
   540 F.3d 231 (3d Cir. 2008) ............................................................................... 23

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ............................................................................................... 9

*Democratic Nat'l Comm. v. Wisconsin State Legislature,*
   No. 20A66, 592 U.S. __ (2020) .......................................................................... 25

*Dewhurst v. Century Aluminum Co.*,
    649 F.3d 287 (4th Cir. 2011) ........................................................ 8, 26

*Doe v. Virginia Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) ........................................................ 12

*Elane Photography, LLC v. Willock*,
    309 P.3d 53 (N.M. 2013) ........................................................ passim

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
    494 U.S. 872 (1990) ........................................................ 21, 23

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) ........................................................ 14

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) ........................................................ 25

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ........................................................ 13

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ........................................................ passim

*In re KBR, Inc., Burn Pit Litig.*,
    744 F.3d 326 (4th Cir. 2014) ........................................................ 7

*Kenny v. Wilson*,
    885 F.3d 280 (4th Cir. 2018) ........................................................ 11

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ........................................................ 24

*Maryland Shall Issue, Inc. v. Hogan*,
    971 F.3d 199 (4th Cir. 2020) ........................................................ 10, 11

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) ........................................................ passim

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974) ........................................................ 20, 21

*Miller v. City of Wickliffe, Ohio*,
    852 F.3d 497 (6th Cir. 2017) ........................................................ 9, 11

*National Park Hosp. Ass'n v. Department of Interior*,
    538 U.S. 803 (2003) ........................................................ 9

*Newman v. Piggie Park Enterprises, Inc.*,
    390 U.S. 400 (1968) ........................................................ 22

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ........................................................ 24

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) ........................................................ 18

*Raines v. Byrd*,
    521 U.S. 811 (1997) ...................................................................................... 9

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................................................... 19

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ............................................................................... passim

*Romer v. Evans*,
    517 U.S. 620 (1996) ................................................................................. 2, 12

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................................. passim

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................... 18, 19

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .................................................................................. 9

*State by McClure v. Sports & Health Club, Inc.*,
    370 N.W.2d 844 (Minn. 1985) ................................................................... 25

*State v. Arlene's Flowers, Inc.*,
    193 Wash. 2d 469 (2019), .............................................................. 12, 22, 25

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ........................................................................... 9, 10, 11

*Telescope Media Grp. v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ................................................................ 11, 21

*Trustgard Ins. Co. v. Collins*,
    942 F.3d 195 (4th Cir. 2019) ...................................................................... 12

*United States v. Hopkins*,
    427 U.S. 123 (1976) ..................................................................................... 25

*United States v. Lee*,
    455 U.S. 252 (1982) ..................................................................................... 22

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ..................................................................................... 19

*Warfaa v. Ali*,
    33 F. Supp. 3d 653 (E.D. Va. 2014) ............................................................. 7

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012), ........................................................................ 4

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................ 26

*Workman v. Mingo Cty. Bd. of Educ.*,
    419 Fed. Appx. 348 (4th Cir. 2011) ............................................................ 22

**Constitutional Provisions**

U.S. Const. art. III, § 2 ............................................................................... 8, 9, 11, 12

U.S. Const. amend. I .............................................................................................. passim

**Statutory Authorities**

20 U.S.C. § 1681 ......................................................................................................... 3

42 U.S.C. § 3604 ......................................................................................................... 3

42 U.S.C. § 12182 ....................................................................................................... 3

42 U.S.C. § 2000e-2 .................................................................................................... 3

Va. Code Ann. § 2.2-520 ............................................................................................. 4

Va. Code Ann. § 2.2-3900 ............................................................................... 2, 3, 26

Va. Code Ann. § 2.2-3904 ............................................................................... 3, 13, 22

Va. Code Ann. § 2.2-3905 ......................................................................................... 22

Va. Code Ann. § 2.2-3906 ........................................................................................... 4

Va. Code Ann. § 2.2-3907 ........................................................................................... 4

Va. Code Ann. § 2.2-3908 ........................................................................................... 4

1987 Va. Acts 938 ....................................................................................................... 3

2020 Va. Acts ch. 1140 ............................................................................................... 3

**Rules**

Fed. R. Civ. P. 12 ................................................................................................... 7, 8

**Other Authorities**

Christy Mallory, Taylor N.T. Brown & Brad Sears, *The Impact of Stigma and Discrimination Against LGBT People in Virginia*, Williams Institute, UCLA School of Law (Jan. 2020) .... 5, 6

Housing Opportunities Made Equal of Virginia, Inc., *A Study of Housing Discrimination Against Same-Sex Couples in Virginia* (Nov. 16, 2015) ....................................................... 6

Justin Mattingly, *'Virginia is for all Lovers': House and Senate Pass Legislation to Ban LGBTQ Discrimination*, Richmond Times-Dispatch (Feb. 6, 2020) ....................................... 6

Kerith J. Conron and Shoshana K. Goldberg, *LGBT People in the US Not Protected by State Non-Discrimination Statutes*, Williams Institute, UCLA School of Law (Apr. 2020) ............... 5

Office of the Governor, *Governor Northam Signs Virginia Values Act* (Apr. 11, 2020) ............... 6

Pew Research Center, *A Survey of LGBT Americans: Attitudes, Experiences and Values in Changing Times* (June 13, 2013) ..................................................................... 5

Sejal Singh and Laura E. Durso, *Widespread Discrimination Continues to Shape LGBT People's Lives in Both Subtle and Significant Ways*, Center for American Progress (May 2, 2017) ........ 5

## INTRODUCTION

"Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). Earlier this year, the Commonwealth of Virginia acknowledged that principle by adopting the Virginia Values Act—a law that specifically prohibits discrimination based on sexual orientation for the first time in Virginia's history. The Act also declares that all Virginians have a right to be free from discrimination in public accommodations and that no one may be turned away from a public-facing business on account of race, sex, religion, disability, or sexual orientation, among other characteristics.

Anti-discrimination laws like the Virginia Values Act "plainly serve[] compelling state interests of the highest order." *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984). And by forbidding certain *conduct*—discrimination based on protected characteristics—without regulating what those in the business world *believe* or *say* about the customers they serve, such laws further those interests without infringing First Amendment rights.

Myriad anti-discrimination laws across the country have been upheld against constitutional challenges, and the Virginia Values Act should be no different. The Virginia General Assembly chose to take affirmative steps to guard against discrimination in the public marketplace, aiming to foster a more inclusive Commonwealth free from the sort of unequal treatment that has long infected public life. And it did so with due regard for the religious convictions of those affected by the law. That choice should be respected, plaintiff's complaint should be dismissed, and the motion for a preliminary injunction should be denied.

**BACKGROUND**

**A.      The Virginia Values Act**

1.      Public accommodations laws have "a venerable history" that can be traced back to the common law. *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 571 (1995). In the decades following the Civil War, many States codified access to public accommodations regardless of race, particularly after the Supreme Court invalidated the federal prohibition on race discrimination adopted during Reconstruction. See *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984). "[U]ntil the Federal Government reentered the field in 1957," State laws "provided the primary means for protecting the civil rights of historically disadvantaged groups." *Id.* Even after Congress passed federal anti-discrimination laws, States remained at the forefront of the fight against unequal treatment based on immutable characteristics. By 1996, "most States ha[d] chosen to counter discrimination by enacting detailed statutory schemes." *Romer v. Evans*, 517 U.S. 620, 628 (1996).

Today, these state laws complement anti-discrimination protections that have been enacted at the federal level. Federal statutes—including the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and Title IX of the Education Amendments of 1972—prohibit discrimination in different aspects of society such as employment (*e.g.*, 42 U.S.C. § 2000e-2), public accommodations (*e.g.*, 42 U.S.C. § 12182), education (see 20 U.S.C. § 1681), and housing (see 42 U.S.C. § 3604).

2.      Virginia's primary anti-discrimination statute—the Virginia Human Rights Act, Va. Code Ann. § 2.2-3900 *et seq.*—dates back to 1987. That year, the General Assembly declared that "[i]t is the policy of the Commonwealth . . . [t]o safeguard all individuals within the Commonwealth from unlawful discrimination because of race, color, religion, national origin, sex, age, marital status or disability." 1987 Va. Acts 938.

2

Earlier this year, the General Assembly significantly expanded the anti-discrimination protections available under Virginia law by adopting the Virginia Values Act. See 2020 Va. Acts ch. 1140. The bill passed with bipartisan support, making Virginia the first southern State to adopt comprehensive legal protections against discrimination for the LGBTQ community.

As relevant here, the Virginia Values Act added a new section expressly prohibiting discrimination in public accommodations, including on the basis of sexual orientation. Specifically, as of July 1, 2020, it is "an unlawful discriminatory practice for any person . . . to refuse, withhold from, or deny any individual . . . any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation . . . on the basis of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, sexual orientation, gender identity, marital status, disability, or status as a veteran." Va. Code Ann. § 2.2-3904(B). The statute defines "[p]lace of public accommodation" to mean "all places or businesses offering or holding out to the general public goods, services, privileges, facilities, advantages, or accommodations." § 2.2-3904(A). The new law also added "sexual orientation" to the list of protected characteristics in the statute's "declaration of policy." § 2.2-3900.

The Virginia Human Rights Act (including the Virginia Values Act) is enforced by the Division of Human Rights in the Office of the Attorney General. See Va. Code Ann. §§ 2.2-520, 2.2-3907. The Division investigates complaints alleging unlawful discrimination, makes determinations about whether there is reasonable cause to believe state or federal laws have been violated, and facilitates conciliation efforts among the parties to resolve disputes. See § 2.2-3907; see also Declaration of Mona Hafeez Siddiqui ¶¶ 4–6 (Siddiqui Decl.) (attached as Exhibit A). A complaint alleging unlawful discrimination may be filed either by individuals "claiming to be

aggrieved" or the Division itself. Va. Code Ann. § 2.2-3907(A). Once a complaint is filed, the

Division conducts an investigation and prepares a report on the reasonable cause determination.

§ 2.2-3907(D). The parties may also agree to participate in mediation. § 2.2-3907(C).

Separate from the administrative enforcement process, the Attorney General may

"commence a civil action" to seek "appropriate relief" in cases involving a "pattern or practice"

of discrimination or "an issue of general public importance." Va. Code Ann. § 2.2-3906(A). The

Attorney General may also "intervene" in civil actions brought by private parties alleging

unlawful discrimination where "the case is of general public importance." § 2.2-3908(C).

3.      The General Assembly had ample reasons to include sexual orientation as a

protected characteristic. As many courts have noted, anti-LGBTQ discrimination has long been a

feature of American society. See, *e.g.*, *Baskin v. Bogan*, 766 F.3d 648, 658 (7th Cir. 2014)

("[H]omosexuals are among the most stigmatized, misunderstood, and discriminated-against

minorities in the history of the world."); *Windsor v. United States*, 699 F.3d 169, 182 (2d Cir.

2012), aff'd, 570 U.S. 744 (2013) ("It is easy to conclude that homosexuals have suffered a

history of discrimination.").

Despite progress in recent decades, this discrimination persists. In 2016, a national survey

showed that 1 in 4 LGBT people had experienced discrimination because of their sexual

orientation or gender identity within the prior year, and that 68.5% of those who had experienced

discrimination reported that it had "at least somewhat negatively affected their psychological

well-being."[1] Data specific to public accommodations show similar trends: In 2013, 23% of

---

[1] Sejal Singh and Laura E. Durso, *Widespread Discrimination Continues to Shape LGBT People's Lives in Both Subtle and Significant Ways*, Center for American Progress (May 2, 2017), https://www.americanprogress.org/issues/lgbtq-rights/news/2017/05/02/429529/ widespread-discrimination-continues-shape-lgbt-peoples-lives-subtle-significant-ways/.

LGBT adults reported that they "received poor service in a restaurant, hotel or other places of business" because of their sexual orientation or gender identity.[2]

Virginia's record is no better. Although the Commonwealth has more than 300,000 LGBT residents,[3] an analysis from January 2020—before the Virginia Values Act was enacted—concluded that Virginia ranked 24th in the nation in terms of "[s]ocial acceptance of LGB people" and that "historical anti-LGBT laws likely have lingering negative effects on the social climate for LGBT people."[4] A study from 2014 that examined the prevalence of discrimination in housing in Richmond showed that opposite-sex couples were treated more favorably than same-sex couples 44% of the time.[5]

The Virginia Values Act was born out of the General Assembly's recognition of this persistent and unremitting discrimination. One of the sponsors of the bill, Senator Adam Ebbin, explained that the legislation was "needed" and "urgent" because "discrimination is still happening in Virginia."[6] Upon signing the new law, the Governor remarked that "LGBTQ

---

[2] Pew Research Center, *A Survey of LGBT Americans: Attitudes, Experiences and Values in Changing Times* at 42 (June 13, 2013), https://www.pewsocialtrends.org/2013/06/13/a-survey-of-lgbt-americans/.

[3] Kerith J. Conron and Shoshana K. Goldberg, *LGBT People in the US Not Protected by State Non-Discrimination Statutes* at 4, Williams Institute, UCLA School of Law (Apr. 2020), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-ND-Protections-Update-Apr-2020.pdf.

[4] Christy Mallory, Taylor N.T. Brown & Brad Sears, *The Impact of Stigma and Discrimination Against LGBT People in Virginia* at 2, 12, Williams Institute, UCLA School of Law (Jan. 2020), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-LGBT-Discrimination-VA-Jan-2020.pdf.

[5] Housing Opportunities Made Equal of Virginia, Inc., *A Study of Housing Discrimination Against Same-Sex Couples in Virginia* (Nov. 16, 2015), https://homeofva.org/wp-content/uploads/2019/01/HousingDiscriminationAgainstSameSexCouplesinVA.pdf.

[6] Justin Mattingly, *'Virginia is for all Lovers': House and Senate Pass Legislation to Ban LGBTQ Discrimination*, Richmond Times-Dispatch (Feb. 6, 2020), https://richmond.com/news/plus/virginia-is-for-all-lovers-house-and-senate-pass-legislation-to-ban-lgbtq-discrimination/article_71712074-184d-524a-895f-e6e03fff7350.html.

Virginians" would no longer "have to fear being fired, evicted, or denied service in public places because of who they are."[7]

The expanded legal protections for LGBTQ people in the Virginia Values Act are also consistent with public opinion. According to a survey in 2018, 68% of Virginians "support policies that would protect LGBT people from discrimination."[8]

### B.   This Litigation

1.     Plaintiff Robert Updegrove (plaintiff) alleges that he is the sole owner of a "for-profit photography business that offers and provides photography services to the general public on a commission basis." Compl. ¶¶ 6, 8, 18, 19.[9] Through his business, plaintiff "offers several kinds of photography services to the public, including services for religious organizations, corporations, non-profits, and other organizational events," as well as "engagement and wedding photography." ¶¶ 21, 26. To identify business opportunities, plaintiff "solicits and receives inquiries for his photography from the general public through his business website" and also relies on "referrals from clients[] and referrals from his personal and professional network." ¶ 20.

According to plaintiff, he cannot accept requests to "create . . . wedding photography" for same-sex couples, because doing so "would promote activities contrary to his beliefs, express messages contradicting his beliefs, and express messages contradicting messages that [he] wants to and does promote elsewhere." Compl. ¶ 107. Plaintiff likewise alleges that photographing same-sex engagements or weddings would "violate his religious beliefs." ¶ 117.

2.     Plaintiff filed this suit on September 28, 2020. The complaint asserts three claims, all of which allege violations of the First Amendment to the United States Constitution:

---

[7] Office of the Governor, *Governor Northam Signs Virginia Values Act* (Apr. 11, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-856051-en.html.

[8] Mallory et al., *supra* note 4, at 18.

[9] The business entity is also a plaintiff in this action.

(a) freedom of speech, association, and press; (b) free exercise of religion; and (c) the establishment clause. Compl. ¶¶ 263–96. As relief, plaintiff seeks a preliminary and permanent injunction against enforcement of the public accommodation law both as applied to him and facially, as well as declarations that the law violates the First Amendment on an as-applied and facial basis. Compl. at 45. Plaintiff also moved for a preliminary injunction, asking the Court to enjoin defendants from enforcing the public accommodation law against plaintiff in any way that would (among other things): (a) require "offer[ing] or provid[ing] . . . wedding photography services . . . for same-sex weddings or engagements," and (b) prevent plaintiff "from asking prospective clients whether they seek photography services celebrating a same-sex wedding or engagement." Dkt. 2 at 2; see also Dkt. 6 (supporting memorandum) (Mem.).

The parties agreed that the preliminary injunction motion could be heard simultaneously with defendants' motion to dismiss, and the Court set a combined briefing schedule. See Dkt. 19.

## LEGAL STANDARDS

"Under Rule 12(b)(1), a court must dismiss an action if finds subject-matter jurisdiction lacking." *Warfaa v. Ali*, 33 F. Supp. 3d 653, 658 (E.D. Va. 2014). As the party "seek[ing] to invoke the court's authority," plaintiff bears "[t]he burden of establishing the existence of subject matter jurisdiction." *Allen v. College of William & Mary*, 245 F. Supp. 2d 777, 782 (E.D. Va. 2003). Where "a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss," the court "may consider evidence outside the pleadings." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014).

Defendants' argument that the claims in the complaint fail as a matter of law is governed by Rule 12(b)(6). Under that rule, a complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the court "must accept as true" all "well-pleaded factual allegations" in the complaint, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678–79.

This combined memorandum also opposes plaintiff's motion for a preliminary injunction. See Dkt. 2. "A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). To obtain a preliminary injunction, a party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*

## ARGUMENT

Plaintiff's complaint should be dismissed—and the preliminary injunction denied—for several independent reasons. This Court lacks subject matter jurisdiction because plaintiff's pre-enforcement challenge does not satisfy Article III's case or controversy requirement. See Part I, *infra*. In the alternative, the complaint should be dismissed under Rule 12(b)(6) because it fails to allege infringement on the rights to free speech or freedom of religion and the Act would survive strict scrutiny in any event. See Parts II–IV, *infra*. And even if the Court does not dismiss the complaint, it should deny the motion for a preliminary injunction because plaintiff has failed to satisfy any of the four requirements for obtaining that "extraordinary remedy." *Dewhurst*, 649 F.3d at 290. See Part V, *infra*.

## I.   This Court lacks jurisdiction over plaintiff's pre-enforcement challenge to the Virginia Values Act

Under Article III, federal court jurisdiction is limited to "Cases" and "Controversies."

U.S. Const. art. III, § 2. Whether viewed through the lens of standing or ripeness, that "bedrock" jurisdictional requirement is not met here. *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

1.      The doctrines of standing and ripeness are closely related, both "originat[ing] in Article III's 'case' or 'controversy' language." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Whereas standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 807 (2003). Carefully scrutinizing the nature and timing of a plaintiff's alleged injury in this way ensures that federal courts are "confine[d] . . . to a properly judicial role." *Spokeo*, 136 S. Ct. at 1547; see also *National Park Hosp. Ass'n*, 538 U.S. at 808 ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.").

Where a plaintiff seeks to invalidate a duly enacted law before the law has actually been enforced, the standing and ripeness requirements "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (*SBA List*); see also *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 506 (6th Cir. 2017) ("In the pre-enforcement First Amendment context, the line between Article III standing and ripeness has evaporated."). Specifically, to satisfy Article III, the plaintiff must show "a credible threat of prosecution" under the challenged law that makes "threatened enforcement sufficiently imminent." *SBA List*, 573 U.S. at 159. Absent such a showing, a pre-enforcement challenge is not justiciable and must be dismissed. *Id.*

2.      a.      Plaintiff has failed to carry his burden of establishing a constitutionally cognizable injury. See *SBA List*, 573 U.S. at 158 (burden is on "[t]he party invoking federal

9

jurisdiction" to establish it). "The most obvious way to demonstrate a credible threat of enforcement in the future" is to establish that there has been "an enforcement action in the past," *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018), but plaintiff attempts no such showing here: Nowhere in either the complaint or his preliminary injunction filings does plaintiff contend that he has been sued by the Attorney General or faced any administrative charges of discrimination under the Virginia Values Act.

That silence is telling, and there is a good reason for it. The Virginia Values Act has only been effective since July 1 of this year and, as of the date of this filing, the public accommodation provision has not yet been enforced against *anyone*—much less plaintiff. See Siddiqui Decl. ¶ 11. Indeed, in the fewer than six months that the new law has been on the books, no complaints alleging sexual orientation discrimination have been filed. *Id.* ¶ 9. Plaintiff therefore cannot offer any "evidence of the law having been enforced as [he] fear[s]." *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020). Nor can plaintiff show an imminent threat of enforcement by analogizing to historical patterns of anti-discrimination enforcement because, before the Virginia Values Act was adopted, state law did not prohibit discrimination based on sexual orientation. See Siddiqui Decl. ¶ 8.

b.       Without any relevant prior enforcement action—whether for sexual-orientation-based discrimination or any other form—plaintiff must look elsewhere to establish an injury that satisfies Article III. But the complaint comes up short there as well. Plaintiff does not assert that he has ever actually been approached by potential clients about photographing a same-sex wedding or that he has refused service to any LGBTQ individuals—either before or after the Virginia Values Act took effect. Nor does plaintiff assert that the Division (or the Office of the Attorney General more broadly) has "threatened prosecution for the supposedly proscribed

conduct," or even suggested that any enforcement action against plaintiff may be imminent. *Maryland Shall Issue*, 971 F.3d at 218. On these facts, any "threat of future enforcement" is too "speculative" and "conjectural" to allow plaintiff's pre-enforcement challenge to proceed. *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018).[10]

3.      Courts facing similar challenges have recognized that Article III's case or controversy requirement cannot be satisfied absent a concrete threat of enforcement. The Sixth Circuit, for example, rejected as non-justiciable a challenge to an Ohio city's ordinance where the law "ha[d] not yet been applied to [the plaintiffs]." *Miller*, 852 F.3d at 503. The claimed injury, the court explained, was "conjectural and hypothetical, rather than concrete and particularized" and "[a]ny decision" about how the law might apply to plaintiff "would be advisory." *Id.* By contrast, the Eighth Circuit allowed a challenge to Minnesota's anti-discrimination law to proceed, but only after pointing out that the State had "employed 'testers' to target noncompliant businesses" and "already pursued a successful enforcement action against a wedding vendor who refused to rent a venue for a same-sex wedding." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019). Because neither step has been taken in the fewer than six months that the Virginia Values Act has been in effect, the Eighth Circuit's decision underscores why plaintiff's complaint falls short of establishing Article III jurisdiction.

4.      The fact that plaintiff's current challenge is not justiciable will not leave him without a remedy should one become necessary. Plaintiff would, of course, be free to raise a First Amendment defense in response to any civil suit or administrative charge that could be filed in the future. And even before that, plaintiff could seek affirmative relief if and when the

---

[10] The public statement and *amici curiae* briefs on which plaintiff relies say nothing about how this statute will be enforced. See Compl. ¶¶ 181–82. These generalized statements—mostly involving out-of-State conduct and other States' laws—cannot show that "threatened enforcement" is "sufficiently imminent" to satisfy Article III. *SBA List*, 573 U.S. at 159.

threat of enforcement becomes sufficiently credible and imminent to satisfy Article III. Waiting

to resolve plaintiff's claims until such a threat materializes—if it ever does—ensures that any

controversy will be "presented in clean-cut and concrete form," *Doe v. Virginia Dep't of State*

*Police*, 713 F.3d 745, 758 (4th Cir. 2013), thereby avoiding the risk of an advisory opinion in a

hypothetical dispute, see *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200–01 (4th Cir. 2019).

## II.    Plaintiff's free speech claim fails because the Virginia Values Act regulates what plaintiff does as a participant in commerce, not what he believes or says

For decades, anti-discrimination laws have been adopted and implemented at both the

state and federal levels without running afoul of the constitutional guarantee of free speech. Like

those laws, the Virginia Values Act prohibits specific discriminatory *acts* but has nothing to say

about any particular message or expression. In other words, plaintiff's free speech claim fails on

every level: the Act regulates conduct, not speech; it does not compel plaintiff to engage in

speech with which he disagrees; and it is content neutral.[11]

### A.    The Virginia Values Act regulates conduct, not speech

1.    a.    The Supreme Court has long recognized that it is "well within the State's

usual power" to adopt laws protecting its residents from discrimination and that these laws "do

not, as a general matter, violate the First . . . Amendment[]." *Hurley v. Irish-American Gay,*

*Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572 (1995); see also *Romer v. Evans*, 517 U.S.

620, 628 (1996) (noting that "state and municipal laws" developed into an "emerging tradition of

statutory protection" against discrimination). Prohibiting "the *act* of discriminating against

individuals in the provision of publicly available goods, privileges, and services" does not "target

---

[11] See also *State v. Arlene's Flowers, Inc.*, 193 Wash. 2d 469, 514 (2019) (rejecting argument that design and sale of custom floral arrangements is expressive conduct requiring exemption from public accommodation law), pet. for cert. filed, No. 19-333 (U.S. Sept. 12, 2019); *Elane Photography, LLC v. Willock*, 309 P.3d 53, 71 (N.M. 2013) ("[T]he First Amendment does not exempt creative or expressive businesses from antidiscrimination laws.").

speech . . . on the basis of its content." *Hurley*, 515 U.S. at 572 (emphasis added). For this reason, "[i]t is unexceptional" that state law may "protect . . . classes of individuals[ ] in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1728 (2018).

The public accommodation provision of the Virginia Values Act does just that. As relevant here, the Act makes it unlawful to "refuse" or "deny" services that are otherwise open to the public based on certain protected characteristics, including race, religion, national origin, sex, pregnancy, sexual orientation, gender identity, disability, or status as a veteran. Va. Code Ann. § 2.2-3904(B). Just as Title VII of the Civil Rights Act of 1964 prohibits firing an employee "because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), the Virginia Values Act also governs behavior—here, by prohibiting the refusal to provide services because of certain trait. See *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (rejecting argument that Title VII infringes employers' First Amendment rights). Like Title VII, then, the Virginia Values Act "affects what [certain businesses] must *do* . . . not what they may or may not *say*," and therefore "regulates conduct, not speech." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006) (*FAIR*); accord *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (noting that "federal and state antidiscrimination laws" have been "previously upheld against constitutional challenge" under the First Amendment).

b.    In compelled-speech challenges, this distinction between conduct and speech is critical. In upholding a law requiring equal treatment of military recruiters on law school campuses, the Supreme Court emphasized that any impact on speech was "plainly incidental to [a law]'s regulation of conduct." *FAIR*, 547 U.S. at 62. The fact that some regulated conduct may

13

be "carried out by means of language, either spoken, written, or printed," the Court explained, "has never been deemed an abridgement of freedom of speech." *Id.* "[M]ak[ing] a course of conduct illegal"—even where the prohibited conduct might involve some "incidental" speech—"is simply not the same" as, for example, "forcing a student to pledge allegiance." *Id*; accord *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

2.    Plaintiff fails entirely to grapple with the conduct/speech distinction, focusing instead on the fact that some courts have recognized photography as a form of protected speech. See Mem. 9–11. But even assuming that to be true, the fact remains that the Virginia Values Act does not dictate the images plaintiff creates or displays. Rather, the Act provides only that plaintiff must offer his services as a photographer to all Virginians on an equal basis and may not discriminate based on protected characteristics. "While photography may be expressive, the operation of a photography business is not," and the latter may be subject to anti-discrimination laws. *Elane Photography*, 309 P.3d at 68; see also *Roberts v. United States Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring) ("The Constitution does not guarantee a right to choose . . . customers . . . in simple commercial transactions, without restraint from the State."). Accordingly, as in *FAIR*, the equal-access requirement in the Virginia Values Act does not offend the First Amendment even if its conduct-focused provisions have some "incidental" impact on speech. *FAIR*, 547 U.S. at 62.

**B.    The Act is constitutional because there is no reasonable likelihood that the public will associate any disputed "message" with plaintiff**

Even if the Virginia Values Act were properly understood as regulating speech rather

than conduct, it would still pass constitutional muster.

1.      As the Supreme Court has recognized, compelled speech challenges fail where there is no reasonable likelihood that the public will associate the disputed "message" with the speaker. *FAIR*, 547 U.S. at 65. In *FAIR*, a group of law schools claimed that a federal law requiring them to host military recruiters impermissibly compelled them to associate with the military's then-existing discriminatory policies toward gay and lesbian service members. *Id.* But "[n]othing about recruiting," the Court explained, "suggest[ed] that law schools agree with any speech by recruiters." *Id.* The Court observed that even high school students "can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so, pursuant to an equal access policy." *Id.* The same would be true of those seeing military recruiters on campus because "[s]urely students have not lost that ability by the time they get to law school." *Id.* For that reason, the Court held, "accommodating the military's message does not affect the law schools' speech." *Id.* at 64.

The Supreme Court's reasoning in *FAIR* applies in full force here. For one thing, plaintiff's claim rests on the dubious proposition that photographs of a same-sex wedding make a political statement, rather than simply celebrating a marriage between two people. But see *Masterpiece Cakeshop*, 138 S. Ct. at 1750 (Ginsburg, J., dissenting) ("When a couple contacts a bakery for a wedding cake, the product they are seeking is a cake celebrating *their* wedding—not a cake celebrating heterosexual weddings or same-sex weddings."). Even leaving that aside, as the photographs in plaintiff's brief show, *it is the couple and their guests* who are celebrating, not the photographer. The fact that plaintiff may maintain "editorial control" and make decisions to "tell a cohesive story about the love, intimacy, and sacrifice of marriage" (Mem. 14) does not somehow transform the couple's story into his own. What may be associated with the

photographer is the quality of the photographs, not the character or piety of the subjects, or the legality or propriety of their marriages. Accordingly, plaintiff's compelled speech challenge fails because, to the extent he is "forced to accommodate" any speech at all, his "own message [is not] affected." *FAIR*, 547 U.S. at 63.

2.    Plaintiff's contrary argument relies heavily on *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995), where the Supreme Court held that application of a public accommodation law to require a parade sponsor to include a gay, lesbian, and bisexual group was impermissible compelled speech. That case is inapposite.

a.    In *Hurley*, the Court emphasized that "[p]arades are . . . a form of expression," citing "the inherent expressiveness of marching to make a point." *Hurley*, 515 U.S. at 568. In addition, the group attempting to participate "was formed for the very purpose of marching . . . to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants, to show that there are such individuals in the community, and to support the like men and women who sought to march in the New York parade." *Id.* at 570. "[O]nce the expressive character of both the parade and the marching . . . contingent is understood," the Court explained, "it becomes apparent that the state courts' application of the statute had the effect of declaring the sponsors' speech *itself* to be the public accommodation." *Id.* at 573 (emphasis added). It was that aspect of the State's application of the public accommodation law that "violate[d] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.*

b.    The features of *Hurley* that drove the Court's conclusion are not present here. Even if a photograph *itself* may constitute speech, plaintiff is in the business of earning money by photographing other people's events for their personal use—not using photographs to present

16

his own messages to the public. That is a far cry from the "inherent expressiveness" of a parade, which is so dependent on "watchers" that it "may as well not have happened" without them. *Hurley*, 515 U.S. at 568; accord *FAIR*, 547 U.S. at 63 ("The expressive nature of a parade was central to our holding in *Hurley*."). Unlike in *Hurley*, therefore, plaintiff's speech *itself* is not the public accommodation—his commercial business is. *Hurley*, 515 U.S. at 573; see also *Elane Photography*, 309 P.3d at 67 ("[Plaintiff]'s choice to offer its services to the public is a business decision, not a decision about its freedom of speech.").[12]

Likewise, the same-sex couples whose marriages plaintiff does not wish to photograph are fundamentally different from the group that wanted to participate in the parade in *Hurley*. As the Supreme Court explained in *Hurley*, the group's "participation as a unit in the parade" was as "expressive" as the parade itself. 515 U.S. at 570. By contrast, a couple getting married is celebrating their *wedding*, not making a statement about the virtues, legality, or politics of same-sex marriage. Because neither of the points on which the Court relied in *Hurley* exists in this case, the Court's conclusion that application of the public accommodation law violated the First Amendment does not apply.

### C.     The Act does not target speech based on content or viewpoint

Plaintiff's assertion (Mem. 21) that the Virginia Values Act unconstitutionally "restricts" speech based on content and viewpoint largely repeats his argument that the Act impermissibly compels speech. And, like plaintiff's previous argument, this one lacks merit.

1.     As already explained, plaintiff's claims fail at the threshold because the law

---

[12] For the same reason, plaintiff is equally wrong (Mem. 15, 19) that *Hurley* would preclude application of public accommodation laws to other professionals, such as lawyers, graphic designers, and advertisers engaged in commerce who preferred to discriminate against customers on the basis of sexual orientation or other protected characteristics. Indeed, that point reveals that it is *plaintiff*, not the Commonwealth, who advocates a "dangerous and limitless principle." *Id.*

regulates conduct, not speech. The Supreme Court has consistently held that any incidental regulation of speech flowing from constitutional regulation of conduct is likewise constitutional. See *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."). Moreover, there is no debate that "[t]he government may ban . . . commercial speech related to illegal activity." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 563–64 (1980). Indeed, the Supreme Court has emphasized that "[a]ny First Amendment interest . . . is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973).

This precedent squarely defeats not only plaintiff's challenge to the requirement that he offer his photography services on an equal basis to same-sex couples (the so-called "Accommodations Clause"), but also his challenge to the Act's "Publication Clause." See Mem. 21–22 (explaining that plaintiff wishes to distribute an "editorial policy" and "statement" describing his religious and artistic reasons for declining to photograph same-sex weddings); see also Compl. Ex. 1 & 2. The fact that a law prohibiting discrimination in employment "will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *FAIR*, 547 U.S. at 62; see also *Sorrell*, 564 U.S. at 567 (noting that "an ordinance against outdoor fires might forbid burning a flag," and "antitrust laws can prohibit agreements in restraint of trade"). Just as employment discrimination laws may constitutionally prohibit an employer from announcing its intent to make hiring decisions based on an applicant's race, so too may a public accommodation law prohibit a vendor from announcing its intent to withhold goods or services

18

based on a customer's sexual orientation. Any incidental burden on speech in connection with regulation of that unlawful conduct does not infringe constitutional rights. See *303 Creative LLC v. Elenis*, 385 F. Supp. 3d 1147, 1159 (D. Colo. 2019) (public accommodation law may prohibit "specific promise to engage in unlawful discrimination against customers based on their sexual orientation" without "run[ning] afoul of the Free Speech clause of the First Amendment"), appeal filed, No. 19-1413 (10th Cir.).

2.      Once again, however, plaintiff's argument fails even leaving the conduct/speech distinction aside. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A content-based law "'on its face' draws distinctions based on the message a speaker conveys," *id.*, or is designed to suppress speech "because of disagreement with the message it conveys," *Sorrell*, 564 U.S. at 566 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). A law is content neutral, by contrast, if it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. Put differently, "[g]overnment regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Id.* (quotation marks and emphasis omitted).

The Virginia Values Act falls into the latter category. Indeed, the Supreme Court has *already rejected* the notion that public accommodation laws discriminate on the basis of viewpoint. In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984) (*Jaycees*), the Court rejected a constitutional challenge to a state law that prohibited "deny[ing] any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin

or sex." *Id.* at 615. "On its face," the Court held, "the . . . Act does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." *Id.* at 623.

Plaintiff offers no basis for ignoring the Supreme Court's clear statement in *Jaycees*. Like the law at issue in that case, the Virginia Values Act neither targets speech nor defines what is prohibited or authorizes enforcement on the basis of viewpoint. Moreover, as described *supra* at 4–6, the General Assembly's motivation in passing the Act was to eliminate discrimination, not to "suppress[] . . . expression." *Jaycees*, 468 U.S. at 624.[13]

Although *Hurley* held that a "peculiar" *application* of a content-neutral public accommodation law unconstitutionally burdened speech, see 515 U.S. at 572, the facts of this case are distinguishable for the reasons already explained. Specifically, requiring plaintiff to photograph same-sex couples does not compel him to adopt anyone's message as his own, much less to "create photographs for those seeking to promote only one view—celebrating same-sex engagements or weddings." Mem. 21. As noted above, photographs of same-sex weddings celebrate the couple being married, not the notion of same-sex marriage. Plaintiff's analogy to *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974), also fails. "That a law regulating the *content* of a *newspaper* was deemed a content-based regulation of speech has no bearing on whether a law regulating *discrimination* in places of *public accommodation* also so qualifies." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 773 (8th Cir. 2019) (Kelly, J., dissenting); see

---

[13] Contrary to plaintiff's contention (Mem. 21–22), the Publication Clause does not "facially" restrict speech based on content or viewpoint. If a law prohibiting discrimination on the basis of protected characteristics "[o]n its face . . . does not distinguish between prohibited and permitted activity on the basis of viewpoint," *Jaycees*, 468 U.S. at 623, the same must be said of a law that prohibits public statements promising to engage in precisely the same discrimination.

also *Elane Photography*, 309 P.3d at 67 (distinguishing *Tornillo* from application of public accommodation law to wedding photographer and noting that "[t]he government has not interfered with Elane Photography's editorial judgment; the only choice regulated is Elane Photography's choice of clients").

### III.   Prohibiting discrimination in public accommodations does not violate plaintiff's right to religious freedom

Plaintiff also fails to state a valid religious liberty claim under the First Amendment.

### A.   The Virginia Values Act is a neutral law of general applicability

Supreme Court precedent has long made clear that the right to free exercise of religion "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). For that reason, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). A law is "neutral" so long at its "object" is not "to infringe upon or restrict practices because of their religious motivation." *Id.* at 533. And a law is generally applicable so long as it does not "impose burdens only on conduct motivated by religious belief" in a "selective manner." *Id.* at 543.

1.   Anti-discrimination laws are precisely the type of neutral, generally applicable laws that withstand First Amendment scrutiny under *Smith*. As the Supreme Court recently explained, "it is a general rule that [religious and philosophical] objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop*, 138 S. Ct. at 1727; see also *United States v. Lee*, 455 U.S. 252, 261

(1982) ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity."). The Court has likewise rejected free-exercise objections to federal laws prohibiting discrimination in public accommodations, describing those challenges as "patently frivolous." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 403 n.5 (1968).

2. The Virginia Values Act is a neutral law of general applicability. Nothing about Virginia's law targets religion or religious activities in any way. To the contrary, both the public accommodation and employment provisions specifically protect *against* discrimination based on religion. See Va. Code Ann. §§ 2.2-3904(B), 2.2-3905(B), and there are no exceptions that suggest the law selectively burdens only religious conduct.[14] Under *Smith*, that is the end of the matter. See *Arlene's Flowers*, 193 Wash. 2d at 523; *Elane Photography*, 309 P.3d at 73.

**B.  The "hybrid rights" doctrine has not been recognized in this Circuit**

Attempting to avoid this clear outcome under *Smith*, plaintiff insists that the religious freedom claim combined with the free speech claim trigger strict scrutiny under the so-called "hybrid-rights doctrine." Mem. 25–26. As plaintiff acknowledges, however, the Fourth Circuit has never recognized this doctrine or applied strict scrutiny in these circumstances. See *Workman v. Mingo Cty. Bd. of Educ.*, 419 Fed. Appx. 348, 353 (4th Cir. 2011) (observing that "there is a circuit split over the validity of this 'hybrid-rights' exception" and declining "to decide this issue here"). And the language from *Smith* on which plaintiff's hybrid rights theory relies is dicta and has not been applied by the Supreme Court since *Smith* was decided in 1990. See *Combs v.*

---

[14] Of the three exceptions to which plaintiff points (see Mem. 27–28), only one is found in the public accommodation law. And even that exception—which allows for differential treatment of those younger than 18 and assistance for those over 50, see Va. Code Ann. § 2.2-3904(D)—has nothing to do with religious beliefs or equal treatment based on sexual orientation.

*Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 246–47 (3d Cir. 2008) (describing circuit split and controversy over hybrid-rights theory). In any event, even if the hybrid rights doctrine had been recognized, it would not apply here because (as discussed in Part II, *supra*) plaintiff has failed to allege a viable free-speech claim. Cf. *Christ Coll., Inc. v. Board of Sup'rs, Fairfax Cty.*, 944 F.2d 901 (Table), 1991 WL 179102, *4 (4th Cir. 1991) (declining to "decide whether appellants' claim is indeed a hybrid" where no burden on religion had been established).[15]

## IV.    The Virginia Values Act satisfies strict scrutiny

For the reasons just explained, plaintiff is wrong that the Virginia Values Act is subject to strict scrutiny. See Parts II & III, *supra*. But even if strict scrutiny applied, the Act would satisfy that standard because it furthers the "compelling state interest" in combatting discrimination and "is narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992).[16]

1.    Plaintiff does not seriously dispute that the public accommodation law promotes a compelling government interest. Nor could he. The Supreme Court has squarely held that a State's interest in "eliminating discrimination and assuring its citizens equal access to publicly available goods and services . . . serves compelling state interests of the highest order." *Jaycees*, 468 U.S. at 624; see also *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) ("[P]ublic accommodations laws plainly serv[e] compelling state interests of the highest order." (internal quotation marks and citation omitted)). Because "acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages" can "cause unique evils" in our society, the government "has a compelling interest to prevent" these

---

[15] The few courts that have adopted plaintiff's theory have required a heightened showing as to the independent constitutional claim. See, *e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295 (10th Cir. 2004) ("We . . . will only apply the hybrid-rights exception to *Smith* where the plaintiff establishes a fair probability, or a likelihood, of success on the companion claim.").

[16] The handful of out-of-circuit decisions on which plaintiff relies that reach a different conclusion are not binding on this Court.

harms. *Jaycees*, 468 U.S. at 628; see also *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 609 (1982) (recognizing, in *parens patriae* context, "state interest in securing residents from the harmful effects of discrimination").

That public interest is no less compelling when it comes to discrimination based on sexual orientation. As the Supreme Court recently reiterated, our laws "can, and in some instances must, protect" LGBTQ individuals "in the exercise of their civil rights . . . on terms equal to others." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). Plaintiff's argument (Mem. 27) that "Virginia cannot identify an 'actual problem' that justifies" prohibiting unequal treatment based sexual orientation disregards the well documented history of discrimination against same-sex couples, and LGBTQ individuals more broadly. See *Obergefell v. Hodges*, 576 U.S. 644, 675 (2015) (noting "long history of disapproval of [same-sex couples'] relationships" that "works a grave and continuing harm"); see also *Lawrence v. Texas*, 539 U.S. 558, 571 (2003) ("[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral."); *supra* at 4–6.

2.      The public accommodation law is also narrowly tailored to serve that indisputably compelling public interest. See *Jaycees*, 468 U.S. at 628 (finding that any "incidental abridgement of . . . protected speech" was "no greater than . . . necessary to accomplish the State's legitimate purposes" of combatting discrimination). Although plaintiff insists that "Virginia has many better options" (Mem. 28) to narrowly tailor the public accommodation law, his argument ignores the goal at the heart of the anti-discrimination project: equality. "[C]arv[ing] out a patchwork of exceptions for ostensibly justified discrimination"—such as the wedding industry, as plaintiff suggests—would "fatally undermine[]" the compelling interest that justifies the law in the first place. *Arlene's Flowers*, 193 Wash. 2d at 531; see also *State by*

*McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 853 (Minn. 1985) (noting that "state's overriding interest" in prohibiting discrimination "permits of no exemption"); *supra* at 4–6. Indeed, plaintiff's proposals—eliminating the Publication Clause; allowing exemptions for "bona fide relationship[s]"; exempting individuals, small businesses, and "highly selective" entities; or limiting the law to "essential" services like "restaurants, hotels, and stadiums" (Mem. 28–30)— would fundamentally alter the goals of the Virginia Values Act from eliminating discrimination in public life to simply mitigating it. That is not "narrow tailoring"; it is "legislating by judicial fiat." *United States v. Hopkins*, 427 U.S. 123, 125 (1976); accord *Democratic Nat'l Comm. v. Wisconsin State Legislature*, No. 20A66, 592 U.S. __ (2020) (Roberts, C.J., concurring in denial of application to stay) (rejecting "federal [court] intrusion on state lawmaking processes").[17]

By adopting the Virginia Values Act, the people of the Commonwealth sought to ensure that no one would feel the "humiliation, frustration, and embarrassment" that comes from being told you are "unacceptable as a member of the public" because of some aspect of your identity. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 292 (1964) (Goldberg, J., concurring). That judgement should be respected, not disregarded.

## V.     Plaintiff is not entitled to a preliminary injunction

To obtain a preliminary injunction, plaintiff must establish: (1) that he is "likely to succeed on the merits," (2) that he is "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in his favor," and (4) that "an injunction

---

[17] Nor is it relevant that plaintiff does not otherwise discriminate against the LGBTQ community. See Mem. 17–18. When approaching a photographer—or any other vendor—in the hopes of procuring their services for a wedding, many same-sex partners are unable to hide their sexual orientation. By contrast, another couple whose marriage plaintiff might not support—such as a couple intending to have an "open relationship[]" (Mem. 4)—need not reveal the aspect of their life plaintiff is likely to denounce. Such unequal treatment based solely on sexual orientation is exactly what the Virginia Values Act is designed to prevent. Accepting plaintiff's argument that he should be permitted to discriminate in the specific context of weddings and engagements would undermine the broad remedial purposes of the Act.

is in the public interest." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Plaintiff cannot satisfy that standard. For all of the reasons discussed above, plaintiff has not established likelihood of success on the merits. See Parts I–IV, *supra*. And the same reasons why this pre-enforcement challenge is not ripe and plaintiff currently lacks standing to bring it defeat any notion that plaintiff has shown he is "*likely* to suffer irreparable harm in the absence of preliminary relief." *Dewhurst*, 649 F.3d at 290 (emphasis added).

Plaintiff has also failed to establish that the balance of equities tips in his favor or that an injunction is in the public interest. In the Virginia Human Rights Act, the General Assembly expressly declared that "[i]t is the policy of the Commonwealth to . . . [s]afeguard all individuals . . . from unlawful discrimination . . . in places of public accommodation." Va. Code Ann. § 2.2-3900(B)(1). To the extent this Court does not dismiss the complaint, enjoining any part of the public accommodation law while this litigation proceeds would frustrate public policy as adopted by the General Assembly and leave at least some Virginians vulnerable to discrimination. For all of these reasons, should any of plaintiff's claims survive defendants' motion to dismiss, the Court should deny plaintiff's request for a preliminary injunction.

## CONCLUSION

Defendants' motion to dismiss should be granted, and plaintiff's motion for a preliminary injunction should be denied.

Dated: November 16, 2020

Respectfully submitted,

**MARK R. HERRING**
**R. THOMAS PAYNE, II**

By: _____ */s/ Jessica Merry Samuels* _____
       Jessica Merry Samuels (VSB No. 89537)
       *Assistant Solicitor General*

| | |
|---|---|
| Mark R. Herring<br>   *Attorney General* | Toby J. Heytens (VSB No. 90788)<br>   *Solicitor General* |
| Erin B. Ashwell (VSB No. 79538)<br>   *Chief Deputy Attorney General* | Martine E. Cicconi (VSB No. 94542)<br>Michelle S. Kallen (VSB No. 93286)<br>   *Deputy Solicitors General* |
| Samuel T. Towell (VSB No. 71512)<br>   *Deputy Attorney General* | Office of the Attorney General<br>202 North Ninth Street<br>Richmond, Virginia 23219<br>(804) 786-6835 – Telephone<br>(804) 371-0200 – Facsimile<br>solicitorgeneral@oag.state.va.us |

27

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel who have appeared, including:

Charles Douglas Welty
C. Douglas Welty LLC
2111 Wilson Boulevard
Suite 800
Arlington, VA 22201
cdwelty@weltyblair.com

By:   */s/ Jessica Merry Samuels*
Jessica Merry Samuels
*Assistant Solicitor General*
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us