```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3
   ROBERT UPDEGROVE, ET AL.         )
 4                                  )
                                    )
 5      VS.                         )   1:20-CV-1141  CMH/JFA
                                    )
 6                                  )   ALEXANDRIA, VIRGINIA
                                    )     JANUARY 15, 2021
 7                                  )
   MARK R. HERRING, ET AL.          )
 8  _____)

 9

10

11

12

13  _____

14              TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE CLAUDE M. HILTON
15             UNITED STATES DISTRICT JUDGE

16  _____

17

18

19

20

21

22

23

24  Proceedings reported by stenotype, transcript produced by

25  Julie A. Goodwin.
```

1                    **A P P E A R A N C E S**

2

3   FOR THE PLAINTIFF:
            ALLIANCE DEFENDING FREEDOM
4           By:  MR. JOHANNES S. WIDMALM-DELPHONSE
            20116 Ashbrook Place
5           Suite 250
            Ashburn, Virginia  20147
6           jwidmalmdelphonse@ADFlegal.org

7           ALLIANCE DEFENDING FREEDOM
            MR. JONATHAN A. SCRUGGS
8           15100 N. 90th Street
            Scottsdale, Arizona  85260
9           480.444.0020
            jscruggs@ADFlegal.org

10

11          C. DOUGLAS WELTY LLC
            By:  MR. CHARLES DOUGLAS WELTY
12          2111 Wilson Boulevard
            Suite 800
13          Arlington, Virginia  22201
            cdwelty@weltyblair.com

14

15

16  FOR THE DEFENDANT:
            OFFICE OF THE ATTORNEY GENERAL
17          By:  MR. TOBY J. HEYTENS
            Solicitor General
18          By:  MS. JESSICA M. SAMUELS
            Assistant Solicitor General
19          202 North Ninth Street
            Richmond, Virginia 23219
20          804.786.6835
            jsamuels@oag.state.va.us

21

22

23  OFFICIAL U.S. COURT REPORTER:
            MS. JULIE A. GOODWIN, CSR, RPR
24          United States District Court
            401 Courthouse Square
25          Alexandria, Virginia  22314
            512.689.7587

1   (JANUARY 15, 2021, 10:02 A.M., OPEN COURT.)

2           THE COURTROOM DEPUTY:  Civil Action Number

3   2020-CV-1141, *Robert Updegrove, et al. versus Mark R. Herring,*

4   *et al.*

5           If counsel would please note their appearance for

6   the record.

7           MS. SAMUELS:  Good morning, Your Honor.  Jessica

8   Samuels for the Commonwealth defendants.  With me at counsel

9   table is also Mr. Toby Heytens.

10          THE COURT:  All right.  Good morning.

11          MR. WIDMALM-DELPHONSE:  Good morning, Your Honor.

12  Johannes Widmalm-Delphonse on behalf of Bob Updegrove and Bob

13  Updegrove Photography, together with Jonathan Scruggs and

14  Charles Douglas Welty.

15          THE COURT:  All right.  Good morning.

16          All right.  This comes on on your motion.  And if

17  you want to take your mask off while you're talking, you're

18  welcome to.

19          MS. SAMUELS:  Thank you, Your Honor.  Good morning.

20          We are here this morning on two motions, both of

21  which implicate the same question, whether the First Amendment

22  prohibits the Commonwealth of Virginia through its elected

23  leaders from expanding protections against discrimination and

24  public life to members of the LGBT community.  The answer to

25  that question is no, and the complaint should therefore be

1  dismissed.

2          In this suit, plaintiff challenges the Virginia

3  Values Act, a law adopted by the general assembly last year

4  that makes our Commonwealth a more equal and inclusive place.

5  While the impact of the Virginia Values Act is significant, the

6  basic premise of the law is no different than the scores of

7  other anti-discrimination laws that have been adopted at the

8  state and federal levels for over a century, such as Title VII

9  in the Americans with Disabilities Act.  Like these other laws,

10  the Virginia Values Act makes it unlawful to discriminate on

11  the basis of certain protected characteristics.  One of those

12  protected characteristics is sexual orientation.

13          The general assembly had ample reason to include

14  sexual orientation in the Virginia Values Act.  As many courts

15  have noted, anti-LGBT discrimination has long been a feature of

16  our society, and despite progress in recent decades, that

17  discrimination still persists today.

18          The legislative determination that no Virginian

19  should be denied service on account of sexual orientation is

20  consistent with Justice Kennedy's observation for a majority of

21  the Supreme Court over two years ago, that, quote, our society

22  has come to the recognition that gay persons and gay couples

23  cannot be treated as social outcasts or as inferior in dignity

24  and worth.

25          Also like other anti-discrimination laws, the

1 Virginia Values Act says nothing about what someone must

2 believe or the views they must espouse.  All it does is require

3 businesses that set up shop and choose to sell their goods or

4 services to the general public to treat customers equally

5 regardless of who they are.

6           Nowhere does the law endorse or compel a particular

7 view or creed.  To the contrary, one of its most important

8 features is that the law applies across the board to all forms

9 of discrimination and public accommodations.  Just as the law

10 protects the same-sex couple looking for a professional

11 photographer to document their wedding, it also protects a

12 devout Christian who wears a cross from being denied service at

13 a coffee shop or a restaurant merely because of her religious

14 beliefs.  In this way, the Virginia Values Act does not

15 restrict how a business owner may express his own message.

16           This case is a perfect example.  Plaintiff is

17 completely free to convey his views about same sex marriage

18 with his own speech, as he did recently in an editorial

19 published by a national newspaper.  These features of the

20 Virginia Values Act show why courts, including the Supreme

21 Court, have consistently upheld state authority to enact this

22 type of anti-discrimination law.

23           Even the cases on which plaintiff relies accept as

24 uncontroversial the proposition that the government, when a

25 majority of our elected representatives choose to do so, may

1 prohibit discrimination in public life.  These laws date back

2 to the decades following the Civil War when many states

3 codified access to public accommodations regardless of race.

4 These laws were expanded with the Civil Rights Act of 1964

5 where Congress prohibited discrimination in certain public

6 accommodations across the country on the basis of race,

7 religion, or national origin.  And this threat continues

8 through today as more than 20 states have enacted public

9 accommodation laws to include protections for LGBT individuals.

10　　　　　Against this historical backdrop, it is

11 unsurprising that both the plaintiffs' First Amendment claims

12 fail as a matter of law.  But this Court need not even reach

13 those questions on the merits to rule in defendants' favor

14 because plaintiffs' claims do not satisfy Article III's case or

15 controversy requirement.  This argument under Rule 12(b)(1) is

16 itself dispositive of both motions, and indeed the entire case.

17 So before we turn to the merits, I would like to emphasize two

18 points on the question of justiciability.

19　　　　　First, there is no dispute that the Virginia Values

20 Act has not been enforced against the plaintiff.  That means

21 there is also no dispute that this case is a pre-enforcement

22 challenge.  Under the test outlined by the Supreme Court in

23 *Susan B. Anthony List* and applied by the Fourth Circuit in

24 *Abbott*, this court lacks jurisdiction unless plaintiff can show

25 a credible threat of enforcement.

1        Based on the complaint and the record presented

2   here, plaintiff has failed to carry that burden.  He does not

3   assert that he has ever been approached by a same-sex couple

4   seeking his photography services for their wedding, nor does he

5   give any reason to think he might face such a request in the

6   near future.

7        Plaintiff has also not offered any evidence to

8   substantiate a credible fear that the law will be enforced

9   against him and his business specifically, much less that any

10  such enforcement action would necessarily be imminent.

11  Instead, plaintiff points to evidence that has nothing to do

12  with Virginia, nothing to do with this law, or nothing to do

13  with this agency's administrative proceedings.

14       By comparison, many of the cases on which plaintiff

15  relies involved a history of past enforcement action against

16  the very plaintiffs themselves, as in *Susan B. Anthony List* and

17  *Kenny*.  Even in the *North Carolina Right to Life* case, that

18  plaintiff had been engaged in a back and forth with the state

19  enforcement agency.  We have nothing similar here.

20       Second, while the standard may seem rigid in some

21  respects, it is not just a technical pleading rule.  From a

22  practical perspective, the requirements of standing in ripeness

23  ensure that the Court has the facts necessary to adjudicate a

24  concrete dispute.  Without those facts, such as who approached

25  the plaintiff, what was requested, whether plaintiff provides

1  similar services to others, and why the customers were denied,

2  we are left with only hypotheticals and abstract questions

3  about what may or may not come to pass.

4          That is not the stuff of a case or controversy

5  under Article III and for good reason.  This Court is not

6  presented with any real world facts on which to base its

7  decision.  From a constitutional perspective, and perhaps most

8  importantly, these doctrinal requirements go to fundamental

9  questions about judicial authority and separation of powers.

10          Without a specific factual scenario before the

11  Court, plaintiff in effect asks for a ruling that outlines in

12  advance when and in what circumstances in the future plaintiff

13  would have a right to violate the law.  That is exactly the

14  kind of advisory opinion that Article III does not permit, and

15  for that reason alone this case should be dismissed.

16          Turning to the merits, I'll take each claim in

17  turn.

18          On the free speech claim, first, it is helpful to

19  take a step back and focus on what it is this law actually

20  does.  The text of the statute is really quite simple.  Under

21  code section 2.2-3904, any business that offers or holds out to

22  the general public goods or services may not refuse or deny

23  those goods or services to an individual on the basis of

24  several protected characteristics, including sexual

25  orientation.  This provision is primarily directed at conduct.

1          All it says is that public accommodations may not

2   refuse to serve certain customers for discriminatory reasons.

3   And the First Amendment has never applied to grant a blanket

4   exemption from government regulation to businesses that rely on

5   creative or artistic skill to create the products they sell.

6   To follow plaintiffs' logic would lead -- would leave a broad

7   swath of the commercial marketplace free to discriminate

8   however they see fit.

9          Nothing about this provision drags plaintiff or his

10  business into the public's sphere, nor does it require him to

11  take photos in a certain way or affirmatively offer particular

12  services.  All the law requires is equal treatment among the

13  services plaintiff chooses to provide.  Whatever is offered to

14  some must be offered to all.

15         That is why contrary to plaintiffs' arguments, this

16  is not a compelled speech case.  The state is not forcing

17  plaintiff to say anything, the way the students in *Barnette*

18  were forced to say a pledge and salute the flag.

19         That is also why plaintiffs' comparison to

20  newspaper and free press cases falls flat.  Making it unlawful

21  to deny service at a hotel or a florist for a discriminatory

22  reason, simply not the same as telling a newspaper what it must

23  print.

24         The way the law works also shows why it is not

25  based on viewpoint.  Under section 2.2-3904, it does not matter

1  what a business owner believes or does not believe about

2  religion, morals, politics, or anything else.  Whatever the

3  owner's motivation, he may not discriminate against customers

4  on the basis of protected characteristics, no matter the

5  reasoning behind that decision.

6          Second, on the free speech claim, despite

7  plaintiffs' insistence to the contrary, the Supreme Court's

8  decision in *Hurley* is not on point.  That case arose from

9  Massachusetts public accommodation law being applied in what

10 the Court called a peculiar way, which had the effect of

11 declaring the parade organizer's speech itself to be the public

12 accommodation.  The Court explained that it was this particular

13 interpretation of the state law that drove the outcome of the

14 case, and that is why *Hurley* is the exception and not the rule.

15         We also know that *Hurley* does not control, because

16 if it did, the *Rumsfeld v. FAIR* case would have come out the

17 other way and that would have been the end of the matter in

18 *Masterpiece Cakeshop*.  If *Hurley* meant, as plaintiff contends,

19 that public accommodation laws may not constitutionally be

20 applied where potentially expressive activity is involved, then

21 the underlying law in *Masterpiece* would have been invalid and

22 the Court would have had no reason to examine the statements

23 from the enforcement proceedings there that ultimately decided

24 that case.

25         For all of these reasons, *Hurley* does not win this

1    case for plaintiff.  Instead, cases like *Jaycees, FAIR, and*

2    *Pittsburgh Press*, all of which upheld anti-discrimination rules

3    against First Amendment challenges, should guide this Court's

4    analysis.

5            Turning next to the religion claim, the Supreme

6    Court's decision in *Employment Division versus Smith* is binding

7    and it is dispositive.  Under *Smith*, which remains the law of

8    the land, unless and until it is overturned by the Supreme

9    Court, a law that is neutral and generally applicable does not

10   raise any problem under the First Amendment even if that law

11   may have the incidental effect of burdening certain religious

12   practices.

13           Section 2.2-3904 meets both of these requirements.

14   It is neutral because it does not single out or target only

15   religious conduct for regulation.  Instead, the broad

16   nondiscrimination rule applies uniformly to all places of

17   public accommodation.

18           The law is also generally applicable for the same

19   reason the law is not based on viewpoint.  The state has

20   pursued its interest in rooting out discrimination without

21   regard to whether that conduct is or is not motivated by

22   religious belief.  Plaintiffs' other arguments on the religion

23   claim are either inconsistent with *Smith* or based on theories

24   that have not been recognized in this circuit and fail for

25   those reasons as well.

1        Finally, even if you disagree with us on either

2   claim on the merits, the result is not that the law must fall.

3   All it means is that strict scrutiny applies.  And even though

4   this may be a high bar, the Virginia Values Act clears it.  The

5   Supreme Court has already held in the *Jaycees* case that

6   eliminating discrimination in public accommodations is a public

7   interest of the highest order.  That is the same interest here,

8   and it is no less compelling.

9        The law is also narrowly tailored to achieve that

10  interest.  To carve out a patchwork of exemptions, as plaintiff

11  proposes, would undermine the goal at the heart of this law to

12  ensure that no one is refused service or turned away because of

13  who they are.  Where, as here, the state's interest is to

14  prohibit all discrimination, not just some.  Allowing

15  discrimination to exist in certain circumstances frustrates

16  rather than furthers that interest.

17       Your Honor, I have a few points to make on the

18  preliminary injunction motion as well.  Would you like me to

19  wrap up with those now or wait till after?

20       THE COURT:  You can go ahead.

21       MS. SAMUELS:  Okay.

22       I'll wrap up by noting that if the Court were to

23  deny our motion to dismiss, plaintiffs still would not be

24  entitled to the preliminary injunction they seek.  For all of

25  the reasons I've already discussed, plaintiff has failed to

1   show a likelihood of success on the merits, as would be

2   necessary for this Court to enter an injunction.

3           In addition to that, though, for this Court to

4   grant such an extraordinary remedy, it is plaintiffs' burden to

5   prove the other injunction factors as well.  Even if the Court

6   decides that plaintiff has done enough to plead a justiciable

7   case in controversy and even if this Court accepts plaintiffs'

8   legal arguments on the merits, plaintiff has still failed to

9   carry his burden as a factual matter under the second winter

10  factor, which is likelihood of irreparable harm.

11          The record before this Court does not prove that

12  the plaintiff is likely to face any harm, much less harm that

13  is irreparable in nature.  For one thing, the law has not been

14  enforced against the plaintiff, and plaintiff has offered no

15  evidence to show a credible fear that it will be.

16          There is also no evidence that plaintiff has ever

17  been approached by a same-sex couple seeking photography

18  services for their wedding, nor is there anything in the record

19  that would support the inference that a same-sex couple will

20  request plaintiffs' services anytime soon.  If this situation

21  plaintiff hypothesizes never comes to be, it is hard to

22  understand how he is currently experiencing irreparable harm.

23          Without any record evidence showing that

24  irreparable harm is likely in the absence of an injunction,

25  plaintiff has failed to carry his burden in seeking that

1   affirmative relief.  Even if this case is to proceed, this

2   Court should not on this record take the extraordinary step of

3   enjoining the law at this stage of the litigation.

4           Thank you for your time this morning, Your Honor.

5   If there are no questions, we would ask that the Court deny the

6   preliminary injunction and dismiss the complaint in its

7   entirety.

8           THE COURT:  All right.  Thank you.

9           MR. WIDMALM-DELPHONSE:  Good morning again, Your

10  Honor.  Again, my name is Johannes Widmalm-Delphonse.  I just

11  want to briefly address standing, and then my colleague,

12  Mr. Scruggs, will address the merits of our claim for the

13  motion to dismiss and the preliminary injunction motion.

14          THE COURT:  Very well.

15          MR. WIDMALM-DELPHONSE:  Thank you, and may it please

16  the Court, Your Honor.

17          In the pre-enforcement context to show standing,

18  plaintiff need only establish three things:  He intends to

19  engage in the course of activity arguably effective with a

20  constitutional interest, that that activity is arguably

21  prescribed by the law, and that he faces a credible threat of

22  prosecution for engaging in that activity.  And here, the

23  Commonwealth does not dispute the first two factors, as the

24  Court need only decide the credible threat of prosecution.

25          Your Honor, there is such a threat here.  And the

1  Court can arrive at that conclusion any number of ways, but
2  really there's just two things that the Court needs to know to
3  find a credible threat here.

4  First, in the Fourth Circuit, cases like *North
5  Carolina Right to Life*, *Preston v. Leake*, *Kenny v. Wilson*, a
6  slew of Fourth Circuit cases have all said that where the text
7  of a non-moribund statute facially restricts the expressive
8  activity that a plaintiff wants to engage in, courts simply
9  presume that there's a credible threat of enforcement.

10  And we have that here.  This is a recent statute.
11  It was passed six months ago.  And the plain text of the
12  statute prohibits Mr. Updegrove from doing any of the things
13  that he wants to do.  He can't post a statement on his website
14  explaining his religious beliefs about weddings and that he
15  will only celebrate weddings between one man and one woman
16  because that would violate the publication clause.

17  He can't ask clients who come to him if they seek
18  his services to celebrate a wedding that he can't fulfill
19  consistent with his beliefs because that would violate -- that
20  would be an attempt to decline services in violation of the
21  law.  He can't adopt the -- his editorial policy or simply have
22  it be his practice to only celebrate weddings between one man
23  and a woman and decline to celebrate same-sex weddings because
24  that would be a pattern or a practice of resistance to the
25  right to the statute.

1            So, we have a recent statute that facially

2    restricts his expressive activity, and there's a presumption

3    that there's a credible threat of enforcement.  And nothing

4    that the Commonwealth has said here today or in the briefs

5    rebuts that presumption, which leads to my second point.  We

6    don't need to show that there's past enforcement.  We know that

7    because of cases like *Virginia v. American Booksellers*

8    *Association*, *Mobil Oil Corporation*, *Liberty University v. Lew*,

9    which all allowed challenges to statutes before the statute was

10   even enacted.  And we don't need to show that he's received the

11   request because he can violate the law right now.

12           And that's what this case comes down to because in

13   their briefs, and in court here today, the Commonwealth admits

14   that the law prohibits Mr. Updegrove from doing the things that

15   he wants to do, the speech that he wants to engage in.  They

16   concede that -- so, they admit that he can't do those things,

17   they defend their ability to enforce the law against him in

18   this way, and they haven't disavowed any intention of

19   prosecuting him should he do any of the things that he wants to

20   do.

21           That's it.  That's all the Court needs to find a

22   live case or controversy, and that puts this case squarely

23   within precedent, like *Virginia v. American Booksellers*

24   *Association* -- excuse me -- and *Mobil Oil Corporation*.

25           Mobil -- in *Mobil Oil*, for instance, the

1    Commonwealth made the same argument that they're making here

2    today.  They said, well, if plaintiff can't prove -- or they

3    can't show how this law would be enforced, so we don't know if

4    there's a live case or controversy.

5              And the Fourth Circuit said, no, if you haven't

6    disavowed, you haven't given us any reason to believe that the

7    law won't be enforced the way that it's written, and so we're

8    going to assume that there is a credible threat of enforcement.

9              And why wouldn't there be?  Why wouldn't they

10   enforce it the way -- the way that the law is written?

11             They've said in court here today and in their

12   briefs that they have a compelling interest.  They said, even

13   if the Court applies strict scrutiny, they have a heightened

14   interest in forcing Mr. Updegrove to celebrate weddings that

15   violate his beliefs so long as he remains in the wedding

16   industry and celebrate weddings between one man and one woman.

17             And, Your Honor, they actually said just the

18   opposite.  If -- if the Commonwealth comes into the courtroom

19   and attacks the substance or the merits of the plaintiffs'

20   claim, that's -- that creates the order of a case or

21   controversy is what the Court -- is what the Fourth Circuit

22   said in *Mobil Oil*.  And again, we have the exact same thing

23   here today.

24             So, Your Honor, there is a presumption of credible

25   threat.  The prosecutor -- the prosecution -- I'm sorry -- the

1 Commonwealth hasn't rebutted that presumption, and some

2 concluding thoughts.

3          I would just remind the Court about what the

4 practical effects of this are for Mr. Updegrove.  He can't post

5 a statement on his website to be upfront and transparent with

6 the public about the services that he provides.  He can't adopt

7 his editorial policy.  He can't simply have it be his practice

8 to only celebrate weddings between one man and one woman

9 consistent with his beliefs, so Mr. Updegrove is in a position

10 where he simply has to hope that no one comes to him and asks

11 for a service that he can't fulfill.  And if they do, he is in

12 a position where he has to choose between violating his beliefs

13 or violating the law, something that no one should be in a

14 position to have to choose between.

15          And if he violates the law in any of the ways that

16 I've just talked about, he could face a lawsuit by a private

17 citizen who feels aggrieved by his actions or the Attorney

18 General could file their own complaint without waiting for

19 someone to come to them complaining that Mr. Updegrove wouldn't

20 celebrate their wedding.  And in that lawsuit he could face

21 fines and fees of up to $50,000 for a first-time violation and

22 $100,000 for a second violation.  So, every day that he lacks

23 clarity about what this law does and how it affects him is --

24 he's operating under a cloud of uncertainty and risking his

25 entire business.

1          Your Honor, I would just conclude by also reminding

2    the Court that other courts have found standing in cases just

3    like this one where creative professionals brought

4    pre-enforcement challenges against public accommodation laws

5    that threatened to force them -- to compel or restrict their

6    speech in the wedding context, whether it be the Eighth Circuit

7    in *Telescope Media Group*, whether it be the Arizona Supreme

8    Court in *Brush & Nib Studio*, or whether it be the Western

9    District of Kentucky in *Chelsey Nelson Photography*.  All of

10   those courts found standing in cases just like this one.

11          So, Your Honor, unless there's any other

12   question -- unless you have any questions, I will turn over to

13   Mr. Scruggs to address the merits of our claim.

14          THE COURT:  Very well.

15          MR. WIDMALM-DELPHONSE:  Thank you.

16          MR. SCRUGGS:  Thank you.  Good morning, Your Honor,

17   and may it please the Court.  As my colleague noted, my name is

18   Jonathan Scruggs, and I'll be talking about the merits issues

19   today.

20          Your Honor, the motion to dismiss and motion for a

21   preliminary injunction raised a whole host of interesting

22   merits issues, and we might be all -- all day here to discuss,

23   so I want to focus -- and of course I'm happy to answer

24   questions about any of those things, but I want to focus my

25   affirmative discussion on the compelled speech issue since it

1   seems to be the topic of major discussion here this morning.

2           And regarding your -- that matter, Your Honor, I

3   think there are three important points that the Commonwealth

4   has not disputed.  First, that Mr. Updegrove's photographs are

5   protected speech; second, that Mr. Updegrove -- Updegrove's

6   photograph -- weddings photographs convey a message celebrating

7   the particular wedding and particular marriage being

8   photographed; and third, that Mr. Updegrove actually creates

9   himself and exercises editorial control over these photographs.

10  Your Honor, those points are decisive under the *Hurley* case --

11  it's been talked about -- and also the *Billups* case that the

12  Fourth Circuit recently issued just this past year.

13          As *Hurley* shows, public accommodation laws that --

14  public accommodation laws cannot compel someone to speak a

15  message that they disagree with, that violates their beliefs.

16  And *Billups* shows that although a law that facially -- that a

17  law that facially regulates business conduct can still regulate

18  speech as applied.

19          Well, here, Your Honor, we have protected speech,

20  as I noted, and although the accommodations clause facially

21  regulates conduct, the effect of that clause here is still to

22  force Mr. Updegrove to create speech, create and convey speech,

23  convey in a message he disagrees with.  And, Your Honor, that

24  means essentially what is going on is unconstitutional

25  compelled speech, but it's important to stress that this

1  conclusion in no way impedes the Commonwealth's ability to

2  accomplish any legitimate interest.  The Commonwealth can still

3  stop actual status discrimination by hotels, by restaurants,

4  and by every other business without forcing Mr. Updegrove to

5  speak a message he disagrees with.

6          Mr. Updegrove serves clients regardless of their

7  status, including those in the LGBT community.  He just simply

8  cannot convey certain messages for anyone no matter who has

9  asked him to do so, whether that be photographs belittling

10  others, demeaning others, whether that be photographs as we put

11  in the record of voodoo themed weddings or satanic themed

12  weddings.  Well, that's true for weddings celebrating same-sex

13  marriages.  He won't convey, create photographs celebrating

14  that message for anyone.

15          In contrast, Your Honor, the Commonwealth's theory

16  really has no limiting point.  It would allow the government to

17  use anti-discrimination laws to force paid speakers to convey

18  any message they disagreed with, whether it be Mr. Updegrove

19  here or even foreseeing an LGBT artist to create artwork

20  criticizing same-sex marriage, or as the Eighth Circuit noted

21  that nothing prevents the Commonwealth from making political

22  belief a protected class and thereby then forcing a democratic

23  or republican speech writer to create campaign speeches, write

24  campaign speeches for a candidate that they disagree with.

25          The First Amendment simply doesn't allow that, Your

1   Honor, and for good reason in our pluralistic society.  So

2   those are kind of the general principles.  I want to dig a

3   little bit deeper into *Hurley* and *Billups* and kind of explain

4   some points in response to my friend's arguments.

5             First, and then second, we'll explain how the Court

6   should weigh the competing interest in this case.  And again, I

7   think *Hurley* and *Billups* guide that analysis.

8             So first, as has been noted, *Hurley* involved a

9   public accommodation law.  And as my friend correctly quoted,

10  even though that law facially regulated conduct and facially

11  was appropriate, that as applied the Court said, you can't

12  apply public accommodation to speech itself to alter the

13  expressive content of speech.

14            Well, here, Your Honor, photographs, as I noted,

15  are protected speech.  Photographs are more expressive than a

16  parade.  In a parade, people are marching and walking.

17            Courts have said that photographs are inherently

18  expressive, so that logic applies here, that because the

19  accommodations clause is applying to these photographs, to

20  change their content to change their message from celebrating

21  an opposite sex wedding to celebrating a same-sex wedding, that

22  we fall right under the -- the logic of *Hurley*.

23            Now, my -- my friends would argue, well, the law

24  here doesn't regulate anything.  It doesn't regulate what types

25  of photographs that Mr. Updegrove writes or how he does his

1  photography or anything like that.

2         Well, Your Honor, again, that's true on its face,

3  but not as applied.  If we look at the actual as applied

4  application, it literally forces Mr. Updegrove to change the

5  content of his photographs.

6         The same thing could have been said in *Hurley*, Your

7  Honor.  The law in *Hurley* didn't tell the parade organizers

8  what color of floats to use or didn't tell them what direction

9  to go in the parade, and not on its face but as applied it

10  certainly did.  It forced them to admit a banner that they

11  didn't want to admit into the parade and that altered the

12  expressive content.

13         And it cannot be said, Your Honor, that *Hurley* only

14  applies to nonprofits.  Well, *Hurley* itself said that these

15  principles of speaker autonomy apply to, quote, business

16  corporations generally as well as professional publishers,

17  unquote.

18         Well, Your Honor, that's just what is happening

19  here.  And I think especially -- this is where *Billups* comes

20  in, which is the Fourth Circuit decision, which helps us,

21  because *Billups* involved a law that facially regulated business

22  conduct.  It applied to paid tour guides to require a license

23  for paid tour guides.  And the City of Charleston came to court

24  making the exact same argument that the Commonwealth is making

25  now that, hey, this law only regulates business conduct, that

1   it only has an incidental burden on speech, that there's no

2   speech at all being regulated.

3        But the Fourth Circuit rejected that argument

4   expressly citing cases like *Holder versus Humeri --*

5   *Humanitarian Law Project* and said, look, because the law is

6   regulating an inherently expressive median speaking about the

7   City of Charleston, that would trigger First Amendment

8   scrutiny.

9        Well, Your Honor, I think that logic applies

10   squarely here, and let me give an example.  I think there's

11   some confusion over how facial versus as applied works out, and

12   I think a simple example can prove our point.

13        Let's take a law like a labor law that regulates

14   child labor, says no child labor by any business.  That lie --

15   that law applies across the board and it can apply to a

16   business that creates speech, such as a wedding photographer,

17   and that would be totally fine.  But when that law is applied

18   to the wedding photographer, that law doesn't alter or tell the

19   photographer in application what photographs that photographer

20   must create or not create or what content must be put in those

21   photographs.  That law -- law applies across the board and

22   applies regardless of what photographs the photographer makes

23   and doesn't affect anything in the photographs.

24        We can make a stark contrast to the law here as

25   we've put those pictures in our brief highlighting essentially

1  the difference in how this law plays out when applied to
2  Mr. Updegrove.

3       A second point that I think highlights why this law
4  is different is that labor law example.  Again, it doesn't --
5  it applies regardless of what type of photographs the
6  photography studio wants to create or doesn't want to create.

7       Here, in contrast, Your Honor, the only reason the
8  law is triggered, the only reason the liability is triggered to
9  force Mr. Updegrove to create photographs celebrating a
10 same-sex wedding is because he wants to create and does create
11 wedding photographs celebrating the opposite sex marriage,
12 opposite sex wedding.

13      So, you see, the law is triggered by the content.
14 If Mr. Updegrove, say, stopped all wedding photographs and only
15 photographed businesses, there would no -- be no obligation
16 under the law to create photographs celebrating the same-sex
17 marriage.  It's only because he creates photographs celebrating
18 an opposite sex marriage that the law is triggered and applied.
19 And that brings, again, the case straightly under principles
20 like *Billups* and like *Holder*.

21      It's important to stress, Your Honor -- and these
22 principles are not new.  The U.S. Supreme Court has applied
23 this logic consistently for the past 80 years.  There have been
24 numerous Supreme Court cases that involve laws regulating
25 conduct, but the Supreme Court strikes down their application

1    as applied when they apply to speech.

2              One of the first First Amendment cases, Your Honor,

3    *Cantwell versus Connecticut*, was that logic.  It involved a

4    breach of the peace statute, or probably maybe more famously

5    *Cohen versus California*.  It involved a breach of the peace

6    statute that regulated conduct on its face, but the Court

7    applied strict scrutiny because in that situation it was

8    applied.  It was triggered by the expressive content of the

9    jacket.

10             So, respectfully, Your Honor, the Commonwealth's

11   position runs in conflict with all these cases that date back

12   not just in the Fourth Circuit, but the U.S. Supreme Court for

13   a while.

14             So, I think we see *Hurley* and *Billups* provide a

15   fair amount of guidance here and explains what they apply, and

16   that's exactly why we have cases that we've cited outside the

17   circuit like the Eighth Circuit *Telescope Media* case; the

18   Arizona Supreme Court, the Russian dip (phonetic) case; the

19   recent photographer case out of the Western District of

20   Kentucky.  All these cases apply this logic from *Hurley* and

21   *Holder versus Humanitarian Law Project* and say, you can't force

22   a creative professional to celebrate marriages -- celebrate

23   same-sex marriages.  So, we see those kind of general

24   principles.

25             Now that we see that the First Amendment kicks in

1   and strict scrutiny applies under the logic of these cases, I
2   want to talk a little bit about how that plays out in the
3   balancing of interest.  And as I noted, Your Honor, the state
4   might have a general compelling interest in play, but that's
5   not the question.  The question is, can they justify compelling
6   Mr. Updegrove in this particular application?
7              In *Hurley*, the Court didn't say, well, let's look
8   at the public accommodation generally and does it serve a
9   compelling interest.  The Court said, is there a compelling
10  interest to regulate this parade.
11             And again, I'd note the Court to look at the
12  *McManus versus Washington Post* [sic] case, the Fourth Circuit
13  case.  In that case, the Fourth Circuit in -- really analyzed
14  the law that was compelling online platforms to publish ads.
15  And in the -- even in intermediate scrutiny, the Court there
16  didn't say, well, what's the compelling interest generally.
17  The Court said, what's the compelling interest to apply this to
18  the plaintiffs, which were the newspapers in that situation.
19             So the compelling interest analysis is fact
20  specific to these plaintiffs.  We're not seeking a facial
21  challenge in our preliminary injunction motion, Your Honor.  We
22  are only seeking an as applied challenge to protect Mr.
23  Updegrove.
24             And it goes back to the simple principles I noted
25  before.  Mr. Updegrove doesn't discriminate based on status.

1   He -- he chooses what messages he wants to speak, like in the

2   *Hurley* case.

3          I think the principle would be similar, Your Honor,

4   if you take a Muslim -- a calligrapher.  That person might

5   serve Christians generally, but he might have a general rule, I

6   don't write the statement Jesus is Lord on a banner for

7   anybody, no matter who asks me to do so.

8          Well, that's not status discrimination, Your Honor.

9   That's just a speaker choosing what he or she wants to say.

10  And that same type of logic applies perfectly here.  It's a

11  logic that was adopted in *Hurley*.  *Hurley* said, look, in that

12  situation the parade organizers allowed LGBT persons to walk in

13  the parade, but they just couldn't celebrate a message they

14  disagreed with, the banner that said gay, lesbian, bisexual

15  organization of Boston, because it conveyed a message they

16  disagreed with.

17         So, Your Honor, there's no interest, legitimate

18  interest at least, under *Hurley* to actually apply this law to

19  Mr. Updegrove to force him to speak a message he disagreed

20  with.  Secondarily, Your Honor, there are many other options

21  the city has.  We've put forth a lot of -- or the County -- or

22  the Commonwealth has, excuse me.  We've put forth those options

23  in our brief.

24         And the Commonwealth comes back and says, look,

25  they're not effective.

1        But look at the *Billups* decision, Your Honor.

2   *Billups* says under even intermediate scrutiny the government

3   can't just say they're not effective.  The government's burden

4   is to provide actual evidence that they considered or tried

5   those alternatives, and those alternatives are not effective.

6        Your Honor, there is absolutely nothing in the

7   record to suggest that, and *Billups* provides the guidelines to

8   say, that fails the standard.

9        Your Honor, so those are kind of my -- my major

10  points.  And I would like to note finally that in weighing

11  these burdens this is a situation where the Commonwealth can

12  have its cake and eat it too.  Right?  Because the Commonwealth

13  can actually stop status discrimination in so many different

14  applications all across the board, it can allow speakers to

15  choose what they -- they want to say.

16        The burden on a speaker, as the Supreme Court has

17  recently said in cases like *Janus* and further back in *Hurley*

18  and the *NIFLA* decision, that forcing someone to speak a message

19  they disagreed with is always demeaning, the Court said, and

20  that it, quote, violates a cardinal constitutional requirement,

21  and in most circumstances would be universally condemned.  And

22  that's because if the First Amendment means anything, as the

23  Court has said, it means that speakers get to choose what they

24  want to say.  That infringing on editorial control and

25  editorial discretion strikes at the heart of the doctrine, and

1   the doctrine is to protect the individual freedom of mind and

2   speaker autonomy.

3         And, Your Honor, the First Amendment says that

4   speakers get to make that choice, not the government.

5         So, unless the Court has any questions for me, I

6   will go ahead and sit down.

7         THE COURT:  All right.  Thank you.

8         MR. SCRUGGS:  Thank you, Your Honor.

9         THE COURT:  Do you want 30 seconds?  I've heard a lot

10  of argument here this morning, but go ahead if there's

11  something you really want to tell me.

12        MS. SAMUELS:  Thank you, Your Honor.  I'll be very

13  quick.

14        I just have three points in reaction to plaintiffs'

15  arguments.  The first is on the justiciability point, which is

16  just to note that all of the reasons the plaintiff offers here

17  for why the Court should take up this challenge and has

18  jurisdiction are exactly the same as any other pre-enforcement

19  challenge, so to accept those arguments would be to eviscerate

20  the Article III limitations about what we look to when a law

21  hasn't been enforced.  And recent cases from the Supreme Court,

22  like *SBA List*, which we think controls, shows that you have to

23  have a credible threat of enforcement.

24        Plaintiff tries to replace the standard with older

25  cases like *Mobil Oil* from 1991 and references to presumptions

1  about non-moribund statutes.  But what that boils down to, Your

2  Honor, is under plaintiffs' theory that a law is on the books

3  at all would -- would invoke this Court's jurisdiction where

4  it's never been enforced and where there's no harm, and so

5  to -- to accept that standard again would be to completely gut

6  this test that the Supreme Court laid out in *SBA List* and that

7  the Fourth Circuit has continuously applied since.

8          One last point on justiciability, Your Honor, is

9  that the publications clause point that plaintiff raises about

10  the statements that Mr. Updegrove would like to post on his

11  website, in the briefing plaintiff has conceded that the claims

12  about what Mr. Updegrove may or may not post or say all

13  collapses into the question of whether he can or cannot decline

14  to photograph same-sex couples.  Those -- those questions rise

15  and fall together, and so the way this case has been argued,

16  and also the constitutional merits of the question, those are

17  linked, and so there's no reason to split that out for the

18  justiciability analysis when -- when plaintiffs aren't even

19  splitting that out on the merits.

20          I'll also, Your Honor, just make one -- one note

21  on -- or three notes briefly on lines that plaintiffs blur in

22  the doctrine that I think it's very important to keep separate.

23  And the first is that line between speech and conduct.

24          Plaintiff here has spent a lot of time talking

25  about the *Billups* case, but *Billups* was not an

1  anti-discrimination case and so we have to understand that is a

2  speech case.  But -- but this is an anti-discrimination case

3  that of course affects speech principles, but -- but *Billups*

4  does not control.  Cases like *Jaycees* where we were looking at

5  an anti-discrimination public accommodations law are -- are a

6  better model.

7          *Billups* is also helpful because it shows what this

8  law does not do.  What *Billups* did was went straight to the

9  heart of an expressive activity, literally speaking on a public

10 sidewalk giving a public tour.  The law here says nothing about

11 what the plaintiff must say.  All it says is that when he

12 chooses to enter commerce and when he chooses to photograph

13 weddings, he cannot turn down couples seeking his services on

14 the basis of protected characteristics.

15          And that -- that distinction, Your Honor, between

16 being a public accommodation and not is the other line that

17 plaintiff blurs.  All of these hypotheticals that -- that

18 plaintiff offers if you zoom out and start with:  Is this

19 business a public accommodation, what service is being asked,

20 and is that being provided to others, and why did this service

21 get turned down.  Those hypotheticals turn on different

22 questions all along the way.  And so to offer examples like a

23 Muslim calligrapher, you need to look at:  What is that

24 service, who is asking for it, what is provided elsewhere, and

25 why is it being denied.  And so those hypotheticals collapse

1    all of these important questions onto each other.

2              The last point I'll make on the expression point,

3    Your Honor - and this is probably the most important one - is

4    that all of plaintiff's argument assumes that the photographs

5    he is taking on a commission basis of other couples' weddings

6    are not his speech; they're not his message.  And this point

7    was dispositive in the *Rumsfeld v. FAIR* case because if all

8    this came down to is when plaintiff opens his mouth the First

9    Amendment insulates him from any government regulation, all of

10   the other cases would have come out the same way.  Cases

11   like -- come out the other way.

12             Cases like *Ward versus Rock Against Racism*.  If all

13   that mattered was that those concerts were speech, then that

14   would be the end of it.  And we know that that's not how that

15   case turned out.  It upheld a regulation, government regulation

16   of expression.

17             And so the question about whether it is plaintiff's

18   message and whether it is his message he is conveying with his

19   speech ignores the fact that he is holding himself out to the

20   general public to take photographs of all number of people at

21   all number of events at all number of weddings, and that is not

22   his message.  In the same way that the law schools in *FAIR* by

23   being required to accommodate the military recruiters were not

24   using their expression to convey their message about the -- the

25   good or evil of military policy at the time.

1        I'll just wrap up, Your Honor - thank you for your

2   patience this morning - by saying that the -- the interest at

3   play here are, again, plaintiff would like to ignore that this

4   is an anti-discrimination case.  Of course speakers can choose

5   what they want to say, but the government also can prohibit

6   discrimination, the conduct of discriminating against somebody.

7   Governments have done that for over a century, and the Court's

8   decision here should be no different.

9        Thank you.

10       THE COURT:  All right.  Thank you.

11       I'm going to look at this a little further.  I'll

12  get you-all an answer as quickly as I can.

13       MS. SAMUELS:  Thank you, Your Honor.

14       THE COURT:  And we'll adjourn until Monday morning at

15  9:30.

16       THE LAW CLERK:  All rise.

17       (PROCEEDINGS CONCLUDED AT 10:47 A.M.)

18                        -o0o-

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA    )

3

4           I, JULIE A. GOODWIN, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the record of proceedings in the above matter, to the best

8  of my ability.

9           I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action in

11 which this proceeding was taken, and further that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14           Certified to by me this 3RD day of JUNE, 2021.

15

16

17

18                       __/s/_____

                         JULIE A. GOODWIN, RPR
19                       Official U.S. Court Reporter
                         401 Courthouse Square
20                       Eighth Floor
                         Alexandria, Virginia  22314
21

22

23

24

25